# EXHIBIT V

# ORIGINAL

UNITED STATES DISTRICT COURT

EASTER DISTRICT OF NEW YORK

------------------------------------------------x

RASHIKA N. HETTIARACHCHI,

                      Plaintiff,

        - against -

COUNTY OF SUFFOLK, SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE, DISTRICT ATTORNEY, THOMAS J.
SPOTA, in his individual and official capacity,
CHIEF DISTRICT ATTORNEY, EMILY CONSTANT, in her
individual and official capacity, DIVISION CHIEF
EDWARD G. HEILIG, in his individual and official
capacity, BUREAU CHIEF EDWARD JABLONSKI, in his
individual and official capacity, BUREAU CHIEF
MAUREEN McCORMACK, in her individual and official
capacity, BUREAU CHIEF KERIANN KELLY, in her
individual and official capacity, DEPUTY BUREAU
CHIEF NANCY CLIFFORD, in her individual and
official capacity and DEPUTY BUREAU CHIEF JAMES
CHALIFOUX, in his individual and official
capacity,

                      Defendants.

Docket No.: CV2:14-06731-DRH-ARL

------------------------------------------------x

                556 Peninsula Boulevard
                Hempstead, New York

THOMAS J. SPOTA

                January 12, 2018
                2:10 p.m.

        REALTIME REPORTING, INC.
    124 East Main Street, Suite 202
      Babylon, New York 11702
          516-938-4000
      www.realtimereporting.com

1

2          Deposition of the Defendant, THOMAS

3     J. SPOTA, pursuant to Notice, before Deborah

4     Rozea, RPR, a Notary Public of the State of

5     New York.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A P P E A R A N C E S:

LAW OFFICES of FREDERICK K. BREWINGTON

Attorneys for Plaintiff

        556 Peninsula Boulevard

        Hempstead, New York 11550

BY:  FREDERICK K. BREWINGTON, ESQ.


PUTNEY, TWOMBLY, HALL & HIRSON, LLP

Attorneys for Defendants

        521 Fifth Avenue

        New York, New York 10175

BY:  MARY ELLEN DONNELLY, ESQ.

1

2          IT IS HEREBY STIPULATED AND

3     AGREED by and between the attorneys

4     for the respective parties herein,

5     that the filing, sealing and

6     certification of the within deposition

7     be waived.

8          IT IS FURTHER STIPULATED AND

9     AGREED that all objections, except

10    as to the form of the question,

11    shall be reserved to the time of the

12    trial.

13         IT IS FURTHER STIPULATED AND

14    AGREED that the within deposition

15    may be sworn to and signed before

16    any officer authorized to administer an

17    oath with the same force and effect as

18    if signed and sworn to before the

19    Court.

20

21              - oOo -

22

23

24

25

T H O M A S   J.   S P O T A,  called as a
        witness, having been duly sworn by a
        Notary Public, was examined and
        testified as follows:
EXAMINATION BY
MR. BREWINGTON:
        Q.      Please state your full name for
the record.
        A.      Thomas J. Spota.
        Q.      What is your address?
        A.      Little Harbor Road, Mt. Sinai,
New York 11766.
        Q.      Mr. Spota, as you probably know
I'm an attorney representing Rashika
Hettiarachi in an action where you're named as
a Defendant --
        A.      Yes.
        Q.      -- as well as other individuals
and entities.
                I'm going to be asking you some
questions today concerning that case, and I'm
also going to be asking you some questions
relating to any information that you may have
that is pertinent to the facts and information

2       in that case.

3                 If at any point you don't

4       understand the question as I pose it, let me

5       know that, and I'll try and rephrase it.  And

6       if you don't hear the question even though

7       we're in fairly close quarters, let me know

8       that as well, and I will try and speak up.

9                 If we need to we can have the

10      question read back.  We have an expert court

11      reporter here who is taking down everything

12      that's said.

13                Along those lines, and I probably

14      don't need to tell you, but I'm going to need

15      you to respond verbally to each of the

16      questions as they're posed --

17           A.     Yes.

18           Q.     -- so that we have a clear record

19      as to what your response is.

20                I'm going to ask you to make sure

21      that you have the question squarely before you

22      before you respond to a question.

23                All right?

24           A.     Yes.

25           Q.     And if you need the time to speak

to your attorney who's seated to your right or

for any other purpose, a comfort break or

otherwise, please let me know, and I'll try

and abide by that as quickly as I can.

          If there's a question that's

pending, I'm going to ask that you try and get

a question and answer on the record, if

possible.  If we can't do that, Ms. Donnelley

and I will work that out, and figure out how

to do that.

          A.     Okay.

          Q.     All right?

          A.     Sure.

          Q.     Now, sir, what was your last

employment, please?

          A.     The Suffolk County District

Attorney's Office.

          Q.     And currently is there any

employment which is ongoing?

          A.     No.

                 They call it retirement.

          Q.     Yes.

          A.     Although I have had some offers.

I may do some part-time, small work.

1

2          Q.       Okay.

3          A.       I'm not sure yet.

4          Q.       But you actually retired from the

5    District Attorney's Office?

6          A.       Yes.

7                   From the -- yes.

8          Q.       From the County?

9          A.       From the County of Suffolk.  Yes.

10         Q.       And the last position that you

11   held for the record, please?

12         A.       District Attorney.

13         Q.       How long did you hold that

14   position?

15         A.       Sixteen years.

16         Q.       And was that an elected position?

17         A.       Yes.

18         Q.       So, would it be accurate to say

19   you were elected in 2001?

20         A.       November of 2001.

21         Q.       And can you tell us, please, what

22   is your highest level of education?

23         A.       Law school and some graduate law

24   school, NYU, interrupted by military service.

25         Q.       Okay.

1

2              So, is your degree a juris

3    doctor?

4         A.    Yes.

5         Q.    And from what institution is

6    that?

7         A.    St. John's University.

8         Q.    And when did you achieve that

9    goal?

10         A.    1966.

11         Q.    And after you received your juris

12    doctor, you said you got some additional

13    formal training in the area of law; is that

14    correct?

15         A.    Yes.

16         Q.    What was that, and where was

17    that?

18         A.    It was New York University School

19    of Law.

20              It was very short.  It was

21    probably -- I'm trying to recall.  Maybe a

22    semester and a half or so.

23         Q.    And was that in an LLM program?

24         A.    Yes.

25         Q.    And you said it was interrupted.

          What was it interrupted by?

     A.    The United States Marine Corps.

     Q.    They pull rank; don't they?

     A.    Yes, they do.

     Q.    And were you engaged in active
service in the United States Marine Corps?

     A.    Yes.

     Q.    For what period of time, please?

     A.    Well, it was originally the
reserves six months, but I did additional
time.

          We were activated.  So, I just
couldn't tell you altogether.

     Q.    Approximately how long?

     A.    I don't think more than a year.
Even less than that I would say.

     Q.    Okay.

          And what was the highest rank you
achieved in the --

     A.    Corporal.

     Q.    -- in the Marines?

     A.    Corporal.

     Q.    After your stint in the Marines,
did you enter the workforce?

A.    Yes.

Q.    In what way?

A.    I was in private practice with an attorney in Hicksville, Robert Corcoran, C-O-R-C-O-R-A-N.

Q.    And how long were you in private practice?

A.    I was in private practice until 19 -- the end of '71.

Q.    So, approximately five years?

A.    Well, no because I was in the service.

Q.    Okay.

A.    Probably about four years.

Q.    Okay.

A.    Three and a half to four years.

Q.    And what type of law did you practice?

A.    It was a variety.  Mostly Mr. Corcoran's practice was primarily real estate and SLA work.

Q.    And just for the record, SLA, what does that stand for?

A.    The State Liquor Authority.

1

2       Q.      That's when they actually had a

3   part in some of the Courts in the City --

4       A.      Yes.

5       Q.      -- they still had those things.

6       A.      Yes, that's right.

7       Q.      And after working with

8   Mr. Corcoran, did you change jobs?

9       A.      Yes.

10      Q.      And where did you go?

11      A.      To the Suffolk County --

12              Well, for a very short period of

13  time I was with the Town Attorney's Office for

14  the Town of North Hempstead.

15      Q.      And then?

16      A.      The Suffolk DA's Office.

17      Q.      And after getting to the Suffolk

18  County District Attorney's Office, did you

19  ever leave employment there?

20      A.      Yes.

21      Q.      Okay.

22              How long were you there after you

23  came from North Hempstead?

24      A.      Well, okay.

25              So, it was the very end of '71

until 1980, March of '82, and then they called

me back to try some additional murder cases.

Q.    Okay.

A.    Which took about another year.

Q.    Okay.

So, in 1982, did you go back out

into private practice?

A.    Yes.

Q.    And were you in practice alone or

with anyone else?

A.    Gerard Sullivan initially.

Q.    And then did you go back to the

DA's Office?

A.    Yes, they asked me to come back

to handle two hom -- murder cases.

Q.    And then after handling those two

murder cases, did your employment change?

A.    No.

Q.    Did you remain in the DA's

Office?

A.    No.

I was still in private practice,

but they were paying me as a special

prosecutor.

Q.    Oh, I see.

A.    Yes.

Q.    So, it was almost simultaneous when you were --

A.    Yes.

Q.    -- working with Mr. Sullivan?

A.    Yes.

      I'm sorry.

Q.    After you tried those two cases, did you remain in private practice?

A.    Yes, for a period of time.

Q.    And how long did you remain in private practice?

A.    Until November of 2001.

Q.    And what happened in November of 2001?

A.    That's when I ran for office, and was elected.

Q.    At any time while you were working in the DA's Office, did you serve in the capacity as a supervisor?

A.    Yes.

Q.    In what capacity and when?

A.    I was a Deputy Bureau Chief.  I

don't recall the year.

        Q.     Okay.

        A.     I was a Bureau Chief.

              And I was the Chief Trial
Prosecutor.

              This is during my initial --

        Q.     Yes.

        A.     -- period.  Yes.

        Q.     At any time before you were
elected --

        A.     Yes.

        Q.     -- to the position of the
District Attorney of Suffolk County?

        A.     Yes.

        Q.     That's what you were referring
to?

        A.     Yes.

        Q.     And the Deputy Bureau Chief, were
you the Deputy Bureau Chief over one or more
Bureaus?

        A.     I was the Deputy Bureau Chief of
one Bureau.

        Q.     What Bureau was that?

        A.     It was the Hom -- we called it

the Major Crime Bureau.

Q.    Major Crimes.

A.    No, I'm sorry, Major Offense
Bureau.  I'm sorry.

Q.    Major Offense.

A.    It was only homicides though.

Q.    And did you become Bureau Chief
of that same unit?

A.    Yes.

Q.    And then you were a Chief
Trial --

A.    Prosecutor.

Q.    -- Prosecutor.

Was that different from being a
Bureau Chief?

A.    Yes.

Q.    And was that for a different time
period?

A.    No, I was the Chief Trial
Prosecutor, and the Bureau Chief at the same
time.

Q.    Was that at Major Offenses as
well?

A.    Well, no, that would have

incorporated the Trial Bureaus.

        Oh, virtually all the Bureaus in the Office.

      Q.     Okay.

      A.     Other than Rackets Bureau.

        You know, there was one other Bureau, but I can't think of what it was though.

      Q.     Okay.

        If you want to, we'll leave a space, and if you remember, and you want to put it in.

      A.     Yeah, sure.

      Q.     Is that okay?

      A.     Yeah, sure.

      Q.     During your --

      A.     Oh, it was Narcotics.

      Q.     So, that was the other exception?

      A.     Yes.

      Q.     So, it would be Rackets and Narcotics?

      A.     And Narcotics, yes.

      Q.     So, we don't need to leave a line.  Very well.

1

2              Can you tell us, sir, during the

3      time that you served as Deputy Bureau Chief,

4      Bureau Chief and Chief Trial --

5              A.      Prosecutor.

6              Q.      -- Prosecutor, did you receive

7      training in any Human Resources area?

8              A.      I don't think so.  Not that I can

9      recall anyway.

10             Q.      I'm going to ask you:  Do you

11     know the name Rashika Hettiarachi?

12             A.      Yes.

13             Q.      And how do you know that name?

14             A.      She was employed by the Office

15     for a period of time.

16             Q.      Okay.

17             A.      As an Assistant District

18     Attorney.

19             Q.      And were you involved in her

20     hiring directly?

21             A.      No.

22             Q.      Did you have occasion during her

23     employment to be involved in evaluating her

24     work at all?

25             A.      Not really.  No, the answer would

be no.

Q.     And during her tenure with your
Office, did you have any direct contact with
her; that being in relation to her work that
she performed in the Office?

A.     Yes.

Q.     And what was that, please?

A.     Well, when she was transferred
from the District Court Bureau she went to the
Case Advisory Bureau.  I would have had some
interaction with her at that point.

And then certainly when she was
transferred from the Case Advisory Bureau to
Economic Crime Bureau I certainly would have
had interaction with her at that point.

And that's basically the
interaction that I had directly with her.

Q.     Okay.

And I was hearing, you said you
would have had interaction.

Let me ask you:  Do you have any
specific recollection of those interactions?

A.     The only one is the Case Advisory
Bureau, the promotion to the Economic Crime

Bureau.

        Q.      And do you recall when that was,
that you had --

        A.      No.

        Q.      -- that interaction?

        A.      No.

        Q.      But you do recall, have some
memory of that; is that accurate?

        A.      I have a vague memory because
there were so many Assistants.

        Q.      Sure.

        A.      I have a -- because I would meet
with them to tell them that they were being
promoted.

        Q.      Okay.

                And do you have any specific
recollections as to your interaction with
Miss Hettiarachi relating to her movement from
Case Advisory to Economics?

        A.      Yes.

        Q.      What do you recall?

        A.      Well, that's what I was referring
to before.

        Q.      Okay.

A.      Oh, just that I would meet with
her, and probably the Chief Assistant was with
me to speak to her, to tell her that she was
being promoted, and that she was going to a
particular Bureau.

Q.      And that would be who?  Who would
be the Chief Assistant?

A.      Emily -- let's see now.

Q.      Constant?

A.      It would depend upon the year.

My first Chief Assistant was John
Buonora, and then Emily Constant.

So, I can't tell you because I
don't recall what year that she was
transferred.

Q.      Okay.

Maybe as we go through some of
the documents if that helps you can tell us.

A.      Oh, yeah, sure.

Q.      And did you have occasion to
speak with Miss Hettiarachi at the end of her
work relationship with the District Attorney's
Office?

A.      No.

1

2      Q.    Okay.  I'm going to go through

3  some documents with you, if that's all right,

4  and ask you some questions relating to those,

5  and I'll try not to belabor it.  We've gotten

6  some other testimony from other folks

7  concerning these documents.  So, we'll see if

8  we can try, and move along in sequence.

9      Okay?

10    A.    Sure.

11      MR. BREWINGTON:  I'm going to ask

12      you to take a look at what's been

13      previously marked as Constant 4, and

14      we'll make this Spota 1, please.

15      (Plaintiff's Spota Exhibit 1,

16      copy of two-page document, first page

17      being a letter dated April 25, 2006 from

18      Jerry W. Matejka to Tom Spota and second

19      page being an Inter-Office

20      Communication, Bates Stamps D0140 and

21      D0141, marked for identification.)

22      (Handing.)

23      MS. DONNELLY:  You take the

24      official one.

25    Q.    This is a two-page document.  It

has Bates Stamps Numbers D0140 and D0141.

Let me just ask you: Do you have any recollection of ever having received this document back in or around 2006?

A.     No.

Q.     Okay.

And would it be unusual for you to receive letters concerning your Assistants when people thought that they were either doing a good job or maybe not doing a good job?

A.     Would it be unusual?

Q.     Unusual.

A.     For me to receive those letters?

Q.     Yes.

A.     I would receive them from time to time, sure.

I can't say it's unusual.

Q.     And with regard to the second page, it appears to be a memo from Mr. John Buonora, Chief Assistant District Attorney to Miss Hettiarachi.

In or about May of 2006 was he your Chief Assistant?

A.      Yes, he was.

Q.      So, we can set that document

right there (indicating).

        And in your Office, do you know

were there any programs that dealt with loan

forgiveness of students or people concerning

their student loans?

A.      We did not have such a program.

        The State -- the DA's Office did

not have that program.

        MR. BREWINGTON:  Let me ask you

to take a look at this document which is

marked as Constant 5.  We'll will make

this Spota 2 for identification.

        (Plaintiff's Spota Exhibit 2,

copy of letter dated March 8, 2011 from

Diane Stankewicz, Bates Stamp Number

D0092, marked for identification.)

        (Handing.)

Q.      First let me ask you:  Diane

Stankewicz --

A.      Yes.

Q.      -- did I pronounce that

correctly?

A.      Yes.

Q.      Do you know who she was or is?

A.      Yes.

Q.      And who was that?

A.      She worked in our Administrative,
Administration Office, and she was the head of
the office, of the Administration Office.

Q.      And this appears to be a letter
written from your Office in or about 2011,
March 8th, 2011 to the New York Higher
Education Services Corporation.

A.      Uh-huh.

Q.      And it has in the re, "District
Attorney Loan Forgiveness Program."

        Specifically, were you aware of
any such program as it's entitled there?

A.      Yes.

Q.      Can you please describe what that
was?

A.      Well, it's a program that is not
-- I don't know why it says District Attorney
Loan Forgiveness Program.  I can't account for
that, but it's a State program, and it's
administered by the State, and it's for

1

2      students who -- this is my recollection --

3      complete a period of time, service within the

4      Office, and some portion or all, I don't know,

5      of their loan is forgiven.

6           Q.      Okay, okay.

7                   And were you aware of that

8      program working for the benefit of some of

9      your Assistants at some point?

10          A.      I was aware that we had -- that

11     we didn't, but the State had such a program

12     and some of our stu -- I'm sorry, excuse me,

13     our employees had taken advantage of it.

14          Q.      Very well.

15                  And other than how you described

16     it, do you have any other formal knowledge

17     concerning that program?

18          A.      No.

19          Q.      You can place that there.

20                  MR. BREWINGTON:   I'm going to

21          show you what's going to be marked as

22          Spota 3 for identification, previously

23          identified as Constant 6.

24                  (Plaintiff's Spota Exhibit 3,

25          copy of document entitled Inter-Office

Communication Suffolk County District

Attorney's Office, dated October 2,

2012, Bates Stamp Number D0080, marked

for identification.)

(Handing.)

Q.     Sir, do you have that document

before you?

A.     Yes, I do.

MS. DONNELLY:  You take the

official one.

Q.     And this document that has the

Bates Stamp Number of D0080 is one that's

entitled, "Subject:  Transfers to all Bureaus

Chiefs and Unit Heads from Thomas J. Spota,

District Attorney."

First of all, are you familiar

with this document?

A.     Well, I don't recall it

particularly, but yes.

Q.     And are you familiar with this

form of document?

A.     Yes.

Q.     And how so?

A.     Well, it's, it's pretty much our

standard document when we had transfers within

the Office.

Q.      And this document has a date of

October 2nd, 2012.

A.      Yes.

Q.      As the date.

A.      Yes.

Q.      What was the process by which

people would be transferred?  Can you just

tell me, please, how did it come about that

decisions would be made that people would be

transferred?

A.      Well, it varied from Bureau to

Bureau.  Essentially it would be a decision

that was made in the lower, in the District

Court Bureau and the Case Advisory Bureau for

the most part when we had an opening in a

Trial Bureau or an Investigative Bureau.

        I would speak to the Bureau

Chiefs and/or Deputy Bureau Chiefs of the

District Court and/or Case Advisory Bureau for

their recommendations.

Q.      And then --

A.      Yes.  If I may.

Q.     I'm sorry.

Yes.

A.     The other Bureaus I was far more
familiar with the people in those Trial
Bureaus and the Investigative Bureaus.

Well, I spoke to the Bureau
Chiefs, Deputy Bureau Chiefs, supervisors.  I
had far more familiarity with those
Assistants.

Q.     And this document has as the.  I
guess, as the fourth person down being
Miss Hettiarachi.

Do you see that?

A.     Yes.

Q.     The Case Advisory Bureau, is that
a Trial Bureau?

A.     No.

Q.     And is there normally a track
that is followed to get to the Case Advisory
Bureau?

A.     The District Court Bureau --

Q.     Okay.

A.     -- to the Case Advisory Bureau is
the normal track.

Q.     And the going from the Case
Advisory Bureau to the Economic Crimes Bureau
-- obviously it's a transfer here, but is that
a promotion?

A.     Yes.

Q.     And is the Economic Crimes Bureau
a Trial Bureau?

A.     Well, it's more -- it's an
Investigative Bureau, but they do trials.

Q.     Okay.

A.     They try the cases that they
investigate, and decide if they're worthy of
prosecution.

Q.     And with regard to this
particular document, you indicated that you're
aware or you at least know the form, but you
have no particular recollection of this
particular document?

A.     No.

Q.     And were you aware that
Miss Hettiarachi was transferred from the Case
Advisory Bureau to the Economic Crimes Bureau
in or about the time that this memo was dated?

A.     No, I was not.

1

2          I am now but...

3     Q.        Who prepares this?

4     A.        This -- October -- probably the

5 Chief Assistant.

6     Q.        Would that be Miss Constant at

7 that time?

8     A.        Yes.

9          MR. BREWINGTON:  I'm going to ask

10         you to take a look at this letter which

11         is dated January 8th, 2013 from

12         Miss Constant to Miss Hettiarachi, and

13         we'll make this please Spota 4.

14              (Plaintiff's Spota Exhibit 4,

15         copy of two-page letter dated January 8,

16         2013, marked for identification.)

17              (Handing.)

18     Q.        Have you had a chance to look at

19 that letter?

20     A.        Yes.

21     Q.        First, have you ever seen this

22 letter before; that you can recall?

23     A.        I don't recall.

24     Q.        And do you have any recollection

25 of learning in or about 2012 or 2013 that

Miss Hettiarachi was out on any type of
medical leave?

    A.    I have a recollection of that.

    Q.    What is your recollection,
please?

    A.    I believe Miss Constant -- I
think it was Miss Constant -- somebody told me
that she had been out on a leave.

    Q.    Okay.

    Did you have any direct
involvement in any decisions made relative to
her medical leave?

    A.    No.

    Q.    And were you -- other than being
generally consulted by Miss Constant or
someone else -- do you have any recollection
of involving yourself in decisions made about
her --

    MS. DONNELLY:  Go ahead.  Finish.

    I just want him to pause before
he answers your question.

    Q.    -- made about her leave?

    MS. DONNELLY:  Objection.

    You can answer.

1

2          A.      I honestly don't recall.

3                  I recall Miss Constant telling me

4     that -- perhaps it was by -- I don't know how

5     she received the indication that she was out

6     on a medical leave, but that she was going to

7     return.

8          Q.      Okay.

9                  And was there a policy that you

10    were aware of concerning people coming back

11    from medical leave having to obtain doctor's

12    notes; if you know?

13         A.      A doctor's note?

14         Q.      Yes.

15         A.      I'm not familiar with that.

16                 A doctor's note about what?

17         Q.      In any form or fashion that

18    you're aware of.

19         A.      Oh, the only thing that I do know

20    is that we had -- it's kind of in here

21    (indicating) that --

22                 Where is it?  Let me see.

23                 Yes, "Prior to your return you

24    must provide this Office with a letter from a

25    medical professional involved in your

treatment that indicates that you're capable

of performing the essential functions of your

position as an Assistant District Attorney."

          That's a policy that the County

requires us to notify the Assistant.  That's

it.

          Q.     Okay.  All right.

          And was that something that you

were familiar with that occurred without your

input?

          MS. DONNELLY:  Objection.

          You can answer.

          Q.     That being, the request for a

medical letter or a medical note?

          MS. DONNELLY:  Objection.

          You can answer.

          A.     I thought I had said it's a

County policy.  We have to do that.

          That's my understanding.

          Q.     All right.  You can place that

there.

          MR. BREWINGTON:  Let's just do

     this so they can stay together.

          This is a letter dated January

1
2      10th, 2013 previously identified as
3      Constant 9.  I will ask that we can mark
4      this as Spota 5.
5              (Plaintiff's Spota Exhibit 5,
6      copy of letter dated January 10, 2013,
7      marked for identification.)
8              (Handing.)
9      A.      Okay.
10     Q.      Have you had a chance to look at
11  that?
12     A.      Yes.
13     Q.      Have you ever seen this one
14  before?
15     A.      No.
16     Q.      With regard to this letter -- as
17  I did with the other letters -- would this
18  type of letter be something that would be sent
19  out without you knowing about it?
20     A.      I may have known about it.  I
21  have absolutely no recollection of it.
22     Q.      Okay.
23     A.      I don't remember ever seeing
24  this.  I could have, but I don't recall.
25     Q.      You can place that to the side,

please.

At some point I think you talked
about different Bureaus within the office.

A.    Yes.

Q.    The ECB Bureau, what was that?

A.    Economic Crime Bureau.

Q.    And that was a Bureau to which
Miss Hettiarachi I think we had established
was being transferred.

A.    Yes.

MR. BREWINGTON:  Let me ask you
if you can just take a look at this
document which was previously identified
as McCormack 1 for identification, and
we will make this Spota 6, please.

(Plaintiff's Spota Exhibit 6,
copy of e-mail dated November 13, 2012,
marked for identification.)

(Handing.)

A.    Okay.

Q.    First, have you seen this
document before?

A.    No.

Q.    Okay.

1

2          Do you have any recollection of

3    any issues relating to the subject which is

4    here, which is "Horrible ECB indictment

5    statistics" --

6          A.     I would not --

7          Q.     In or about November of 2012?

8          A.     I would not have classified them

9    as horrible, but there was a time -- I can't

10   say if it was this period of time when --

11         I was concerned about the fact

12   that were quite a number of open indictments

13   for that particular Bureau.  They weren't

14   moving cases rapidly.

15         And I also was critical of their

16   investigations, the manner in which they were

17   investigating some case, the length of time

18   that they were investigating them.

19         I have to presume that that's

20   what this was addressing.

21         Q.     And with regard to your memory,

22   the issues that are raised in this memo, do

23   you have any specific recollection of speaking

24   to Miss McCormack or anyone else in the

25   District Attorney's Office about the content

of this memo?

               MS. DONNELLY:  Objection.

               You can answer.

     A.     I would not have spoken to her about the content of this memo.  I personally would not have.

     Q.     And did you ever hear from anyone that there was any concern with regard to Miss Hettiarachi's production in this Bureau; that being the Economic Crime Bureau?

     A.     Could I just go back to this (indicating)?

     Q.     Sure.

               You're looking back at a couple of the other documents.

     A.     Yeah.

               Could you just repeat the question?

               MR. BREWINGTON:  Sure.  We can have it read back.

               (Record read.)

     A.     I have no specific recollection, but she was only in the Bureau October 22nd until -- it was only three or four weeks.

So, I don't know how she could

have been the subject of whatever

Miss McCormack was talking about here.  As a

matter of fact, it says in here that, "We'll

give Rashika a pass."  I presume that means

because she was just there a very short period

of time.

        Q.     She was the new kid on the block?

        A.     Yeah.

        Q.     Okay.  Very well.

        And do you know if

Miss Hettiarachi was transferred from the

Economic Crime Bureau to the Major Crime

Bureau at some point?

        A.     Yes.

        MR. BREWINGTON:  Let me ask you

        to take a look at what we'll mark as

        Spota 7, previously identified as

        Clifford 2.

        (Plaintiff's Spota 7, copy of

        document entitled Inter-Office

        Communication, dated February 21st,

        2013, Bates Stamp Number

        HETTIARACHCHI00118, marked for

identification.)

(Handing.)

Q.      Have you had a chance to peruse

that document, sir?

A.      Yes.

Q.      And this has a Bates Stamp Number

at the bottom HETTIARACHCHI00118.

And this form of document was

that once again the type of document that

would be used for identifying people being

transferred from one Bureau to another?

A.      I can't tell you from this

because it's all blacked out.

Q.      I don't have a lot of control

with that.

A.      I don't know.

Q.      Okay.

When there would be these type of

promotions and transfers in February of 2013,

would that be something that you would prepare

or it would be prepared for you?

A.      For the most part it would be

prepared for me.

Q.      And do you have any recollection

1

2      as to this particular document?

3            A.      No.

4            Q.      Okay.

5                    And in or about February of 2013,

6      February 21st of 2013, this indicates that ADA

7      Rashika Hettiarachi is transferred from the

8      Economic Crime Bureau to the Major Crime

9      Bureau.

10                   Do you see that?

11           A.      Yes.

12           Q.      Is that a promotion?

13           A.      No, that's a lateral move.

14           Q.      When you say "a lateral move"

15     what do you mean?

16           A.      Simply what the term implies.

17     It's a move from one Bureau to another Bureau.

18           Q.      And based on the documents that

19     we just looked at, that would be a move of

20     Miss Hettiarachi from the Economic Crime

21     Bureau which she had just gone to in October

22     of 2012.

23                   Is that approximately right?

24           A.      Well, from these documents, yes.

25           Q.      Do you know what brought about

that transfer in that short period of time?

A.    The only recollection I have is
that she requested to go to the Major Crime
Bureau.

I -- my vague recollection is
that I had asked her to go to the Economic
Crime Bureau because of some -- there was a
need for additional people in the Economic
Crime Bureau.  I don't remember why.  It could
be people were out sick, maternity leave.
Perhaps I promoted somebody from that Bureau
to another Bureau, and I needed somebody in
the interim.

Q.    Do you have any recollection of
speaking to her about why you were sending her
to the Economic Crime Bureau initially?

A.    Oh, sure.

Q.    Okay.

A.    Do I have a recollection?

Q.    Yes.

A.    I can't say I have a specific
recollection.

I certainly would have spoken to
her.  If you recall, I said initially I meet

1

2      people in the Case Advisory Bureau.  I speak

3      to them, congratulate them, them being

4      promoted, and I certainly would have told her

5      she's going to the Economic Crime Bureau.

6               Whether I said it was on an

7      interim basis or not, I just don't recall.

8          Q.      Okay.  You can place that down.

9               And in the Economic Crime Bureau,

10     was the supervisor in or around late 2012 and

11     early 2013 Mr. Jablonski?

12         A.      In which Bureau?

13         Q.      That being the Economic Crime

14     Bureau.

15         A.      No.

16         Q.      Where was he the supervisor?

17         A.      Case Advisory Bureau.

18         Q.      That's right.  I'm sorry.

19              MR. BREWINGTON:  Let me ask you

20         if you have ever seen this evaluation

21         which bears a date on the second page of

22         5/20/13.

23              And we'll mark it as Spota 8 for

24         identification.

25              (Plaintiff's Spota Exhibit 8,



1

2          copy of four-page document, entitled

3          Suffolk County District Attorney's

4          Office, Assistant District Attorney

5          Evaluation, Bates Stamp D0301 through

6          D0304, marked for identification.)

7               (Handing.)

8     A.        I've read it.

9     Q.        Okay.

10              Mr. Spota, have you ever seen

11    this document before?

12    A.        I don't recall.

13    Q.        Was there a regular evaluation, a

14    written evaluation process, in place during

15    your tenure as the District Attorney?

16              MS. DONNELLY:   Objection.

17              You can answer.

18    A.        At a point, yes.

19    Q.        When you say "at a point", for

20    what period of time if you can tell me?

21    A.        I don't recall.

22    Q.        For approximately how long?

23    A.        I just don't recall.

24    Q.        When you say "at a point", what

25    do you mean, "at a point"?

1

2      A.      Well, it started -- the -- one of

3  the Chiefs, Edward Heilig, instituted an

4  evaluation system.  I think it was this

5  evaluation.  I'm trying to think.

6              For the District Court Bureau

7  personnel they have a three-year commitment.

8  This is my recollection.  I hope I'm accurate.

9              And he showed me the form, and I

10 liked the form, and I said well, why don't we

11 expand it to everybody in the Office.

12     Q.      Okay.

13     A.      But it didn't start for, for -- I

14 was in the Office quite a while before we

15 decided to do that.

16     Q.      That's your best recollection?

17     A.      Yeah.

18     Q.      Now, I'm going to point out to

19 you a couple dates on this document.

20     A.      Yes.

21     Q.      This obviously in the name, it

22 says ADA name, Rashika Hettiarachi, and it

23 says, "Bureau start date 10/22/10."

24              Do you see that?  On the

25 right-hand side.

1

2       A.      Yes.

3       Q.      And then it says, "Date of

4  evaluation 2/26/13."

5               Do you see that?

6       A.      Yes.

7       Q.      First of all, what does this

8  evaluation deal with?  What Bureau is it

9  dealing with?

10      A.      Well, to -- from this evaluation

11  it appears it's dealing with a period of time

12  when Miss Hettiarachi was in the Case Advisory

13  Bureau, and then the Economic Crime Bureau.

14      Q.      And in February, and I'm going to

15  ask you -- do you need to look at some other

16  documents?

17      A.      I just looked at them.

18      Q.      I'm just dealing with those two

19  dates first.

20              So, it says, "Date of evaluation

21  2/26/13."

22      A.      Right.

23      Q.      I will ask you to turn to the

24  second page.

25              Do you know when this document

1
2   was actually presented to Miss Hettiarachi?

3        A.     No.

4        Q.     Do you see on the second page

5   where it says 5/20 of '13?

6        A.     Yes.

7        Q.     Do you know where

8   Miss Hettiarachi was, what Bureau she was in

9   on 5/20 of 2013?

10       A.     Well, from this document, what is

11  this, Spota 7, it appears that she would have

12  been in the Major Crime Bureau.

13       Q.     And this evaluation that's being

14  provided in or about May of 2013, what was the

15  purpose of providing an evaluation for a

16  Bureau that she was no longer in; if you

17  recall?

18            MS. DONNELLY:  Objection.

19            You can answer.

20       A.     I really can't answer that.

21  That's a question better put to Mr. Heilig,

22  but I can only assume because she --

23            They normally were in a two-year

24  period of time.  More than likely it's because

25  when this evaluation was being done it covered

the period of time that she was in the Case

Advisory Bureau and the Economic Crime Bureau,

but had since been transferred to the Major

Crime Bureau.

So, in other words, what I'm

saying is she was probably in the Major Crime

Bureau at the time when the evaluation was

being done, but it covered the period that she

was in both the Case Advisory Bureau and the

Economic Crime Bureau.

I hope that makes sense.

Q.    There are more documents coming.

A.    Okay.

Q.    So, we'll take a look at those.

A.    Okay.

Q.    But with regard to this document,

would it be accurate to say that you had no

direct involvement in the determinations made

about her performance as it's identified on

this document?

A.    No, this would have been done by

the Bureau Chief.  It looks like it's

Jablonski.

Q.    You see where it says, "Did not

meet with ADA."

    A.    Yes.

    Q.    Was there a process that had been agreed to so that when evaluations were done the Assistant District Attorneys who were being evaluated would be spoken to, and would meet?

    A.    Yes.

    Q.    Where it says, "Did not meet with ADA."

    Did you ever come to learn that evaluations were being given out without ADAs being met with or spoken to about their evaluation?

    MS. DONNELLY:  Objection.

    You can answer.

    A.    Well, the only --

    I can't recall this particular document.

    Almost always, to my knowledge, they always met with the, with the ADA.  I presume it's -- the reason this isn't, it says, "Did not meet with ADA" is because he was no longer the Bureau Chief.

          I would -- I can't say for sure,

but she would have met with -- she would have

met with, more than likely, the Bureau Chief

to which she was then assigned.

          Q.     Okay.

          Do you know for a fact that

Miss Hettiarachi met with any Bureau Chief

concerning this evaluation or any other

evaluation?

          A.     I don't know.

          Q.     We're going to place that to the

side.

          Let me just ask:  Were you aware

that Miss Hettiarachi filed a response to this

evaluation?

          A.     I -- maybe it's this page.

          Q.     No, I don't think it's there yet.

          A.     Oh.

          Q.     I'm just asking:  Were you aware

that there was one, that there was a response?

          A.     I can't recall.

          Q.     Then I will show it to you.

                 MR. BREWINGTON:  This will be

          Spota 9 for identification, previously

1
2     identified as Jablonski 19.

3              (Plaintiff's Spota Exhibit 9,

4     copy of document entitled Response to

5     Evaluation by Bureau Chief Edward

6     Jablonski, Bates Stamp Number D0309,

7     marked for identification.)

8              (Handing.)

9        Q.    Have you had a chance to look at

10    that?

11       A.    Yes.

12       Q.    Are you familiar with this

13    document?

14       A.    No.

15       Q.    With regard to the content of

16    this document, was any of it familiar to you?

17       A.    No.

18       Q.    Then we'll place that there.

19              MR. BREWINGTON:  I'm going to

20    show you the next document which was

21    previously marked as Constant 1, which

22    we'll identify this as Spota 10 for

23    identification.

24              It's a four-page document

25    starting with D0305 through D0308.

                (Plaintiff's Spota Exhibit 10,

        copy of four-page document entitled

        Suffolk County District Attorney's

        Office, Assistant District Attorney

        Evaluation, Bates Stamp D0305 through

        D0309, marked for identification.)

                (Handing.)

        A.      Yes.

        Q.      Have you had a chance to look at

this document, sir?

        A.      Yes.

        Q.      Have you ever seen this document

before?

        A.      I may have, but I have no

specific recollection.

        Q.      Do you have any recollection of

speaking to anyone about this document or the

content of this document?

        A.      Yes.

        Q.      Who do you recall speaking to,

and just tell me what that conversation was?

        A.      It was with Miss Constant, and

the conversation was essentially what's

contained in Page 3, that there was -- that

Miss McCormack, the Bureau Chief, had told

Miss Constant that she could not understand

why Miss Hettiarachi was making the

allegations that she was making with respect

to the meeting that they had had, the Bureau

Chief meeting.

That Miss Hettiarachi, as I see

it in here, was misinterpreting her comments,

and she just couldn't understand that nor

could she understand why she would want to

leave the Bureau almost immediately.  She was

only there a very short period of time.

I now see that it was because --

I was sending her there because -- remember I

had said before that it would be for some

reason, they were short people.  It says here

other ADAs were shortly to go on maternity

leave.

So, that's the reason I sent her

there for that period of time.

I know that there was some

concern, and I see it in this evaluation from

Mr. Jablonski, and I recall Miss Constant

telling me that Miss McCormack was complaining

that she was not a team player, which

apparently was also something that was of

concern to Mr. Jablonski as well.

I don't recall a complaint being

made by somebody, a witness stating that she

felt Miss Hettiarachi was dismissive of the

crime.  I don't know that at all.

Q.     And with regard to your memory at

least of some of the information which is

contained in Spota 10, was there any

indication that a corrective action was going

to be taken; that being discipline or some

other form based on Miss Hettiarachi's

position that she was stating?

MS. DONNELLY:  Objection.

You can answer.

A.     As far as what's contained in

this document?

Q.     Yes.

A.     No.

Q.     And were you aware of whether or

not Miss Hettiarachi responded to this

document in writing?

A.     I am not aware.

1

2          Q.      Let me ask you to take a look at

3    -- by the way, was it a right of an employee

4    to respond to an evaluation --

5          A.      Yes.

6          Q.      -- in writing?

7          A.      I'm sorry.  I shouldn't have

8    answered.

9          Q.      That's okay.

10                 MR. BREWINGTON:  I'll ask you to

11           take a look at what was previously

12           identified as McCormack 8 that we're

13           going to identify as Spota 11 for

14           identification.

15                 (Plaintiff's Spota Exhibit 11,

16           copy of seven-page document, Bates Stamp

17           Numbers D0310 through D316, marked for

18           identification.)

19                 (Handing.)

20           Q.      The first thing I'm going to do

21    is ask you to peruse it briefly, and then I'll

22    ask a question, and then if you need to do

23    that, you can do that.

24           A.      Peruse it briefly?

25           Q.      Yes, just take a quick look at

1

2      it.  Yes, please.

3              A.      All right.  Okay.

4                      It's rather lengthy but...

5              Q.      Have you had a chance to briefly

6      skim over it, sir?

7              A.      Yes.

8              Q.      Here's my first set of questions.

9                      You indicated that an employee or

10     Assistant would have a right to respond to

11     their evaluation; is that correct?

12             A.      Yes.

13             Q.      Were you aware that

14     Miss Hettiarachi had supplied a response to

15     her evaluation as indicated here?

16             A.      I was not, no.

17             Q.      And were you aware of any process

18     which existed whereby the evaluators could

19     submit a reply to the response provided by the

20     employee?

21             A.      I wasn't personally aware, but

22     it's not -- I don't see any reason why they

23     couldn't.

24             Q.      When an evaluation or a response

25     to an evaluation comes back -- and now I'm

1

2      just going to point to just a couple of things

3      to just generally know how you expected things

4      to be handled in the office.

5              But the first paragraph of the

6      response, where it says, "Ms. McCormack's

7      Evaluation is consistent with her hostility

8      towards me."

9              Who would be the person or

10     persons that would see a response such as this

11     other than Miss McCormack?

12          A.     Oh, I'm sure that Mr. Heilig and

13     Miss Constant saw it.

14          Q.     Do you know if --

15          A.     I shouldn't say I'm sure.

16          Q.     Okay.  Let me ask you.

17              Do you know if either

18     Miss Constant or Mr. Heilig asked

19     Miss Hettiarachi to explain more what the

20     hostility was that she felt was being leveled

21     towards her?

22          A.     Do I know?

23          Q.     Yes.

24          A.     No, I don't know.

25          Q.     Did anybody ever tell you that

Miss Hettiarachi had written down in her

response that she felt that there was

hostility being leveled towards her?

    A.    I -- not in those terms, no.

    Q.    And this goes on to say,

"Ms. McCormack has constantly shown anger,

dismay and/or annoyances with me."

          Was that ever related to you that

Miss Hettiarachi had reported that in her

response?

    A.    No.

    Q.    And then it says that,

"Ms. McCormack evaluation is based on me

working for her for approximately two months."

          Do you see that?

    A.    No.

    Q.    Right in the top.

    A.    Oh, we're still in the first

paragraph?

    Q.    First paragraph, yes.

    A.    I'm sorry.

    Q.    Do you see where it says that?

    A.    Yes, I see that.

    Q.    Okay.

Were you aware that
Miss McCormack's evaluation, where she
references all the things that she's speaking
about was over a two-month period?

A.     Well, I'm aware of it now, but I
was not aware of this at the time.

Q.     Let me just ask with regard to --
I'm going to ask you to turn to the page
number that has in the bottom right-hand
corner D0312.

And this is a document that says
at the top, "Corrections and reply to ADA
Hettiarachi's evaluation response."

Do you see that?

A.     Yes.

Q.     Do you know who this was written
to?

A.     No, I don't.

It's in response to -- well, the
answer is who it was specifically addressed
to?

Q.     Yes.

A.     No.

Q.     Just go down to response, to

Paragraph Number 2.

    A.     Yes.

    Q.     And then in the paragraph above
the response I think that Miss McCormack is
reiterating what Miss Hettiarachi wrote.

        Do you see that?  In the
italicized section.

        MS. DONNELLY:  I'm sorry, what's
the question?

    A.     I'm sorry, is it B?

    Q.     B, yes.

    A.     I don't follow your question.

    Q.     You see where she is just
repeating what Miss Hettiarachi has written.

    A.     Yes.

    Q.     So, she's actually outlining or
not outlining, she's writing out what
Miss Hettiarachi wrote, and then she's
responding to it.

    A.     Yes.

    Q.     Do you see that?

    A.     Uh-huh.

    Q.     And Miss Hettiarachi indicates in
this document that she, "relayed the comments

made by Ms. McCormack to Mr. Jablonski, Ms.

Hartman and several ADAs.  This was met with

laughter and comments such as favors and money

were trade to get me transferred from CAB."

Do you see that?

A.     Yes.

Q.     And the next sentence says,

"These initial comments instilled in me a

feeling of not being wanted at ECB."

And the next paragraph that I

think is the response from Miss McCormack.

Is that how you're reading it?

A.     Yes.

Q.     It says, "Ms. Hettiarachi's

claims of feeling unwanted are baseless."

Was that consistent, making such

a judgment on someone's feelings, was that

consistent with what you expected of your

supervisors?

MS. DONNELLY:  Objection.

You can answer.

A.     I don't even know how to answer

that.

I think what she's -- maybe it's

unartfully phrased, but what Miss McCormack is
saying, and I know Miss Constant was telling
me, was that -- she being Miss McCormack --
was perplexed at why Miss Hettiarachi wanted
out of that Bureau when she had just gotten
there.

That's the best I can answer.

        Q.      Did you ever have a conversation
with anyone where they told you that
Miss Hettiarachi felt that she was not wanted?

        A.      Well, that's exactly what I just
said.

        Q.      Right.

Who told you that, that
Miss Hettiarachi felt that she was not wanted?

        A.      Miss Constant told me that
Miss McCormack was telling her that she could
not understand.  She had only been there a
very, very short period of time, and she was
basically indicating that she,
Miss Hettiarachi, felt that she was not
wanted.  When, in fact, that was not the case.

        Q.      Well, I'm just going to ask you,
when you say that was not the case --

1

2          A.        That's what I was being told.

3          Q.        Right.

4          A.        I don't mean to say that I know

5      that to be a fact.

6          Q.        Okay.  Let's just go back.

7          A.        Okay.

8          Q.        Did you ever ask anybody to speak

9      to Miss Hettiarachi to explain what she was

10     feeling, and why she felt unwanted?

11                   MS. DONNELLY:  Objection.

12                   You can answer.

13         A.        I don't recall.

14         Q.        Do you know if anybody ever did?

15         A.        I don't recall.  I don't know I

16     should say.  That's not fair to say.  I just

17     don't know.

18         Q.        And this sentence where it says

19     that Miss Hettiarachi's claims of feeling

20     unwanted are baseless.

21                   Did you ever have anybody

22     evaluate --

23         A.        Excuse me, where are we?

24         Q.        The same place.  The bottom of

25     Page 312.

1

2          MS. DONNELLY:  Go back a page.

3          MR. BREWINGTON:  312.

4          MS. DONNELLY:  One more page.

5          THE WITNESS:  I'm sorry.

6          MS. DONNELLY:  That's okay.

7      Q.     Did you ever ask anyone to do any

8  type of evaluation or investigation to see

9  whether or not the claim that her feeling

10 unwanted was quote "baseless"?

11     A.     I did not.

12     Q.     In terms of a person's or that

13 being an ADA's position in the Office, would a

14 complaint that someone felt that they were

15 unwanted in the Office from your standpoint

16 require some evaluation?

17         MS. DONNELLY:  Objection.

18         You can answer.

19     A.     I don't know how to answer that.

20         I did not know that she was

21 feeling that she was unwanted in the Office.

22     Q.     Well, I think you indicated at

23 some point someone told you.

24     A.     I didn't say in the Office.  I

25 said in the Bureau.

1

2          Q.      Well, the Bureau is in the

3     Office; correct?

4          A.      Well, the Bureau is in the

5     Office, but the Office encompasses everything.

6                  And this was dealing only with a

7     particular Bureau.

8          Q.      And when she says that she was

9     not, she felt that she was not being wanted in

10    ECB, did anybody ever tell you that she did

11    not feel that she was wanted in ECB?

12                 MS. DONNELLY:  Objection.

13                 You can answer.

14         A.      Where are we now?  I'm sorry.

15                 MS. DONNELLY:  That's okay.

16         Q.      In B.

17                 MS. DONNELLY:  We're back to

18         where we were before.

19         A.      About feeling unwanted or

20    baseless.

21                 MS. DONNELLY:  Can you read back

22         the question, please?

23                 THE WITNESS:  Yes, please.

24                 (Record read.)

25         A.      I think I've already answered

that, but I'll answer it once again.

Miss Constant relayed to me that Miss McCormack was telling Miss Constant that Miss Hettiarachi wanted to be transferred out of the Bureau, and she was perplexed as to why when she had just gotten there.

That's the best answer I can give you.

Q.     I understand that.  I'm not dealing with what Miss McCormack's being perplexed was.

My question is:  The statement that Miss Hettiarachi has written here that she had a feeling of not being wanted, did anybody speak with you about Miss Hettiarachi being asked or any further investigation being done as to why Miss Hettiarachi felt unwanted?

MS. DONNELLY:  Objection.

You can answer.

A.     I think I have already answered that.

I don't know.

Q.     But you didn't ask anybody to do that; did you?  To do an investigation or ask

her further questions?

        MS. DONNELLY:  Objection.

        You can answer.

    A.     Let me just state it once again.

        I never was aware, if indeed it actually happened, that she felt she was being -- she was unwanted in the Bureau.

        I was aware that she wanted to be transferred to the Major Crime Bureau.

    Q.     That wasn't --

    A.     And that -- this -- and I'll say it one more time.

        Miss McCormack was perplexed as to why she wanted to be transferred when she had only been there a short period of time.

    Q.     That's -- perhaps my question was not clear.

        For clarity:  Did anybody tell you that Miss Hettiarachi had reported that she felt unwanted?

    A.     No.

    Q.     Okay.  Okay.

        And other than having some conversation with Miss Constant about what

1

2      Miss McCormack had told her, were you aware of

3      any of the content of these documents that

4      make up Plaintiff's Spota 11 for ID?

5           A.    No.

6           Q.    At any time did anybody ever show

7      you a copy of this document relative to

8      Miss Hettiarachi's employment while she was

9      employed?

10          A.    This document?

11          Q.    Yes, sir.

12          A.    I have no recollection of that at

13     all.

14          Q.    Okay.  You can put that to the

15     side.

16               MR. BREWINGTON:  I'm going to

17          show you what's been previously marked

18          as Constant 11, and we'll make this

19          Spota 12 for identification, please.

20               (Plaintiff's Spota Exhibit 12,

21          copy of document entitled ADA Step

22          Increases July 2013, marked for

23          identification.)

24               (Handing.)

25          Q.    Mr. Spota, have you had a chance

1

2   to look --

3          A.      Yes.

4          Q.      -- at that?

5          A.      Yes, I have.

6          Q.      Are you familiar with the format

7   that's presented in this document aside from

8   all the blackout stuff?

9          A.      I am familiar with what it is,

10  but...

11         Q.      Okay.

12         A.      But this is probably the first

13  time I've ever seen this.

14         Q.      Okay.

15                 What do you understand this to

16  be?

17         A.      It talks about step increases.

18         Q.      And what are step increases?

19         A.      It's a form of a management plan

20  that we had in the District Attorney's Office

21  so that ADAs would -- it was during -- it was

22  every July 1st I believe.  Every ADA -- well,

23  not every ADA.  ADAs would get an increase in

24  their salary.

25                 It was a form of our management

plan.

    Q.    And who made the decision on who would get steps, and who would not get step increases?

    A.    The ultimate decision?

    Q.    Yes.

    A.    I made that.

    Q.    And what did you base your ultimate decisions on?

    A.    For the most part it was the recommendations of the Chiefs or Deputy Bureau Chiefs with respect to the -- whomever the ADA was that they were supervising.

    Q.    And with regard to Miss Hettiarachi in or about July of 2013 with whom, if anyone, did you speak about whether or not she should or should not get a step increase?

    A.    Oh, it would have been Miss Kerriann Kelly, Nancy Clifford.  I probably -- I don't recall, but I certainly recall speaking to them.

        Probably Mr. Chalifoux.

    Q.    And what was your conversation

with either of them, and if you can tell us

who you were speaking with concerning

Miss Hettiarachi and her not receiving a step

increase?

A.    They felt that she wasn't

deserving of a step increase.

Q.    Who is the "they"?  Who

specifically said that?

A.    Oh, I can't tell you

specifically.  I just don't recall the exact

conversation, and I won't say anything

specific.

Q.    Okay.

A.    But I do know that Miss Het --

I'm sorry, Miss Clifford and Miss Kelly in

particular, and more than likely

Mr. Chalifoux, were of the opinion that she

should not get a step increase.

Q.    Did they tell you why?

A.    Yes.

Q.    What did they tell you?

A.    I cannot, I can't say

specifically, but I can talk in generalities.

Q.    Just so you know, my question is,

I'm looking for facts, not assumptions.

A.      I can't answer specifically.  I just don't have that recollection specifically.

Q.      And were there other ADAs during this very same time who did not receive step increases that you're aware of?

A.      I don't recall.

Q.      This indicates that there would have been a step increase of approximately $135; is that correct?

A.      It's hard to say from this, but -- yes, it does look like it would be $135.

Q.      Biweekly?

A.      Biweekly.

        Not just $135.

Q.      Right.  Let's set that document aside.

        And this was July of 2013.  In or about that time had you had discussions with anyone about terminating Miss Hettiarachi?

A.      At what time?

Q.      July of 2013.

A.      Not in July.

1

2          She had already.  I can't recall

3  when she was terminated, but the answer would

4  be yes.

5          Q.      Okay.

6          Who did you speak with?

7          A.      Would have been Miss Clifford and

8  Miss Kelly and Mr. Chalifoux.

9          Q.      And what were your discussions

10  with any of those individuals specifically, if

11  you recall?

12          A.      I can't answer specifically.  I

13  cannot be specific.

14          Q.      And who was it that recommended

15  that she be terminated, if anyone?

16          A.      Well, I would have been

17  ultimately -- I would have made the ultimate

18  decision.

19          Q.      I understand that.

20          But who was it, if you recall,

21  that recommended she be terminated?

22          MS. DONNELLY:  Objection.

23          You can answer.

24          A.      Well, it would have been

25  Miss Constant, and more than likely

Mr. Heilig.

     Q.    And do you recall what their recommendation was; that being, what did they say?

     A.    I don't recall specifically, no.

     Q.    Do you recall what the reason was that Miss Hettiarachi was being terminated?

     A.    There were a number of reasons.

     The main reason was that she was deceptive, dishonest to her Bureau Chiefs, her Bureau Chief I should say, and Deputy Bureau Chief Clifford on a number of occasions.

     Q.    What Bureau Chief was she dishonest and deceptive to?

     A.    I'm not finished with the answer.

     Q.    I just want to know which one.

     A.    I'm sorry?

     Q.    Which one was she deceptive and dishonest to?

     A.    Miss Kelly and Miss Clifford. May have been Chalifoux. He may have participated in some of the meetings, but I can't be -- I don't have a recollection. I don't want to misspeak on Chalifoux.

1

2       Q.      Who told you that she was

3   deceptive and dishonest?

4       A.      Both Miss Kelly and

5   Miss Clifford, and Miss Constant relayed that

6   to me as well.  She had been speaking to them.

7       Q.      Who told Miss Hettiarachi, if

8   anyone, that her job was in jeopardy because

9   she was "deceptive and dishonest"?

10              MS. DONNELLY:  Objection.

11              You can answer.

12      A.      I just told you.

13              I can't -- I don't recall the

14  specifics.  I can't say that they did or did

15  not say that to her.

16      Q.      Did you ever speak with her to

17  say, "I'm being told that you're deceptive and

18  dishonest, what do you have to say about that,

19  young lady?"

20      A.      No --

21              MS. DONNELLY:  Objection.

22              You can answer.

23              THE WITNESS:  Sorry.

24      A.      The answer was no, I did not.

25      Q.      Sir, do you know what progressive

discipline is?

A.    Yes.

Q.    And was that a regular part of
the process within your Office?

A.    Yes.

Q.    Was progressive discipline ever
utilized with regard to Miss Hettiarachi --

A.    Yes.

Q.    -- if you know?

A.    Yes.

Q.    What was the discipline, the
progressive discipline process, that was
engaged concerning her?

A.    Well, there were a series of
events that occurred while she was in the
Major Crime Bureau itself; some of which I've
already told you about, the fact that she was
deceptive, had lied to Miss Clifford, lied to
Miss Kelly.

And there were -- there was --
and I don't know if we can call it
"discipline", but she was --

I guess the best way I can
describe it is that they tried their very,

very best to deal with some of her inabilities

to understand the Criminal Procedure Law, the

Penal Law, how to deal with cases, how to deal

with witness preparation.  Her attitudes

towards other people; which was kind of

consistent from what I see here with the

evaluations of Mr. Jablonski and

Miss McCormack.

She was very, very

confrontational towards not only the

secretarial, the support staff, but also other

prosecutors.

And they tried their very, very

best.  They helped her.

There was a particular judge that

made some complaints specifically about her on

a hearing that she participated in.  I believe

she conducted the actual hearing.

Q.     Let's just go back.  Let's stop

there for a second.

A.     Okay.

Could I get a glass of water?

MR. BREWINGTON:  Absolutely.

Absolutely.

2                    (Discussion off the record.)

3                    MR. BREWINGTON:  Back on.

4             Q.     Mr. Spota, you indicated that a

5       judge had made a specific complaint about

6       Miss Hettiarachi, and how she was conducting

7       a --

8             A.     She had conducted.

9             Q.     -- she had conducted a hearing.

10            A.     Yes.

11            Q.     Do you know which judge that was?

12      If I told you Judge Hahn.

13            A.     I don't know any Judge Hahn.

14            Q.     Judge Kahn.

15            A.     Oh, yes, it could have been Kahn,

16      yes.

17            Q.     Okay.

18                   And do you have a recollection of

19      what Judge Kahn specifically was complaining

20      about?

21            A.     Oh, this is what I -- never

22      complained to me.

23            Q.     All right.

24                   What were you told that Judge

25      Kahn was complaining about?  Miss Hettiarachi?

A.     Well, that she was not prepared

for whatever hearing it was, and did not

understand the fundamental concepts or

elements of the crime.

Q.     Do you know if Miss Hettiarachi

trained other people in her Bureau about how

to conduct hearings?

A.     Miss Hettiarachi?

Q.     Yes.

A.     No, I don't.

Q.     By the way, when Judge Kahn

complained, do you know if Judge Kahn

specifically said that she went and singled

Miss Hettiarachi out or that she thought it

was the entire Bureau that needed training?

A.     That's not --

MS. DONNELLY:  Objection.

A.     -- what I was told at all.

MR. BREWINGTON:  Let me ask you

to take a look at this document which is

going to be Spota 13 for identification,

previously identified as Constant 15.

(Plaintiff's Spota Exhibit 13,

17-page document, Bates Stamp Numbers

D00400 through D00416, marked for

identification.)

(Handing.)

Q.      I'm going to point you to a

couple pages after you get a chance to have

that document before you, but do you know what

these are, these pages?

A.      Looks like a calendar.

No, I don't know what they are.

Q.      They've been previously

identified in other depositions, but I just

represent to you that these are notes taken by

some of the supervisors that you've referenced

here.

I ask you to look at the Bates

Stamp page which is D00402, the third page in.

A.      Okay.

Q.      Now, who was it that told you the

information about Judge Kahn?  Which one of

the supervisors?

A.      It was either Miss Kelly or

Miss Clifford.

Q.      I'll ask you to just take a look

at that first paragraph which says

1

2      "miscellaneous."

3              Do you see that?

4      A.      Yes.

5      Q.      I'll read it, and then I'll ask

6      you a question.

7              It says, "Judge Kahn asked me to

8      come to her courtroom one morning, a day after

9      ADA Hettiarachi had done a SORA hearing in her

10     part.  While she made it clear that it was not

11     her intention to be critical of ADA

12     Hettiarachi in particular, she asked whether

13     if would be possible for MCB Assistants to

14     receive training from CADVB on how to do such

15     hearings."

16              Do you see that?

17     A.      Yes.

18     Q.      Was that ever told to you, that

19     information in those two sentences I read to

20     you?

21              MS. DONNELLY:  Objection.

22              You can answer.

23     A.      Not in those terms, no.

24     Q.      So, it was told to you that the

25     complaint was about Miss Hettiarachi; right?

A.     Yes.

Q.     It wasn't told to you that the
judge made it clear that it was not her
intention to be critical of ADA Hettiarachi in
particular.

That was never told to you; was
it?

MS. DONNELLY:  Objection.

You can answer.

A.     It was told to me in a different
form.

Q.     Were you told, as it's written
here, that the judge was not being "intending
to be critical of ADA Hettiarachi in
particular"?

A.     Those exact words, no.

Q.     Okay.

So, would it be that one of the
reasons that you terminated Miss Hettiarachi
was because of this complaint?

MS. DONNELLY:  Objection.

You can answer.

Q.     Is that one of the reasons?

A.     It was taken into consideration,

but it was not the main reason, no.

And I disagree with your interpretation.

Q.    I didn't ask you, sir, if it was the main reason.  I asked you if it was one of the reasons.

A.    I've answered that question.

Q.    And the answer is yes?

A.    No, I didn't say the answer was yes.

Q.    So, was the complaint that you referenced earlier about Miss Hettiarachi's conducting this hearing one of the reasons for her termination; yes or no?

A.    It was --

I can't answer that question yes or no.

Q.    Okay.

So, would it be accurate -- and if you can just skim these pages, did you ever see this conglomeration of writings before?

A.    (No verbal response.)

Q.    Mr. Spota, just so you know, the question I have before you is:  Have you ever

1

2       seen this conglomeration or these documents

3       before?

4               A.      Oh, I'm sorry, no.

5               Q.      Okay.

6                       So, would it be accurate to say

7       as far as you know, the first time that you're

8       actually seeing this set of documents ranging

9       from D00400 through D00416 is today?

10              A.      That's my recollection, yes.

11              Q.      And these weren't shown to you

12      prior to Miss Hettiarachi's termination as far

13      as you recall; is that correct?

14              A.      The document, no.

15              Q.      All right.  You can put that

16      aside.

17                      And Miss Hettiarachi was

18      terminated; correct?

19              A.      Yes.

20              Q.      And you made that decision;

21      correct?

22              A.      Yes.

23              Q.      And at that time how many ADAs of

24      color, that being an African American, an

25      Asian American, other than white, who were in

the Felony Bureaus?

        MS. DONNELLY:  Objection.

        Could you put a date on it?

        MR. BREWINGTON:  Sure.

        At the time that she was

terminated.

        MS. DONNELLY:  He may not recall

the date that she was terminated.

        MR. BREWINGTON:  Okay.  In July

of 2013.

        MS. DONNELLY:  Thank you.

A.     In July?

Q.     Yes.

A.     I just don't --

        I'd have to really see the

roster.  We had 190 some odd ADAs.

        I can recall some of them, but

I...

Q.     Which --

A.     Especially those in the District

Court Bureau, and I know we did have some.

        I don't recall.  Let's see --

Q.     My question was specifically in

the Felony Bureaus.

A.        Oh, in Felony.

Q.        Yes.

A.        I'm sorry, I misunderstood.

I'd have to see the roster.

I can think of some of them

offhand if you want me to name those.

Q.        Who were African Americans or

persons of color who were in the Felony

Bureaus.

A.        Oh, I thought you said Asians.

Q.        Persons of color.  I consider

Asians --

A.        Oh, there was -- in the Felony

Bureaus.

Ming Parson.  Annie Oh, O-H.

Lauren Tan.  Erin Cho.  Sheetal Shetty.

Sheetal, I think it's her last name, Shetty.

Sonia Gandy (phonetic).  Ros Gray.

I'm trying to think.  There's a

fellow in the Special Investigations Bureau.

I just cannot think of his name, and I should

because he's a terrific guy, but I can't think

of his name.

Q.        Well, in 2013 where was

Miss Gray?

    A.    Appeals.

    Q.    So, she wasn't trying cases; right, in Appeals?

    A.    She would have been doing -- I can't say.

    Normally they would not do the trials, no. She may have second sat, but I don't know.

    Q.    Had there been any form of disciplinary action taken against Miss Hettiarachi prior to her termination?

    MS. DONNELLY: Objection.

    You can answer.

    A.    No.

    Q.    Had Miss Hettiarachi been asked to go for any retraining in her role as an Assistant District Attorney prior to her termination?

    MS. DONNELLY: Objection.

    You can answer.

    A.    No.

    Q.    Had Miss Hettiarachi received anything, other than those two evaluations

that we saw, write ups for doing something

wrong as an Assistant District Attorney --

                MS. DONNELLY:  Objection.

                You can answer.

     Q.      -- that you are aware of?

     A.      I'd have to look at these

documents.

                Oh, that I'm aware of.

     Q.      That you're aware of.  Yes.

     A.      No.

     Q.      And had Miss Hettiarachi been

engaged in hiding evidence?

                MS. DONNELLY:  Objection.

                You can answer.

     A.      I don't know what you mean by

that.

                Hiding evidence?

     Q.      Yes.  You know what Brady

violations are; right?

     A.      Well, that's not -- I thought you

meant physically hiding evidence.

     Q.      I'll get to that in a second.

     A.      No, I don't think so.

     Q.      How about altering documents, had

1

2    she ever altered any documents that you're

3    aware of?

4         A.    That I am aware of?

5         Q.    Yes.

6         A.    No.

7         Q.    But you're aware of some of your

8    Assistants that were found to have altered

9    documents; right?

10             MS. DONNELLY:  Objection.

11             You can answer.

12        A.    I can only think of one person.

13        Q.    Who is that?

14        A.    I'm trying to think of her name.

15        Q.    If I said Leslie Stevens.

16        A.    Yes.

17        Q.    And what was Miss Stevens accused

18   of?

19        A.    She had presented a matter before

20   the Grand Jury, and apparently on one of the

21   original documents she put something in

22   pencil.

23             She didn't alter it.  She added

24   to it.  She added something that she -- from

25   her memory she wrote on an original document.

Q.    And was there a finding by a court concerning her actions?

A.    The Grievance Committee made a finding.

Q.    Well, other than the Grievance Committee.

Was there a finding by a judge concerning the actual case that she was involved with, concerning that case?

A.    I don't believe that the judge -- I don't recall -- it was Judge Camacho.  I don't recall him making a finding with respect to that.

I think they upheld the Grand Jury minutes because ultimately there was a plea of guilty.

MR. BREWINGTON:  I'm going to ask you to take a look at what we'll mark as Spota 14 for identification.

(Plaintiff's Spota Exhibit 14, copy of Newsday article entitled "Prosecutors in Datre case admit to adding markings to payrolls" dated October 6, 2015, marked for

1

2          identification.)

3                   (Handing.)

4          A.     Okay.

5          Q.     So, do you remember a case People

6     versus Datre, D-A-T-R-E?

7          A.     Yes.

8          Q.     And that was the case where you

9     were referring to the pencil markings on the

10    papers?

11         A.     Yes.

12         Q.     And did you learn at some point

13    that the pencil markings had been presented on

14    documents presented to the Grand Jury?

15         A.     Yes, sir.  I just mentioned that.

16         Q.     And with regard to that, with

17    regard to Justice Camacho's findings, was

18    there ever a finding by Justice Camacho that

19    the documents that had been presented to the

20    Grand Jury had been altered?

21         A.     There was a finding that they had

22    not been altered.

23                My understanding.

24         Q.     Your understanding was that --

25         A.     They were not altered.

Q.     That was your understanding?

A.     Yes.

And that's what this article talks about.

Q.     Okay.

Well, with regard to Justice Camacho's findings --

A.     What are the findings that you're talking about?

Q.     Well, do you know what the findings were concerning those documents, and whether or not there was a violation of any type?

A.     I don't believe that there was.

Q.     Okay.

A.     That's my recollection.

Q.     Okay.  That's fine.

And by the way, Miss Stevens, at the time that you left, was she still employed there?

A.     Yes.

Q.     Okay.

And do you recall Justice Camacho declaring a mistrial in that case?

A.      In which Datre case?

There were a number of Datre cases. One was the prevailing wage case. One was the dumping, I'll call it the dumping case, the environmental case.

Which one are you referring to?

Q.      It's the one dealing with these particular documents, the one where there had been an allegation that she had altered the documents to the Grand Jury.

A.      I don't think he --

My recollection is he did not declare a mistrial. My recollection is they entered pleas of guilty.

Q.      Okay.

A.      Am I -- could I go off the record?

Q.      No, we're going to stay on the record.

A.      Am I incorrect?

MS. DONNELLY:  You can only testify to your recollection.

Are you done with this document?

MR. BREWINGTON:  Yes.

Q.    Do you know the name Kurtzrock?

A.    Kurtzrock.

Q.    Yes.

A.    Yes.

Q.    Who is that?

A.    He was an Assistant District
Attorney in the Homicide Bureau.

Q.    And at the time that you left,
was he still there?

A.    No.

Q.    And how did he come to leave?

A.    I term -- I believe I terminated
him.

Q.    Are you sure you terminated him,
or did you allow him to resign?

        MS. DONNELLY:  Objection.

        You can answer.

A.    I did not allow --

        Oh, I was about to terminate him.
I had his Bureau Chief go down to ask him to
come down to my office to tell him, and I told
her to warn him in advance that I was
terminating him.

        He came in, and said he was

resigning.

Q.      Now, this termination warning
that was given to Mr. Kurtzrock, was it ever
given to Miss Hettiarachi?

A.      I don't know.

Q.      Did you ever tell anybody to give
that warning to Miss Hettiarachi?

A.      I don't recall if I did or I did
not.

Q.      And Mr. Kurtzrock, he had been in
the Office for what period of time; that being
your Office?

A.      I don't recall.

Q.      Do you know if he had been in the
Nassau DA's Office before?

A.      Yes, he was in Nassau before,
yes.

Q.      And at the time that he resigned,
did you accept his resignation?

A.      I don't know if he actually
resigned or I terminated him.

        My recollection is that he came
into the Office.

        I believe I told him he was being

1

2       terminated, and he said, "Well, I'm

3       resigning."  That's my recollection.

4                       So, whether you call it a

5       resignation or a termination.

6               Q.      I'm --

7               A.      Let me finish.

8               Q.      I'm not calling it anything, sir.

9       I'm asking you.

10              A.      Well, let me finish my answer

11      then.

12                      Whether you call it a resignation

13      or a termination, the fact of the matter is in

14      my mind he was being terminated.

15              Q.      Okay.

16                      And were you aware of whether or

17      not Mr. Kurtzrock was allowed to go and pack

18      his office before he left?

19              A.      No, I'm not aware.

20              Q.      Do you know if Miss Hettiarachi

21      was allowed to go and pack her office before

22      she left?

23              A.      I'm not aware.

24              Q.      Do you know who Raphael Pearl is?

25              A.      Yes.

Q.    Who is that?

A.    He's an Assistant District
Attorney.

Q.    At the time that you left, was he
still working there?

A.    Yes.

Q.    And were you aware of his
involvement in a case called People versus
Hubbard?

A.    Hubbard?

I know there was a Hubbard case.
I can't say that I know that --

Q.    Are you familiar with --

A.    -- he prosecuted that case.  I
don't know.

I believe he did, but I'm not
sure.

Q.    Were you aware of a finding by
the Appellate Division that he was engaged in
a Brady violation in a case?

A.    Yes.

Q.    And what do you know about that
violation as it was found by the Appellate
Division?

A.    I believe he was -- I believe it
was a summation to the jury, and he indicated
-- I guess he was vouching for one of the
witnesses, a homicide detective, and the judge
found that there was an internal -- there was
an Internal Affairs case that had been
preferred against that detective, and I think
a Civil case as well.

And based upon the fact that
there were those two cases, and he had I
presume vouched or he said something in his
summation about the detective that the judge
felt improper, based upon the fact that there
was an Internal Affairs investigation, and a
Civil matter, and he found that to be a Brady
violation, which I absolutely disagree with
because of the fact that he was cleared of the
Internal Affairs investigation, and the Civil
case I think is pending to this day.

Q.    With regard --

A.    So, there was no finding of
liability.

Q.    Well, is that the standard by
which you judge whether or not an ADA has

acted appropriately or inappropriately, the

Civil case?

A.      No, I'm not --

MS. DONNELLY:  Objection.

You can answer.

A.      I'm saying -- you're entirely

taking this out of --

Q.      No, I'm just asking.

A.      Well, you are entirely taking

what I said out of complete context.

Q.      No, I was asking you a question.

A.      You're entirely taking what I

said out of complete context if that's your

question.

My answer was that the judge

found that there was a pending Internal

Affairs investigation when, in fact, the

investigation had found that the detective had

been cleared, and there was -- the judge was

saying that there was a Civil matter against

him when, in fact, the Civil case had never,

there had been a determination in the Civil

case which was pending, and I believe is still

pending, that there was any responsibility on

1

2  the part of the detective, civilly or

3  criminally or otherwise.

4        Q.    And you disagreed with the

5  judge's finding?

6        A.    Yes.

7        Q.    And you disagreed with the

8  finding of the Appellate Division?

9        A.    Yes.

10       Q.    So, with regard to those

11 disagreements that you had concerning those

12 violations which were determined by two judges

13 or at least two courts --

14       A.    Yes.

15       Q.    -- can you tell me, sir, what

16 retraining happened with regard to Mr. Pearl?

17             MS. DONNELLY:  Objection.

18             You can answer.

19       Q.    If any.

20       A.    I don't recall what training,

21 retraining there was.

22       Q.    What discipline was meted out

23 against Mr. Pearl, if any?

24       A.    We referred it to our Committee

25 on Professional Conduct for them to --

2          Q.      I understand you did that.

3                  My question was --

4          A.      Well, I didn't mention that.  I

5     don't know how you know that.

6          Q.      No, I understand.  You just said

7     it.

8          A.      No, I didn't just say it.  You

9     just said it.

10         Q.      My question to you, sir, was:

11    What discipline was meted out against him, if

12    any?

13         A.      I referred it to the Committee on

14    Professional Conduct for them to make a

15    determination upon completion.

16                 Their determination, they would

17    come back to me, and I would make the

18    appropriate discipline if, indeed, they

19    recommended it or I felt it was necessary.

20         Q.      Okay.  So, back to my question.

21                 What discipline was meted out

22    against him?

23         A.      They never reached a -- while I

24    was in office they did not reach a

25    determination.

1

2          Q.      So, at this point would it be

3     fair to say that at the time that you left

4     Mr. Pearl had not been subjected to any

5     discipline --

6          A.      That's correct.

7          Q.      -- in the Office?

8          A.      That's correct.

9          Q.      Okay.

10                 And he's still employed there, at

11    the time that you left?

12         A.      Yes.

13         Q.      Was he ever asked to resign?

14         A.      No.

15         Q.      Was he ever told that his job was

16    in jeopardy?

17         A.      You're talking about by me now?

18         Q.      Yes.

19         A.      No.

20         Q.      And Mr. Pearl, what was his race,

21    please?

22         A.      He's Caucasian.

23         Q.      And Mr. Kurtzrock, what was his

24    race?

25         A.      Caucasian.

1

2          Q.     And Miss Stevens, what is her

3     race, please?

4          A.     Caucasian.

5          Q.     And do you know the name Sharyn

6     Gitter?

7          A.     Sharyn Gitter-Goldstein, yes.

8          Q.     How do you know that name?

9          A.     She's a prosecutor in the Office.

10         Q.     Do you know if she was ever

11    transferred from a Felony Bureau back to a

12    District Court Bureau?

13         A.     To a District Court Bureau?  She

14    was -- the answer is no.

15         Q.     Do you know if she was

16    transferred from a Felony Bureau to a Bureau

17    of a lesser renowned?

18              MS. DONNELLY:  Objection.

19         A.     No.

20              MS. DONNELLY:  You can answer.

21              THE WITNESS:  Sorry.

22         A.     No.

23         Q.     Was she ever transferred from a

24    Bureau that would normally be a higher Bureau

25    to a lower Bureau?

MS. DONNELLY:  Objection.

You can answer.

A.     I would answer that no.

Q.     Do you know of any transfers that happened with regard to Miss Gitter?

A.     Yes.

Q.     What transfers are you aware of concerning Miss Gitter?

A.     She went from the -- she was transferred from the Child Abuse & Domestic Violence Bureau to a unit of that Bureau, the Domestic Violence Unit.

Q.     Does the Domestic Violence Unit handle felonies?

A.     Yes.

Q.     And where is that located?

A.     Hauppauge.

I'm sorry, I misspoke.  Central Islip.

Q.     And at the time of that transfer --

And by the way, Joshua Bengis, B-E-N-G-I-S.

A.     Yes.

Q.      Do you know that name?

A.      Yes.

Q.      Who is that?

A.      A prosecutor.

Q.      Was he ever transferred from one unit to another; that being with regard to the Child Abuse & Domestic Violence Bureau to another Bureau?

        MS. DONNELLY:  Objection.

A.      No.

Q.      Was he ever transferred out of that Bureau at all?

A.      Yes.

Q.      From where to where?

A.      From the Child Abuse & Domestic Violence Bureau to the Domestic Violence Unit which is a part of the Child Abuse & Domestic Violence Bureau.

Q.      So, similar to Miss Gitter; is that correct?

A.      Yes.

Q.      And why were they transferred?

A.      Miss Gitter requested it, the transfer.

And Mr. Bengis, I can't recall
why he was transferred.

I think -- I just don't recall
right now.

Q.    And when they were transferred to
the Domestic Violence Unit were they able to
keep their senior titles; if you know?

A.    Yes.

MS. DONNELLY:  Objection.

You can answer.

A.    Yes.

Q.    Do you know the name --

By the way, Miss Gitter and
Mr. Bengis, what are their races, please?

A.    Caucasian.

Q.    Were they ever subject to any
suggestion that they would be terminated from
you?

A.    No, not at all.

Q.    Do you know Maria Troulakis,
T-R-O-U-L-K-I-S?

A.    Troulakis.

Q.    Troulakis?

A.    Yes.

1

2     Q.      Who is that?

3     A.      She's a prosecutor.

4     Q.      Was she ever transferred from one

5  unit to another that you're aware of?

6     A.      From one unit to another, no.

7     Q.      Was she ever transferred from the

8  Economic Crime Bureau back to the District

9  Court Bureau?

10    A.      I don't believe so, no.

11            Yeah, let me just clarify that.

12  That may be so.  I can't recall.

13    Q.      If it was so, just assuming for

14  purposes of this question, was going from the

15  Electronic Crime Bureau back to the District

16  Court Bureau the normal --

17    A.      Progression.

18    Q.      -- progression?

19    A.      Well, it's the Economic Crime

20  Bureau.

21    Q.      The Economic Crime Bureau.  I'm

22  sorry.

23    A.      That's okay.

24            No.

25    Q.      Would that be considered a

demotion?

     A.     No.

     Q.     Why not?

     A.     Because she -- we didn't -- a
demotion would be some pay.  I would think it
would have something to do with pay.

          But more importantly she was
transferred back because we felt that she was
a very fine prosecutor, continues to be a fine
prosecutor.

          She needed more trial experience.
She's a very hard worker, and I think very
highly of her.

     Q.     Okay.

          And with regard to her being
transferred to the District Court Bureau, that
was so she could get more experience or get
better training; is that right?

          MS. DONNELLY:  Objection.

          You can answer.

     A.     She lacked, in my opinion and in
the -- it was really in the opinion of her
supervisors that she was a hard working
prosecutor, and deserved to be in the Felony

Bureau, but needed just some more trial
experience.

She went to the District Court
Bureau.  Tried a number of cases in a short
period of time, and was transferred -- I
believe I put her in the Major Crime Bureau.

Q.      When she was in the Economic
Crime Bureau, did she conduct hearings?

A.      I said before I'm not sure if it
was a transfer back from the Economic Crime
Bureau.

Q.      Okay.

When she was in the Felony
Bureau, did she --

A.      Yes.

Q.      -- conduct hearings?

MS. DONNELLY:  Objection.

You can answer.

A.      I can't tell you exactly.

That would be a question better
put to her Bureau Chiefs or Deputy Bureau
Chiefs.

Q.      The transfer back to the District
Court Bureau is something that you approved;

1

2      is that correct?

3              A.      I approved it, yes.

4              Q.      So, with regard to her transfer,

5       you said that she needed more experience in

6       conducting trials.

7              A.      That's what the Bureau Chiefs

8       told me.

9              Q.      Okay.

10              And with regard to that, you

11      figured out a way for her to get that

12      experience; right?

13             A.      Did I --

14             Q.      You figured out a way for her to

15      get that experience.

16             A.      I figured out a way.

17             Q.      Was that, the fact that she may

18      have had or needed more trial experience, was

19      that something that you held against her?

20                      MS. DONNELLY:  Objection.

21                      You can answer.

22             A.      I didn't -- I don't even know

23      what you mean by that.

24             Q.      Sure.

25                      You didn't find that to be

1
2     something, if she needed more training in that
3     area, something that you held against her; is
4     that correct?
5                MS. DONNELLY:  Objection.
6                You can answer.
7        A.      I didn't hold anything against
8     her.
9        Q.      Right.
10               But you did hold a report from
11    Judge Kahn, allegedly, that Miss Hettiarachi
12    had problems in conducting a hearing against
13    Miss Hettiarachi; correct?
14               MS. DONNELLY:  Objection.
15               You can answer.
16       A.      You're entirely misunderstanding.
17               You may recall before -- let me
18    finish.
19       Q.      No, I'm just going to ask you --
20       A.      No, no, no.
21               I am going --
22               MS. DONNELLY:  You can't restrict
23    his answer.
24               MR. BREWINGTON:  It called for a
25    yes or no answer.

1

2          MS. DONNELLY:  No, you cannot

3    restrict his answer.

4          MR. BREWINGTON:  I am going to --

5    it called for a yes or no answer.

6          MS. DONNELLY:  You can't restrict

7    his answer.

8    Q.    Can you answer it yes or no?

9          MS. DONNELLY:  You may not like

10   the answer --

11   A.    I am going to answer it --

12   Q.    Can you answer it yes or no?

13         MS. DONNELLY:  You may not like

14   the answer, but you can't restrict his

15   answer.

16         You can answer it however you

17   want.

18   Q.    Can you answer it yes or no

19   first?

20         And then you can answer it any

21   way you want.

22   A.    What I said before and you --

23   that there were a series of events with

24   respect to your client, and it was not just

25   the SORA hearing.

1

2      Q.      I agree that you said that

3  before.

4             Now, here's my question.

5      A.      Okay.

6      Q.      Did you hold the issue of the

7  SORA hearing as one of the reasons that led to

8  Miss Hettiarachi's termination; yes or no?

9             MS. DONNELLY:  Objection.

10             You can answer.

11      A.      I can't answer that yes or no

12  because there was further matters pertaining

13  to the SORA matter that were brought to my

14  attention.

15      Q.      What were they?

16      A.      That they had --

17             First of all, I was told that the

18  judge had told either Miss Clifford or

19  Miss Kelly or both of them that she did not

20  want to single out Miss Hettiarachi, but it

21  was, indeed, the reason for the hearing that

22  she was woefully --

23             You're looking at me?

24      Q.      I am.  I'm going to ask you a

25  question because you just said before that you

were never told that she didn't want to single

out Miss Hettiarachi.

    A.    I never said that.

    Q.    Very well.  Okay.

          You want to finish your answer.

    A.    Yeah.

          That she did not want her to be

singled out, but that she required retraining,

and it was a suggestion made either amongst

the judge and the prosecutors, or just the

prosecutors that there would be a training

session, and that during the course of the

training session Miss Hettiarachi either

wasn't paying attention or was sleeping, and

she felt that the session was of no value to

her at all.

          That's what I wanted to say.

    Q.    So, you're saying that that was

the session that Judge Kahn, the session

you're referring to was the one that resulted

as a result of Judge Kahn speaking to the

supervisor?

    A.    Yes.

    Q.    Sir, did you ever read the

1
2      determination by the State Division of Human

3      Rights in this case?

4          A.      Well, I'm sure I did.

5          Q.      And do you know what the

6      determination was of the State Division of

7      Human Rights?

8          A.      The determination was that they

9      could -- your client could go to a hearing.

10         Q.      Well, do you know what the

11     determination was?

12         A.      I'd have to see the document that

13     you're looking at.

14              MR. BREWINGTON:  Sure.

15              Make this into Spota 15 for

16          identification, please.

17              (Plaintiff's Spota Exhibit 15,

18          copy of seven-page document entitled

19          Determination After Investigation,

20          marked for identification.)

21              (Handing.)

22         Q.      Does this help refresh your

23     recollection as to what the determination was

24     by the State Division of Human Rights

25     concerning Miss Hettiarachi's complaint made



to them?

    A.    Yes.

    Q.    And what was that finding, that determination?

    A.    That the Division has jurisdiction of the matter, and that probable cause exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

    Q.    And when did you first learn -- I'm finished with that document.  Thank you.

    When did you first learn that Miss Hettiarachi was complaining about discrimination; if you did?

    A.    When she first made the complaint.

    MS. DONNELLY:  Off the record.

    (Discussion off the record.)

    Q.    With regard to your style as a District Attorney in the County of Suffolk, did you consider yourself as a hands-on manager?

    A.    For the most part, yes.

    Q.    Do you know the name Cameron

Kelly?

      A.     Yes.

      Q.     Who is Cameron Kelly?

      A.     Cameron Kelly was a prosecutor.

      Q.     Male, female?

      A.     Female.

      Q.     What was Miss Kelly's race?

      A.     Oh, Cameron Kelly.

            I'm sorry, I don't know who that
is.

      Q.     Were you aware of a lawsuit filed
by a Cameron Kelly?

      A.     No.

      Q.     Do you know a person by the name
of Lippits, L-I-P-P-I-T-S?

      A.     Oh, yes.

      Q.     Who is that?

      A.     Ronald Lippits was a prosecutor.

      Q.     Okay.

            And what was his race?

      A.     Caucasian.

      Q.     Was he allowed to resign?

      A.     I believe I terminated him.  I
don't recall.

1

2          Q.     Do you know what the reason was

3     for you terminating him?

4          A.     He may have resigned.

5                 I can't recall if he -- which of

6     the two it was.

7          Q.     At the time that he left service

8     in the District Attorney's Office, were there

9     allegations against him?

10         A.     Yes.

11         Q.     What were the allegations?

12         A.     That he had made inappropriate

13    comments to one of the prosecutors in the

14    Office.

15         Q.     And who was that?

16         A.     Cameron Kenny.

17         Q.     And was Miss Kenny terminated?

18         A.     Yes.

19         Q.     For what?

20         A.     She was giving information to the

21    -- some defense attorneys.

22         Q.     Okay.

23         A.     Confidential information.

24         Q.     And Miss Kenny, what was her

25    race?

1

2          A.      Caucasian.

3          Q.      And with regard to Mr. Lippits,

4    when was he terminated; do you know?  Or when

5    did he leave the Office?

6          A.      I don't recall.

7          Q.      And, sir, with regard to your

8    management style, is termination an act of

9    last resort --

10         A.      Yes.

11         Q.      -- for ADAs?

12         A.      Yes.

13                 If there's nothing else -- yes.

14                 MR. BREWINGTON:  I'm going to ask

15           you to take a look at this document

16           which we will mark as Spota 16 for

17           identification, please.

18                 (Plaintiff's Spota Exhibit 16,

19           copy of letter dated January 10, 2013,

20           marked for identification.)

21                 (Handing.)

22         Q.      Have you had a chance to look at

23    that?

24         A.      Yes.

25         Q.      Is that your signature that's on

this document?

    A.    Yes.

    Q.    Okay.

    On July 2nd, 2013 had you made the determination that you were going to terminate Miss Hettiarachi already?

    A.    I don't recall the date that I made that determination.

    Q.    Well, do you recall when it was that you made the determination that she would be terminated?

    A.    I just said I don't recall.

    Q.    And with regard to this letter which indicates that you were not going to give her, that she would not be receiving a step increase in her salary for that year, was that determination made at or about the same time, whenever it was, that you were going to terminate her?

    MS. DONNELLY:  Objection.

    You can answer.

    A.    I don't recall the date.

    Q.    At the time that you made this -- I'm not asking you the date, I'm asking you

whether or not it's at or about the same time.

A.     I don't recall.  I can't tell
you.

If I knew the date I could tell
you, but I don't know.

Q.     Well, do you have a recollection
of having the conversation about not giving
Miss Hettiarachi her step increase?

A.     Yes.

Q.     At or about that time were you
having conversations with supervisors about
her termination?

A.     No.

Q.     When did those conversations take
place in relation to your decision not to give
her a step increase?

MS. DONNELLY:  Objection.

You can answer.

A.     I wish I could answer that
question.  I just don't recall.

Q.     And at the time that
Miss Hettiarachi was terminated, how long had
she been working in the Bureau that she was
terminated from?

1

2      A.      I'd have to look back at these

3  documents (indicating).

4      Q.      Feel free.

5      A.      I would say five months.

6              I'm using this document

7  (indicating) as...

8      Q.      And of those five months, how

9  much of that time was she out on sick leave;

10 if you know?

11     A.      None.  No time.

12             MR. BREWINGTON:  Okay.

13             We'll take a break, and I'll see

14     if I have anything else.

15             MS. DONNELLY:  Thanks.

16             (Discussion off the record.)

17     Q.      With regard to yourself, have you

18 taken any training with regard to the handling

19 of complaints of discrimination?

20     A.      Have I undertaken?

21     Q.      Yes.

22     A.      Yes.

23     Q.      When and where?

24     A.      It was a number of years ago,

25 Upstate New York.

        And I recently -- although I did
not attend this -- I recently had a training
session that was sponsored by Amistad.  Jay
Stewart Moore and Kevin Satterfield.

        My daughter gave birth -- I had
to go to Tennessee where one of my children
lives, and I could not attend it.

        I had set it all up, and then at
the last minute I just couldn't attend it.

        Q.    And how many years ago was that,
approximately, the one that you went to --

        A.    Oh, this year.

        Q.    No, the one --

        MS. DONNELLY:  No.  He's
referring to -- sorry.

        MR. BREWINGTON:  That's all
right.  Thank you.

        Q.    The one that you said was years
ago.

        A.    That was a number of years ago.

        Q.    And the one that you could not
attend, that was on implicit bias; correct?

        A.    Yes.

        Q.    And that was held after the

1

2   filing of this complaint; correct?

3          A.      Yes.

4          Q.      And with regard to that training,

5   did you ever review any of the materials, if

6   there were materials?

7          A.      I did not, no.

8          Q.      And do you know what implicit

9   bias is?

10         A.      You know, let me --

11                 I don't know if there were

12   materials.

13                 I spoke to Mr. Moore or perhaps

14   Mr. Satterfield, one of the two about it after

15   the fact, and I spoke to my Chief Assistant

16   about it.

17                 I don't recall reviewing any

18   materials.  That's not to say that there

19   weren't materials.  I just don't recall.

20         Q.      Are you aware of what the term

21   "implicit bias" refers to?

22         A.      Yes.

23         Q.      What do you understand it to

24   mean?

25         A.      It's a bias that we may very well

Now.

Spota                                        125

have, but not be aware of.

That's my understanding.

Q.    And at any time after the filing of Miss Hettiarachi's complaint to the State Division of Human Rights, did you as the District Attorney ask anyone to conduct an investigation concerning her complaint?

A.    Yes.

Q.    Who did you ask?

A.    Miss Donnelly.

Q.    Okay.

And as a result of that request, was there a report issued; if you know?

A.    By Miss Donnelly?

Q.    Yes.

A.    A report to us you mean, the DA's Office?

Q.    I'm asking after you learned that there was a complaint of discrimination whether or not there was a report issued concerning Miss Hettiarachi's complaint of discrimination, not in preparation for defense, but whether or not there was an evaluation of her complaint, and whether there



2    was a report of whether her report was

3    actually evaluated?

4         A.      The answer to that -- and I don't

5    know if I recall the report -- it was the

6    result of the investigation conducted by

7    Ms. Donnelly.

8              She responded to, in a lengthy

9    statement, to the Division of Human Rights.

10        Q.      And now let my clarify my

11   question in light of that answer.

12             Other than responding to the

13   complaint, to the State Department of Human

14   Rights defending against the complaint, was

15   there any other investigation done within your

16   Office to see if Miss Hettiarachi had been or

17   had not been discriminated against?

18        A.      The only investigation was the

19   one that Miss Donnelly conducted.

20             MR. BREWINGTON:  I have no

21        further questions.

22             Thank you.

23             MS. DONNELLY:  Thank you.

24             (Time noted:  4:35 p.m.)

25

A C K N O W L E D G M E N T

STATE OF NEW YORK    )
                     :ss
COUNTY OF            )


        I, THOMAS J. SPOTA, hereby certify

that I have read the transcript of my

testimony taken under oath in my deposition of

January 12, 2018; that the transcript is a

true, complete and correct record of my

testimony, and that the answers on the record

as given by me are true and correct.




                    _____

                        THOMAS J. SPOTA



Signed and subscribed to before
me, this              day
of                      , 2018.

_____
Notary Public, State of New York

```
 1                                              128
 2    ------------------I N D E X------------------
 3    WITNESS              EXAMINATION BY        PAGE
 4    THOMAS J. SPOTA    MR. BREWINGTON            5
 5    ------------------EXHIBITS------------------
 6    PLAINTIFF'S SPOTA                     FOR I.D.
 7       1        Copy of two-page document,
 8                first page being a letter
 9                dated April 25, 2006 from
10                Jerry W. Matejka to Tom
11                Spota and second page being
12                an Inter-Office Communication,
13                Bates Stamps D0140 and D0141    22
14       2        Copy of letter dated March 8,
15                2011 from Diane Stankewicz,
16                Bates Stamp Number D0092        24
17       3        Copy of document entitled
18                Inter-Office Communication
19                Suffolk County District
20                Attorney's Office, dated
21                October 2, 2012, Bates Stamp
22                Number D0080                    26
23       4        Copy of two-page letter dated
24                January 8, 2013                 31
25       5        Copy of letter dated
```

WITNESS — EXAMINATION BY — PAGE
THOMAS J. SPOTA — MR. BREWINGTON — 5

PLAINTIFF'S SPOTA — FOR I.D.
1  Copy of two-page document, first page being a letter dated April 25, 2006 from Jerry W. Matejka to Tom Spota and second page being an Inter-Office Communication, Bates Stamps D0140 and D0141 — 22
2  Copy of letter dated March 8, 2011 from Diane Stankewicz, Bates Stamp Number D0092 — 24
3  Copy of document entitled Inter-Office Communication Suffolk County District Attorney's Office, dated October 2, 2012, Bates Stamp Number D0080 — 26
4  Copy of two-page letter dated January 8, 2013 — 31
5  Copy of letter dated

------------EXHIBITS (Continued)-------------

PLAINTIFF'S SPOTA                    FOR I.D.

                    January 10, 2013        35

        6       Copy of e-mail dated

                November 13, 2012          36

        7       Copy of document entitled

                Inter-Office Communication,

                dated February 21st, 2013,

                Bates Stamp Number

                HETTIARACHCHI00118         39

        8       Copy of four-page document,

                entitled Suffolk County

                District Attorney's Office,

                Assistant District Attorney

                Evaluation, Bates Stamp D0301

                through D0304               43

        9       Copy of document entitled

                Response to Evaluation by

                Bureau Chief Edward Jablonski,

                Bates Stamp Number D0309    51

        10      Copy of four-page document

                entitled Suffolk County

                District Attorney's Office,

                Assistant District Attorney

------------EXHIBITS (Continued)-------------

PLAINTIFF'S SPOTA                    FOR I.D.

             Evaluation, Bates Stamp

             D0305 through D0309           52

11           Copy of seven-page document,

             Bates Stamp Numbers D0310

             through D316                  55

12           Copy of document entitled ADA

             Step Increases July 2013      68

13           17-page document, Bates Stamp

             Numbers D00400 through D00416  79

14           Copy of Newsday article entitled

             "Prosecutors in Datre case

             admit to adding markings to

             payrolls" dated October 6, 2015  90

15           Copy of seven-page document

             entitled Determination After

             Investigation               115

16           Copy of letter dated January

             10, 2013                    119


             (Counsel retained exhibits.)

**$**

**$135** [3] - 72:12, 72:14, 72:17

**'**

**'13** [1] - 47:5
**'71** [2] - 11:10, 12:25
**'82** [1] - 13:2

**1**

**1** [5] - 22:14, 22:15, 36:15, 51:21, 128:7
**10** [4] - 35:6, 51:22, 52:2, 54:11, 119:19, 129:4, 129:22, 130:21
**10/22/10** [1] - 45:23
**10175** [1] - 3:12
**10th** [1] - 35:2
**11** [5] - 55:13, 55:15, 68:4, 68:18, 130:6
**115** [1] - 130:19
**11550** [1] - 3:6
**11702** [1] - 1:24
**11766** [1] - 5:13
**119** [1] - 130:21
**12** [6] - 1:20, 68:19, 68:20, 127:10, 130:9
**124** [1] - 1:23
**13** [5] - 36:18, 79:22, 79:24, 129:6, 130:11
**14** [3] - 90:20, 90:21, 130:13
**15** [4] - 79:23, 115:15, 115:17, 130:17
**16** [3] - 119:16, 119:18, 130:20
**17-page** [2] - 79:25, 130:11
**17th** [1] - 131:20
**19** [2] - 11:10, 51:2
**190** [1] - 85:17
**1966** [1] - 9:10
**1980** [1] - 13:2
**1982** [1] - 13:7
**1st** [1] - 69:22

**2**

**2** [7] - 24:15, 24:16, 27:3, 39:20, 60:2, 128:14, 128:21
**2/26/13** [2] - 46:4, 46:21
**2001** [4] - 8:19, 8:20, 14:15, 14:17
**2006** [4] - 22:17, 23:5, 23:24, 128:9

**2011** [4] - 24:17, 25:10, 25:11, 128:15
**2012** [9] - 27:4, 28:5, 31:25, 36:18, 37:7, 41:22, 43:10, 128:21, 129:6
**2013** [25] - 31:11, 31:16, 31:25, 35:2, 35:6, 39:24, 40:20, 41:5, 41:6, 43:11, 47:9, 47:14, 68:22, 70:16, 72:20, 72:24, 85:11, 86:25, 119:19, 120:5, 128:24, 129:4, 129:9, 130:10, 130:21
**2015** [2] - 90:25, 130:16
**2018** [4] - 1:20, 127:10, 127:21, 131:21
**202** [1] - 1:23
**21st** [3] - 39:23, 41:6, 129:9
**22** [1] - 128:13
**22nd** [1] - 38:24
**24** [1] - 128:16
**25** [2] - 22:17, 128:9
**26** [1] - 128:22
**2:10** [1] - 1:21
**2nd** [2] - 28:5, 120:5

**3**

**3** [4] - 26:22, 26:24, 52:25, 128:17
**31** [1] - 128:24
**312** [2] - 63:25, 64:3
**35** [1] - 129:4
**36** [1] - 129:6
**39** [1] - 129:11

**4**

**4** [4] - 22:13, 31:13, 31:14, 128:23
**43** [1] - 129:17
**4:35** [1] - 126:24

**5**

**5** [6] - 24:14, 35:4, 35:5, 128:4, 128:25
**5/20** [2] - 47:5, 47:9
**5/20/13** [1] - 43:22
**51** [1] - 129:21
**516-938-4000** [1] - 1:24
**52** [1] - 130:5
**521** [1] - 3:11
**55** [1] - 130:8
**556** [2] - 1:19, 3:5

**6**

**6** [4] - 26:23, 36:16, 36:17, 90:25, 129:5, 130:16
**68** [1] - 130:10

**7**

**7** [4] - 39:19, 39:21, 47:11, 129:7
**79** [1] - 130:12

**8**

**8** [8] - 24:17, 31:15, 43:23, 43:25, 55:12, 128:14, 128:24, 129:12
**8th** [2] - 25:11, 31:11

**9**

**9** [4] - 35:3, 50:25, 51:3, 129:18
**90** [1] - 130:16

**A**

**abide** [1] - 7:5
**able** [1] - 106:7
**absolutely** [4] - 35:21, 77:24, 77:25, 98:17
**Abuse** [4] - 104:11, 105:8, 105:16, 105:18
**accept** [1] - 95:20
**account** [1] - 25:23
**accurate** [6] - 8:18, 20:9, 45:8, 48:18, 83:20, 84:6
**accused** [1] - 89:17
**achieve** [1] - 9:8
**achieved** [1] - 10:20
**act** [1] - 119:8
**acted** [1] - 99:2
**action** [4] - 5:16, 54:12, 87:12, 131:16
**actions** [1] - 90:3
**activated** [1] - 10:13
**active** [1] - 10:6
**actual** [2] - 77:19, 90:9
**ADA** [17] - 41:6, 45:22, 49:2, 49:11, 49:22, 49:24, 59:13, 68:21, 69:22, 69:23, 70:13, 81:9, 81:11, 82:5, 82:15, 98:25, 130:9
**ADA's** [1] - 64:13

**ADAs** [6] - 49:13, 53:18, 61:3, 69:21, 69:23, 72:6, 84:23, 85:17, 119:11
**added** [2] - 89:23, 89:24
**adding** [2] - 90:24, 130:15
**additional** [4] - 9:12, 10:11, 13:3, 42:9
**address** [1] - 5:11
**addressed** [1] - 59:21
**addressing** [1] - 37:20
**administer** [1] - 4:16
**administered** [1] - 25:25
**Administration** [2] - 25:7, 25:8
**Administrative** [1] - 25:6
**admit** [2] - 90:23, 130:15
**advance** [1] - 94:23
**advantage** [1] - 26:13
**Advisory** [16] - 19:11, 19:14, 19:24, 20:20, 28:17, 28:22, 29:16, 29:20, 29:24, 30:3, 30:23, 43:2, 43:17, 46:12, 48:3, 48:10
**Affairs** [4] - 98:7, 98:15, 98:19, 99:18
**African** [2] - 84:24, 86:8
**ago** [4] - 122:24, 123:11, 123:20, 123:21
**agree** [1] - 113:2
**AGREED** [3] - 4:3, 4:9, 4:14
**agreed** [1] - 49:5
**ahead** [1] - 32:20
**allegation** [1] - 93:10
**allegations** [3] - 53:5, 118:9, 118:11
**allegedly** [1] - 111:11
**allow** [2] - 94:16, 94:19
**allowed** [3] - 96:17, 96:21, 117:23
**almost** [3] - 14:4, 49:21, 53:12
**alone** [1] - 13:10
**alter** [1] - 89:23
**altered** [4] - 89:2, 89:8, 91:20, 91:22,

91:25, 93:10
**altering** [1] - 88:25
**altogether** [1] - 10:14
**American** [2] - 84:24, 84:25
**Americans** [1] - 86:8
**Amistad** [1] - 123:4
**AND** [3] - 4:2, 4:8, 4:13
**anger** [1] - 58:7
**Annie** [1] - 86:16
**annoyances** [1] - 58:8
**answer** [79] - 7:8, 18:25, 32:25, 34:13, 34:17, 38:4, 44:17, 47:19, 47:20, 49:17, 54:17, 59:21, 61:22, 61:23, 62:8, 63:12, 64:18, 64:19, 65:13, 66:2, 66:8, 66:20, 67:4, 72:3, 73:3, 73:12, 73:23, 74:16, 75:11, 75:22, 75:24, 81:22, 82:10, 82:23, 83:9, 83:10, 83:17, 87:15, 87:22, 88:5, 88:15, 89:11, 94:18, 96:10, 99:6, 99:16, 100:18, 103:14, 103:20, 104:3, 104:4, 106:11, 108:21, 109:19, 110:21, 111:6, 111:15, 111:23, 111:25, 112:3, 112:5, 112:7, 112:8, 112:10, 112:11, 112:12, 112:14, 112:15, 112:16, 112:18, 112:20, 113:10, 113:11, 114:6, 120:22, 121:19, 121:20, 126:4, 126:11
**answered** [4] - 55:8, 65:25, 66:21, 83:8
**answers** [2] - 32:22, 127:12
**anyway** [1] - 18:9
**appeals** [1] - 87:3
**Appeals** [1] - 87:5
**Appellate** [3] - 97:20, 97:24, 100:8
**appropriate** [1] - 101:18
**appropriately** [1] - 99:2
**approved** [2] - 109:25, 110:3
**April** [2] - 22:17,

128:9
area [3] - 9:13, 18:7, 111:3
article [3] - 90:22, 92:4, 130:13
as.. [1] - 122:7
Asian [1] - 84:25
Asians [2] - 86:11, 86:13
aside [3] - 69:7, 72:19, 84:16
assigned [1] - 50:5
Assistant [20] - 18:17, 21:3, 21:8, 21:12, 23:22, 23:25, 31:5, 34:4, 34:6, 44:4, 49:6, 52:5, 56:10, 87:19, 88:3, 94:7, 97:3, 124:15, 129:15, 129:25
Assistants [6] - 20:11, 23:9, 26:9, 29:10, 81:13, 89:8
assume [1] - 47:22
assuming [1] - 107:13
assumptions [1] - 72:2
attend [4] - 123:3, 123:8, 123:10, 123:23
attention [2] - 113:14, 114:15
attitudes [1] - 77:5
attorney [3] - 5:15, 7:2, 11:5
ATTORNEY [2] - 1:8, 1:9
Attorney [19] - 8:12, 15:14, 18:18, 23:22, 25:15, 25:22, 27:16, 34:4, 44:4, 44:15, 52:5, 87:19, 88:3, 94:8, 97:4, 116:21, 125:7, 129:15, 129:25
ATTORNEY'S [1] - 1:8
Attorney's [14] - 7:18, 8:5, 12:13, 12:18, 21:23, 27:3, 37:25, 44:3, 52:4, 69:20, 118:8, 128:20, 129:14, 129:24
Attorneys [3] - 3:4, 3:10, 49:6
attorneys [2] - 4:3, 118:21
Authority [1] - 11:25
authorized [1] - 4:16
Avenue [1] - 3:11
aware [37] - 25:16, 26:7, 26:10, 30:17,

30:21, 33:10, 33:18, 50:14, 50:20, 54:22, 54:25, 56:13, 56:17, 56:21, 59:2, 59:6, 59:7, 67:6, 67:9, 68:2, 72:8, 88:6, 88:9, 88:10, 89:3, 89:4, 89:7, 96:16, 96:19, 96:23, 97:8, 97:19, 104:8, 107:5, 117:12, 124:20, 125:2

**B**

B-E-N-G-I-S [1] - 104:24
Babylon [1] - 1:24
base [1] - 70:9
based [5] - 41:18, 54:14, 58:14, 98:10, 98:14
baseless [4] - 61:16, 63:20, 64:10, 65:20
basis [1] - 43:7
Bates [22] - 22:20, 23:2, 24:18, 27:4, 27:13, 39:24, 40:7, 44:5, 51:6, 52:6, 55:16, 79:25, 80:16, 128:13, 128:16, 128:21, 129:10, 129:16, 129:21, 130:4, 130:7, 130:11
bears [1] - 43:21
become [1] - 16:8
belabor [1] - 22:5
benefit [1] - 26:8
Bengis [3] - 104:23, 106:2, 106:15
best [8] - 45:16, 62:8, 66:8, 76:24, 77:2, 77:15
better [3] - 47:21, 108:19, 109:21
between [1] - 4:13
bias [4] - 123:23, 124:9, 124:21, 124:25
birth [1] - 123:6
biweekly [2] - 72:15, 72:16
blacked [1] - 40:14
blackout [1] - 69:8
block [1] - 39:9
blood [1] - 131:16
bottom [3] - 40:8, 59:10, 63:24
Boulevard [2] - 1:19, 3:5
Brady [3] - 88:19, 97:21, 98:16
break [2] - 7:3,

122:13
BREWINGTON [32] - 3:3, 3:7, 5:7, 22:11, 24:12, 26:20, 31:9, 34:23, 36:12, 38:20, 39:17, 43:19, 50:24, 51:19, 55:10, 64:3, 68:16, 77:24, 78:3, 79:20, 85:5, 85:10, 90:18, 93:25, 111:24, 112:4, 115:14, 119:14, 122:12, 123:17, 126:20, 128:4
briefly [3] - 55:21, 55:24, 56:5
brought [2] - 41:25, 113:13
Buonora [2] - 21:13, 23:22
BUREAU [5] - 1:11, 1:11, 1:12, 1:13, 1:14
Bureau [149] - 14:25, 15:4, 15:19, 15:20, 15:22, 15:23, 15:24, 16:2, 16:5, 16:8, 16:21, 17:6, 17:8, 18:3, 18:4, 19:10, 19:11, 19:14, 19:15, 19:25, 20:2, 21:6, 28:14, 28:15, 28:17, 28:19, 28:20, 28:21, 28:22, 29:7, 29:8, 29:16, 29:17, 29:21, 29:22, 29:24, 30:3, 30:7, 30:8, 30:10, 30:23, 36:6, 36:7, 36:8, 37:13, 38:10, 38:11, 38:24, 39:14, 39:15, 40:12, 41:8, 41:9, 41:17, 41:21, 42:5, 42:8, 42:10, 42:12, 42:13, 42:17, 43:2, 43:5, 43:9, 43:12, 43:14, 43:17, 45:6, 45:23, 46:8, 46:13, 47:8, 47:12, 47:16, 48:3, 48:5, 48:8, 48:10, 48:11, 48:23, 49:25, 50:4, 50:8, 51:5, 53:2, 53:6, 53:12, 62:6, 64:25, 65:2, 65:4, 65:7, 66:6, 67:8, 67:10, 70:12, 74:11, 74:12, 74:14, 76:17, 79:7, 79:16, 85:22, 86:21, 94:8, 94:21, 103:11, 103:12, 103:13, 103:16, 103:24, 103:25, 104:12, 105:8, 105:9, 105:13, 105:17,

105:19, 107:8, 107:9, 107:15, 107:16, 107:20, 107:21, 108:17, 109:2, 109:5, 109:7, 109:9, 109:12, 109:15, 109:22, 109:25, 110:7, 121:24, 129:20
Bureaus [12] - 15:21, 17:2, 17:3, 27:14, 29:4, 29:6, 36:4, 85:2, 85:25, 86:10, 86:15
but.. [3] - 31:2, 56:4, 69:10
BY [4] - 3:7, 3:13, 5:6, 128:3

**C**

C-O-R-C-O-R-A-N [1] - 11:6
CAB [1] - 61:5
CADVB [1] - 81:14
calendar [1] - 80:9
Camacho [3] - 90:12, 91:18, 92:24
Camacho's [2] - 91:17, 92:8
Cameron [6] - 116:25, 117:4, 117:5, 117:9, 117:13, 118:16
cannot [4] - 71:23, 73:13, 86:22, 112:2
capable [1] - 34:2
capacity [10] - 1:9, 1:10, 1:11, 1:11, 1:12, 1:13, 1:14, 1:15, 14:22, 14:24
case [27] - 5:22, 6:2, 37:17, 62:23, 62:25, 90:9, 90:10, 90:23, 91:5, 91:8, 92:25, 93:2, 93:4, 93:6, 97:9, 97:12, 97:15, 97:21, 98:7, 98:9, 98:20, 99:3, 99:22, 99:24, 115:3, 130:14
Case [16] - 19:11, 19:14, 19:24, 20:20, 28:17, 28:22, 29:16, 29:20, 29:24, 30:2, 30:22, 43:2, 43:17, 46:12, 48:2, 48:10
cases [1] - 13:3, 13:16, 13:18, 14:10, 30:12, 37:14, 77:4, 87:4, 93:4, 98:11, 109:5
Caucasian [4] - 102:22, 106:16, 117:22, 119:2

caucasian [2] - 102:25, 103:4
central [1] - 104:19
certainly [5] - 19:13, 19:15, 42:24, 43:4, 70:22
certification [1] - 4:6
certify [3] - 127:7, 131:8, 131:14
Chalifoux [5] - 70:24, 71:18, 73:8, 74:22, 74:25
CHALIFOUX [1] - 1:14
chance [9] - 31:18, 35:10, 40:4, 51:9, 52:10, 56:5, 68:25, 80:6, 119:22
change [2] - 12:8, 13:18
CHIEF [7] - 1:9, 1:10, 1:11, 1:11, 1:12, 1:13, 1:14
Chief [33] - 14:25, 15:4, 15:5, 15:19, 15:20, 15:22, 16:8, 16:11, 16:16, 16:20, 16:21, 18:3, 18:4, 21:3, 21:8, 21:12, 23:22, 23:25, 31:5, 48:23, 49:25, 50:4, 50:8, 51:5, 53:2, 53:7, 74:12, 74:13, 74:14, 94:21, 124:15, 129:20
Chiefs [12] - 27:15, 28:21, 29:8, 45:3, 70:12, 70:13, 74:11, 109:22, 109:23, 110:7
Child [4] - 104:11, 105:8, 105:16, 105:18
children [1] - 123:7
Cho [1] - 86:17
City [1] - 12:3
Civil [7] - 98:9, 98:16, 98:19, 99:3, 99:21, 99:22, 99:23
civilly [1] - 100:2
claim [1] - 64:9
claims [2] - 61:16, 63:19
clarify [2] - 107:11, 126:10
clarity [1] - 67:19
classified [1] - 37:8
clear [4] - 6:18, 67:18, 81:10, 82:4
clear [2] - 98:18, 99:20
client [2] - 112:24, 115:9
Clifford [10] - 39:20,

70:21, 71:16, 73:7, 74:13, 74:21, 75:5, 76:19, 80:23, 113:18
**CLIFFORD** [1] - 1:13
**close** [1] - 6:7
**color** [3] - 84:24, 86:9, 86:12
**comfort** [1] - 7:3
**coming** [2] - 33:10, 48:13
**comments** [5] - 53:9, 60:25, 61:4, 61:9, 118:13
**commitment** [1] - 45:7
**Committee** [4] - 90:4, 90:7, 100:24, 101:13
**Communication** [6] - 22:20, 27:2, 39:23, 128:12, 128:18, 129:8
**complained** [3] - 78:22, 79:13, 116:10
**complaining** [4] - 53:25, 78:19, 78:25, 116:14
**complaint** [16] - 54:5, 64:14, 78:5, 81:25, 82:21, 83:12, 115:25, 116:17, 124:2, 125:5, 125:8, 125:20, 125:22, 125:25, 126:13, 126:14
**complaints** [2] - 77:17, 122:19
**complete** [4] - 26:3, 99:11, 99:14, 127:11
**completion** [1] - 101:15
**concepts** [1] - 79:4
**concern** [3] - 38:9, 53:23, 54:4
**concerned** [1] - 37:11
**concerning** [18] - 5:22, 22:7, 23:9, 24:7, 26:17, 33:10, 50:9, 71:3, 76:14, 90:3, 90:9, 90:10, 92:12, 100:11, 104:9, 115:25, 125:8, 125:22
**Conduct** [2] - 100:25, 101:14
**conduct** [4] - 79:8, 109:9, 109:17, 125:7
**conducted** [5] - 77:19, 78:8, 78:9, 126:6, 126:11
**conducting** [4] - 78:6, 83:14, 110:6,

111:12
**confidential** [1] - 118:23
**confrontational** [1] - 77:11
**conglomeration** [2] - 83:22, 84:2
**congratulate** [1] - 43:3
**consider** [2] - 86:12, 116:22
**consideration** [1] - 82:25
**considered** [1] - 107:25
**consistent** [4] - 57:7, 61:17, 61:19, 77:7
**constant** [1] - 21:10
**CONSTANT** [1] - 1:9
**Constant** [26] - 21:13, 22:13, 24:14, 26:23, 31:6, 31:12, 32:7, 32:8, 32:16, 33:3, 35:3, 51:21, 52:23, 53:3, 53:24, 57:13, 57:18, 62:3, 62:17, 66:3, 66:4, 67:25, 68:18, 73:25, 75:5, 79:23
**constantly** [1] - 58:7
**consulted** [1] - 32:16
**contact** [1] - 19:4
**contained** [3] - 52:25, 54:11, 54:18
**content** [5] - 37:25, 38:6, 51:15, 52:19, 68:3
**context** [2] - 99:11, 99:14
**Continued** [2] - 129:2, 130:2
**continues** [1] - 108:10
**control** [1] - 40:15
**conversation** [7] - 52:22, 52:24, 62:9, 67:25, 70:25, 71:12, 121:8
**conversations** [2] - 121:12, 121:15
**copy** [16] - 22:16, 24:17, 26:25, 31:15, 35:6, 36:18, 39:21, 44:2, 51:4, 52:3, 55:16, 68:7, 68:21, 90:22, 115:18, 119:19
**Copy** [15] - 128:7, 128:14, 128:17, 128:23, 128:25, 129:5, 129:7, 129:12, 129:18, 129:22,

130:6, 130:9, 130:13, 130:17, 130:20
**Corcoran** [2] - 11:5, 12:8
**Corcoran's** [1] - 11:21
**corner** [1] - 59:11
**corporal** [2] - 10:21, 10:23
**Corporation** [1] - 25:12
**Corps** [2] - 10:3, 10:7
**correct** [17] - 9:14, 56:11, 65:3, 72:12, 84:13, 84:18, 84:21, 102:6, 102:8, 105:21, 110:2, 111:4, 111:13, 123:23, 124:2, 127:11, 127:13
**Corrections** [1] - 59:13
**corrective** [1] - 54:12
**correctly** [1] - 24:25
**Counsel** [1] - 130:23
**COUNTY** [4] - 1:8, 127:5, 131:4
**County** [15] - 7:17, 8:8, 8:9, 12:11, 12:18, 15:14, 27:2, 34:5, 34:19, 44:3, 52:4, 116:21, 128:19, 129:13, 129:23
**couple** [4] - 38:15, 45:19, 57:2, 80:6
**course** [1] - 114:13
**Court** [14] - 4:19, 19:10, 28:17, 28:22, 29:22, 45:6, 85:22, 103:12, 103:13, 107:9, 107:16, 108:17, 109:4, 109:25
**court** [2] - 6:10, 90:3
**COURT** [1] - 1:2
**courtroom** [1] - 81:8
**Courts** [1] - 12:3
**courts** [1] - 100:13
**covered** [2] - 47:25, 48:9
**Crime** [32] - 16:2, 19:15, 19:25, 36:7, 38:11, 39:14, 41:8, 41:20, 42:4, 42:8, 42:10, 42:17, 43:5, 43:9, 43:13, 46:13, 47:12, 48:3, 48:5, 48:7, 48:11, 67:10, 76:17, 107:8, 107:15, 107:19, 107:21, 109:7, 109:9, 109:11
**crime** [2] - 54:8, 79:5

**Crimes** [4] - 16:3, 30:3, 30:7, 30:23
**Criminal** [1] - 77:3
**criminally** [1] - 100:3
**critical** [4] - 37:15, 81:11, 82:5, 82:15
**CV2:14-06731-DRH-ARL** [1] - 1:17

**D**

**D00400** [3] - 80:2, 84:9, 130:12
**D00402** [1] - 80:17
**D00416** [3] - 80:2, 84:9, 130:12
**D0080** [3] - 27:4, 27:13, 128:22
**D0092** [2] - 24:19, 128:16
**D0140** [3] - 22:20, 23:2, 128:13
**D0141** [3] - 22:21, 23:2, 128:13
**D0301** [2] - 44:5, 129:16
**D0304** [2] - 44:6, 129:17
**D0305** [3] - 51:25, 52:6, 130:5
**D0308** [1] - 51:25
**D0309** [4] - 51:6, 52:7, 129:21, 130:5
**D0310** [2] - 55:17, 130:7
**D0312** [1] - 59:11
**D316** [2] - 55:17, 130:8
**DA's** [7] - 12:16, 13:14, 13:20, 14:21, 24:10, 95:16, 125:17
**Date** [2] - 46:3, 46:20
**date** [10] - 28:4, 28:7, 43:21, 45:23, 85:4, 85:9, 120:8, 120:23, 120:25, 121:5
**dated** [2] - 22:17, 24:17, 27:3, 30:24, 31:11, 31:15, 34:25, 35:6, 36:18, 39:23, 90:24, 119:19, 128:9, 128:14, 128:20, 128:23, 128:25, 129:5, 129:9, 130:16, 130:20
**dates** [2] - 45:19, 46:19
**Datre** [5] - 90:23, 91:6, 93:2, 93:3, 130:14
**DATRE** [1] - 91:6

**daughter** [1] - 123:6
**deal** [4] - 46:8, 77:2, 77:4
**dealing** [6] - 46:9, 46:11, 46:18, 65:6, 66:11, 93:8
**dealt** [1] - 24:6
**Deborah** [1] - 2:3
**DEBORAH** [2] - 131:6, 131:24
**deceptive** [7] - 74:11, 74:15, 74:19, 75:3, 75:9, 75:17, 76:19
**decide** [1] - 30:13
**decided** [1] - 45:15
**decision** [6] - 28:15, 70:3, 70:6, 73:18, 84:20, 121:16
**decisions** [4] - 28:12, 32:12, 32:18, 70:10
**declare** [1] - 93:14
**declaring** [1] - 92:25
**Defendant** [2] - 2:2, 5:17
**Defendants** [2] - 1:16, 3:10
**defending** [1] - 126:14
**defense** [2] - 118:21, 125:24
**degree** [1] - 9:2
**demotion** [2] - 108:2, 108:6
**Department** [1] - 126:13
**Deposition** [1] - 2:2
**deposition** [5] - 4:6, 4:14, 127:9, 131:10, 131:12
**depositions** [1] - 80:12
**DEPUTY** [2] - 1:13, 1:14
**Deputy** [10] - 14:25, 15:19, 15:20, 15:22, 18:3, 28:21, 29:8, 70:12, 74:12, 109:22
**describe** [2] - 25:19, 76:25
**described** [1] - 26:15
**deserved** [1] - 108:25
**deserving** [1] - 71:7
**detective** [5] - 98:5, 98:8, 98:13, 99:19, 100:2
**Determination** [2] - 115:19, 130:18
**determination** [14] -

99:23, 101:15, 101:16, 101:25, 115:2, 115:6, 115:8, 115:11, 115:23, 116:5, 120:6, 120:9, 120:11, 120:18
**determinations** [1] - 48:19
**determined** [1] - 100:12
**Diane** [3] - 24:18, 24:21, 128:15
**different** [4] - 16:15, 16:18, 36:4, 82:11
**direct** [3] - 19:4, 32:11, 48:19
**directly** [2] - 18:20, 19:18
**disagree** [2] - 83:3, 98:17
**disagreed** [2] - 100:4, 100:7
**disagreements** [1] - 100:11
**disciplinary** [1] - 87:12
**discipline** [11] - 54:13, 76:2, 76:7, 76:12, 76:13, 76:23, 100:22, 101:11, 101:18, 101:21, 102:5
**discriminated** [1] - 126:17
**discrimination** [4] - 116:15, 122:19, 125:20, 125:23
**discriminatory** [1] - 116:10
**Discussion** [3] - 78:2, 116:19, 122:16
**discussions** [2] - 72:21, 73:9
**dishonest** [6] - 74:11, 74:15, 74:20, 75:3, 75:9, 75:18
**dismay** [1] - 58:8
**dismissive** [1] - 54:7
**District** [46] - 7:17, 8:5, 8:12, 12:18, 15:14, 18:17, 19:10, 21:23, 23:22, 25:14, 25:22, 27:2, 27:16, 28:16, 28:22, 29:22, 34:4, 37:25, 44:3, 44:4, 44:15, 45:6, 49:6, 52:4, 52:5, 69:20, 85:21, 87:19, 88:3, 94:7, 97:3, 103:12, 103:13, 107:8, 107:15, 108:17, 109:4,

109:24, 116:21, 118:8, 125:7, 128:19, 129:14, 129:15, 129:24, 129:25
**DISTRICT** [5] - 1:2, 1:3, 1:8, 1:8, 1:9
**Division** [8] - 97:20, 97:25, 100:8, 115:2, 115:6, 115:24, 116:6, 125:6, 126:9
**DIVISION** [1] - 1:10
**Docket** [1] - 1:17
**doctor** [2] - 9:3, 9:12
**doctor's** [3] - 33:11, 33:13, 33:16
**document** [72] - 22:16, 22:25, 23:5, 24:3, 24:13, 26:25, 27:7, 27:12, 27:18, 27:22, 28:2, 28:4, 29:11, 30:16, 30:19, 36:14, 36:23, 39:22, 40:5, 40:9, 40:10, 41:2, 44:2, 44:11, 45:19, 46:25, 47:10, 48:17, 48:21, 49:20, 51:4, 51:13, 51:16, 51:20, 51:24, 52:3, 52:11, 52:13, 52:18, 52:19, 54:19, 54:24, 55:16, 59:12, 60:25, 68:7, 68:10, 68:21, 69:7, 72:18, 79:21, 79:25, 80:7, 84:14, 89:25, 93:24, 115:12, 115:18, 116:12, 119:15, 120:2, 122:6, 128:7, 128:17, 129:7, 129:12, 129:18, 129:22, 130:6, 130:9, 130:11, 130:17
**documents** [22] - 21:19, 22:3, 22:7, 38:16, 41:18, 41:24, 46:16, 48:13, 68:3, 84:2, 84:8, 88:8, 88:25, 89:2, 89:9, 89:21, 91:14, 91:19, 92:12, 93:9, 93:11, 122:3
**Domestic** [8] - 104:11, 104:13, 104:14, 105:8, 105:16, 105:17, 105:18, 106:7
**done** [8] - 47:25, 48:9, 48:22, 49:5, 66:18, 81:9, 93:24, 126:15
**Donnelley** [1] - 7:9
**Donnelly** [4] - 125:11, 125:15,

126:7, 126:19
**DONNELLY** [66] - 3:13, 22:23, 27:10, 32:20, 32:24, 34:12, 34:16, 38:3, 44:16, 47:18, 49:16, 54:16, 60:9, 61:21, 63:11, 64:2, 64:4, 64:6, 64:17, 65:12, 65:15, 65:17, 65:21, 66:19, 67:3, 73:22, 75:10, 75:21, 79:18, 81:21, 82:9, 82:22, 85:3, 85:8, 85:12, 87:14, 87:21, 88:4, 88:14, 89:10, 93:22, 94:17, 99:5, 100:17, 103:18, 103:20, 104:2, 105:10, 106:10, 108:20, 109:18, 110:20, 111:5, 111:14, 111:22, 112:2, 112:6, 112:9, 112:13, 113:9, 116:18, 120:21, 121:18, 122:15, 123:15, 126:23
**down** [7] - 6:11, 29:12, 43:8, 58:2, 59:25, 94:21, 94:22
**duly** [2] - 5:3, 131:11
**dumping** [2] - 93:5
**during** [9] - 15:7, 17:17, 18:2, 18:22, 19:3, 44:14, 69:21, 72:6, 114:13

**E**

**e-mail** [2] - 36:18, 129:5
**early** [1] - 43:11
**East** [1] - 1:23
**EASTER** [1] - 1:3
**ECB** [5] - 36:6, 37:4, 61:10, 65:10, 65:11
**Economic** [23] - 19:15, 19:25, 30:3, 30:7, 30:23, 38:11, 39:14, 41:8, 41:20, 42:7, 42:9, 42:17, 43:5, 43:9, 43:13, 46:13, 48:3, 48:11, 107:8, 107:19, 107:21, 109:8, 109:11
**economic** [1] - 36:7
**Economics** [1] - 20:20
**education** [1] - 8:22
**Education** [1] - 25:12

**EDWARD** [2] - 1:10, 1:11
**Edward** [3] - 45:3, 51:5, 129:20
**effect** [1] - 4:17
**either** [7] - 23:10, 57:17, 71:2, 80:22, 113:18, 114:10, 114:14
**elected** [4] - 8:16, 8:19, 14:19, 15:11
**Electronic** [1] - 107:15
**elements** [1] - 79:5
**ELLEN** [1] - 3:13
**Emily** [2] - 21:9, 21:13
**EMILY** [1] - 1:9
**employed** [4] - 18:14, 68:9, 92:20, 102:10
**employee** [2] - 55:3, 56:9, 56:20
**employees** [1] - 26:13
**employment** [6] - 7:16, 7:20, 12:19, 13:18, 18:23, 68:8
**encompasses** [1] - 65:5
**end** [3] - 11:10, 12:25, 21:22
**engaged** [5] - 10:6, 76:14, 88:13, 97:20, 116:9
**engaging** [1] - 116:9
**enter** [1] - 10:25
**entered** [1] - 93:15
**entire** [1] - 79:16
**entirely** [4] - 99:7, 99:10, 99:13, 111:16
**entities** [1] - 5:20
**entitled** [18] - 25:17, 26:25, 27:14, 39:22, 44:2, 51:4, 52:3, 68:21, 90:22, 115:18, 128:17, 129:7, 129:13, 129:18, 129:23, 130:9, 130:13, 130:18
**environmental** [1] - 93:6
**Erin** [1] - 86:17
**especially** [1] - 85:21
**ESQ** [2] - 3:7, 3:13
**essential** [1] - 34:3
**essentially** [2] - 28:15, 52:24
**established** [1] - 36:9
**estate** [1] - 11:22

**evaluate** [1] - 63:22
**evaluated** [2] - 49:7, 126:3
**evaluating** [1] - 18:23
**evaluation** [29] - 43:20, 44:13, 44:14, 45:4, 45:5, 46:4, 46:8, 46:10, 46:20, 47:13, 47:15, 47:25, 48:8, 49:15, 50:9, 50:10, 50:16, 53:23, 55:4, 56:11, 56:15, 56:24, 56:25, 58:14, 59:3, 59:14, 64:8, 64:16, 125:25
**Evaluation** [1] - 44:5, 51:5, 52:6, 57:7, 129:16, 129:19, 130:4
**evaluations** [4] - 49:5, 49:13, 77:8, 87:25
**evaluators** [1] - 56:18
**events** [2] - 76:16, 112:23
**evidence** [3] - 88:13, 88:18, 88:22
**exact** [2] - 71:11, 82:17
**exactly** [2] - 62:12, 109:20
**EXAMINATION** [2] - 5:6, 128:3
**examined** [1] - 5:4
**except** [1] - 4:9
**exception** [2] - 26:12, 63:23
**Exhibit** [15] - 22:15, 24:16, 26:24, 31:14, 35:5, 36:17, 43:25, 51:3, 52:2, 55:15, 68:20, 79:24, 90:21, 115:17, 119:18
**EXHIBITS** [2] - 128:5, 129:2, 130:2
**exhibits** [1] - 130:23
**existed** [1] - 56:18
**exists** [1] - 116:8
**expand** [1] - 45:11
**expected** [2] - 57:3, 61:19
**experience** [7] - 108:12, 108:18, 109:3, 110:5, 110:12, 110:15, 110:18
**expert** [1] - 6:10
**explain** [2] - 57:19, 63:9

**F**

fact [14] - 37:11, 39:5, 50:7, 62:23, 63:5, 76:18, 96:13, 98:10, 98:14, 98:18, 99:18, 99:22, 110:17, 124:15
facts [2] - 5:25, 72:2
fair [2] - 63:16, 102:3
fairly [1] - 6:7
familiar [10] - 27:17, 27:21, 29:5, 33:15, 34:10, 51:12, 51:16, 69:6, 69:9, 97:14
familiarity [1] - 29:9
far [5] - 29:4, 29:9, 54:18, 84:7, 84:12
fashion [1] - 33:17
favors [1] - 61:4
February [6] - 39:23, 40:20, 41:5, 41:6, 46:14, 129:9
feelings [1] - 61:18
fellow [1] - 86:21
felonies [1] - 104:15
Felony [9] - 85:2, 85:25, 86:2, 86:9, 86:14, 103:11, 103:16, 108:25, 109:14
felt [17] - 54:7, 57:20, 58:3, 62:11, 62:16, 62:22, 63:10, 64:14, 65:9, 66:18, 67:7, 67:21, 71:6, 98:14, 101:19, 108:9, 114:16
female [2] - 117:6, 117:7
Fifth [1] - 3:11
figure [1] - 7:10
figured [3] - 110:11, 110:14, 110:16
filed [2] - 50:15, 117:12
filing [3] - 4:5, 124:2, 125:4
findings [4] - 91:17, 92:8, 92:9, 92:12
fine [2] - 92:18, 108:10
finish [5] - 32:20, 96:7, 96:10, 111:18, 114:6
finished [2] - 74:16, 116:12
first [22] - 21:12, 22:16, 24:21, 27:17, 31:21, 36:22, 46:7, 46:19, 55:20, 56:8, 57:5, 58:19, 58:21,

69:12, 80:25, 84:7, 112:19, 113:17, 116:11, 116:13, 116:16, 128:8
five [3] - 11:11, 122:5, 122:8
folks [1] - 22:6
follow [1] - 60:13
followed [1] - 29:20
follows [1] - 5:5
FOR [3] - 128:6, 129:3, 130:3
force [1] - 4:17
forgiven [1] - 26:5
forgiveness [1] - 24:7
Forgiveness [2] - 25:15, 25:23
form [2] - 4:10, 27:22, 30:17, 33:17, 40:9, 45:9, 45:10, 54:14, 69:19, 69:25, 82:12, 87:11
formal [2] - 9:13, 26:16
format [1] - 69:6
forth [1] - 131:11
four [8] - 11:15, 11:17, 38:25, 44:2, 51:24, 52:3, 129:12, 129:22
four-page [5] - 44:2, 51:24, 52:3, 129:12, 129:22
fourth [1] - 29:12
FREDERICK [2] - 3:3, 3:7
free [1] - 122:4
full [1] - 5:8
functions [1] - 34:3
fundamental [1] - 79:4
FURTHER [2] - 4:8, 4:13

**G**

Gandy [1] - 86:19
generalities [1] - 71:24
generally [2] - 32:16, 57:3
Gerard [1] - 13:12
Gitter [7] - 103:6, 103:7, 104:6, 104:9, 105:20, 105:24, 106:14
Gitter-Goldstein [1] - 103:7
given [5] - 49:13, 95:4, 95:5, 127:13,

131:13
glass [1] - 77:23
goal [1] - 9:9
Goldstein [1] - 103:7
graduate [1] - 8:23
Grand [5] - 89:20, 90:15, 91:14, 91:20, 93:11
Gray [2] - 86:19, 87:2
Grievance [2] - 90:4, 90:6
guess [3] - 29:12, 76:24, 98:4
guilty [2] - 90:17, 93:15
guy [1] - 86:23

**H**

Hahn [2] - 78:12, 78:13
half [2] - 9:22, 11:17
HALL [1] - 3:9
hand [3] - 45:25, 59:10, 131:20
Handing [16] - 22:22, 24:20, 27:6, 31:17, 35:8, 36:20, 40:3, 47:2, 47:8, 50:8, 50:15, 53:4, 53:8, 54:7, 54:23, 56:14, 57:19, 58:2, 58:10, 60:6, 60:15, 60:19, 60:24, 62:5, 62:11, 62:16, 62:22, 63:9, 66:5, 66:14, 66:16, 66:18, 67:20, 70:16, 71:4, 72:22, 74:8, 75:7, 76:8, 78:6, 78:25, 79:6, 79:9, 79:15, 81:9, 81:12, 81:25, 82:5, 82:15, 82:20, 84:17, 87:13, 87:17, 87:24, 88:12, 95:5, 95:8, 96:20, 111:11, 111:13, 113:20, 114:3, 114:14, 116:14, 120:7, 121:9, 121:23, 126:16
handle [1] - 13:16, 104:15
handled [1] - 57:4
handling [2] - 13:17, 122:18
hands [1] - 116:22
hands-on [1] - 116:22
Harbor [1] - 5:12
hard [3] - 72:13, 108:13, 108:24
Hartman [1] - 61:3
Hauppauge [1] - 104:18
head [1] - 25:7
Heads [1] - 27:15
hear [2] - 6:6, 38:8
hearing [12] - 19:20, 77:18, 77:19, 78:9, 79:3, 81:9, 83:14, 111:12, 112:25, 113:7, 113:21, 115:9
hearings [4] - 79:8, 81:15, 109:9, 109:17
HEILIG [1] - 1:10
Heilig [5] - 45:3, 47:21, 57:12, 57:18, 74:2
held [4] - 8:11, 110:19, 111:3, 123:25

help [1] - 115:22
helped [1] - 77:15
helps [1] - 21:19
Hempstead [4] - 1:19, 3:6, 12:14, 12:23
hereby [1] - 127:7, 131:8
HEREBY [1] - 4:2
herein [1] - 4:4
hereinbefore [1] - 131:10
hereunto [1] - 131:20
Het [1] - 71:15
HETTIARACHCHI [1] - 1:5
HETTIARACHCHI 00118 [3] - 39:25, 40:8, 129:11
Hettiarachi [76] - 5:16, 18:11, 20:19, 21:22, 23:23, 29:13, 30:22, 31:12, 32:2, 36:9, 39:13, 41:7, 41:20, 45:22, 46:12, 47:2, 47:8, 50:8, 50:15, 53:4, 53:8, 54:7, 54:23, 56:14, 57:19, 58:2, 58:10, 60:6, 60:15, 60:19, 60:24, 62:5, 62:11, 62:16, 62:22, 63:9, 66:5, 66:14, 66:16, 66:18, 67:20, 70:16, 71:4, 72:22, 74:8, 75:7, 76:8, 78:6, 78:25, 79:6, 79:9, 79:15, 81:9, 81:12, 81:25, 82:5, 82:15, 82:20, 84:17, 87:13, 87:17, 87:24, 88:12, 95:5, 95:8, 96:20, 111:11, 111:13, 113:20, 114:3, 114:14, 116:14, 120:7, 121:9, 121:23, 126:16
Hettiarachi's [12] - 38:10, 54:14, 59:14, 61:15, 63:19, 66:8, 83:13, 84:12, 113:8, 115:25, 125:5, 126:22
Hicksville [1] - 11:5
hiding [3] - 88:13, 88:18, 88:22
higher [1] - 103:24
Higher [1] - 25:11
highest [2] - 8:22, 10:19
highly [1] - 108:14

hiring [1] - 18:20
HIRSON [1] - 3:9
hold [4] - 8:13, 111:7, 111:10, 113:6
hom [1] - 13:16
Hom [1] - 15:25
Homicide [1] - 94:8
homicide [1] - 98:5
homicides [1] - 16:7
honestly [1] - 33:2
hope [2] - 45:8, 48:12
Horrible [1] - 37:4
horrible [1] - 37:9
hostility [3] - 57:7, 57:20, 58:4
Hubbard [3] - 97:10, 97:11, 97:12
Human [7] - 18:7, 115:2, 115:7, 115:24, 125:6, 126:9, 126:13

**I**

I.. [1] - 85:19
I.D [3] - 128:6, 129:3, 130:3
ID [1] - 68:4
identification [28] - 22:21, 24:15, 24:19, 26:22, 27:5, 31:16, 35:7, 36:15, 36:19, 40:2, 43:24, 44:6, 50:25, 51:7, 51:23, 52:7, 55:14, 55:18, 68:19, 68:23, 79:22, 80:3, 90:20, 91:2, 115:16, 115:20, 119:17, 119:20
identified [8] - 26:23, 35:2, 36:14, 39:19, 48:20, 51:2, 55:12, 79:23, 80:12
identify [1] - 51:22, 55:13
identifying [1] - 40:11
immediately [1] - 53:12
implicit [3] - 123:23, 124:8, 124:21
implies [1] - 41:16
importantly [1] - 108:8
improper [1] - 98:14
IN [1] - 131:19
inabilities [1] - 77:2
inappropriate [1] - 118:12
inappropriately [1] - 99:2

INC [1] - 1:23
incorporated [1] - 17:2
incorrect [1] - 93:21
increase [9] - 69:23, 70:19, 71:5, 71:7, 71:19, 72:11, 120:17, 121:9, 121:17
increases [2] - 68:22, 130:10
increases [4] - 69:17, 69:18, 70:5, 72:8
indeed [3] - 67:6, 101:18, 113:21
indicated [6] - 30:16, 56:9, 56:15, 64:22, 78:4, 98:3
indicates [5] - 34:2, 41:6, 60:24, 72:10, 120:15
indicating [4] - 33:21, 38:13, 62:21, 122:7
indicating) [2] - 24:4, 122:3
indication [2] - 33:5, 54:12
indictment [1] - 37:4
indictments [1] - 37:12
individual [8] - 1:9, 1:10, 1:10, 1:11, 1:12, 1:13, 1:13, 1:14
individuals [2] - 5:19, 73:10
information [7] - 5:24, 5:25, 54:10, 80:20, 81:19, 118:20, 118:23
initial [2] - 15:7, 61:9
input [1] - 34:11
instilled [1] - 61:9
instituted [1] - 45:3
institution [1] - 9:5
intending [1] - 82:14
intention [2] - 81:11, 82:5
inter [6] - 22:19, 26:25, 39:22, 128:12, 128:18, 129:8
Inter-Office [6] - 22:19, 26:25, 39:22, 128:12, 128:18, 129:8
interaction [6] - 19:12, 19:16, 19:18, 19:21, 20:6, 20:18
interactions [1] - 19:23
interested [1] - 131:17

interim [2] - 42:14, 43:7
internal [1] - 98:6
internal [4] - 98:7, 98:15, 98:19, 99:17
interpretation [1] - 83:4
interrupted [3] - 8:24, 9:25, 10:2
investigate [1] - 30:13
investigating [2] - 37:17, 37:18
investigation [1] - 115:19, 130:19
investigation [11] - 64:8, 66:17, 66:25, 98:15, 98:19, 99:18, 99:19, 125:8, 126:6, 126:15, 126:18
investigations [1] - 86:21
investigations [1] - 37:16
investigative [3] - 28:19, 29:6, 30:10
involved [4] - 18:19, 18:23, 33:25, 90:10
involvement [3] - 32:12, 48:19, 97:9
involving [1] - 32:18
IS [3] - 4:2, 4:8, 4:13
islip [1] - 104:20
issue [1] - 113:6
issued [2] - 125:14, 125:21
issues [2] - 37:3, 37:22
IT [3] - 4:2, 4:8, 4:13
italicized [1] - 60:8
itself [1] - 76:17

**J**

JABLONSKI [1] - 1:11
jablonski [1] - 54:4
Jablonski [8] - 43:11, 48:24, 51:2, 51:6, 53:24, 61:2, 77:8, 129:20
JAMES [1] - 1:14
January [11] - 1:20, 31:11, 31:15, 34:25, 35:6, 119:19, 127:10, 128:24, 129:4, 130:20, 131:21
Jay [1] - 123:4
jeopardy [2] - 75:8, 102:16
Jerry [2] - 22:18,

128:10
job [4] - 23:11, 23:12, 75:8, 102:15
jobs [1] - 12:8
John [2] - 21:12, 23:21
John's [1] - 9:7
Joshua [1] - 104:23
judge [15] - 77:16, 78:5, 78:11, 78:14, 82:4, 82:14, 90:8, 90:11, 98:5, 98:13, 98:25, 99:16, 99:20, 113:18, 114:11
Judge [2] - 78:12, 78:13, 78:19, 78:24, 79:12, 79:13, 80:20, 81:7, 90:12, 111:11, 114:20, 114:22
judge's [1] - 100:5
judges [1] - 100:12
judgment [1] - 61:18
July [10] - 68:22, 69:22, 70:16, 72:20, 72:24, 72:25, 85:10, 85:13, 120:5, 130:10
juris [2] - 9:2, 9:11
jurisdiction [1] - 116:7
Jury [5] - 89:20, 90:16, 91:14, 91:20, 93:11
jury [1] - 98:3
Justice [4] - 91:17, 91:19, 92:7, 92:24

**K**

Kahn [1] - 78:14, 78:15, 78:19, 78:25, 79:12, 79:13, 80:20, 81:7, 111:11, 114:20, 114:22
keep [1] - 106:8
KELLY [1] - 1:12
Kelly [13] - 70:21, 71:16, 73:8, 74:21, 75:4, 76:20, 80:22, 113:19, 117:2, 117:4, 117:5, 117:9, 117:13
Kelly's [1] - 117:8
Kenny [3] - 118:16, 118:17, 118:24
KERIANN [1] - 1:12
Kerriann [1] - 70:21
Kevin [1] - 123:5
kid [1] - 39:9
kind [2] - 33:20, 77:6
knowing [1] - 35:19
knowledge [2] - 26:16, 49:21

known [1] - 35:20
Kurtzrock [6] - 94:2, 94:3, 95:4, 95:11, 96:17, 102:23

**L**

lacked [1] - 108:22
lady [1] - 75:19
last [5] - 7:15, 8:10, 86:18, 119:9, 123:10
late [1] - 43:10
lateral [2] - 41:13, 41:14
laughter [1] - 61:4
Lauren [1] - 86:17
LAW [1] - 3:3
law [4] - 8:23, 9:13, 11:18
Law [3] - 9:19, 77:3, 77:4
lawsuit [1] - 117:12
learn [4] - 49:12, 91:12, 116:11, 116:13
learned [1] - 125:19
learning [1] - 31:25
least [3] - 30:17, 54:10, 100:13
leave [16] - 12:19, 17:11, 17:24, 32:3, 32:9, 32:13, 32:23, 33:6, 33:11, 42:11, 53:12, 53:19, 94:12, 119:5, 122:9
led [1] - 113:7
left [8] - 92:20, 94:9, 96:18, 96:22, 97:5, 102:3, 102:11, 118:7
length [1] - 37:17
lengthy [2] - 56:4, 126:8
Leslie [1] - 89:15
less [1] - 10:17
lesser [1] - 103:17
letter [20] - 22:17, 24:17, 25:9, 31:10, 31:15, 31:19, 31:22, 33:24, 34:15, 34:25, 35:6, 35:16, 35:18, 119:19, 120:14, 128:8, 128:14, 128:23, 128:25, 130:20
letters [3] - 23:9, 23:15, 35:17
level [1] - 8:22
leveled [2] - 57:20, 58:4
liability [1] - 98:23
lied [2] - 76:19
light [1] - 126:11

likely [4] - 47:24, 50:4, 71:17, 73:25
line [1] - 17:25
lines [1] - 6:13
Lippits [2] - 117:16, 117:19
LIPPITS [1] - 117:16
lippits [1] - 119:3
Liquor [1] - 11:25
lives [1] - 123:8
LLM [1] - 9:23
LLP [1] - 3:9
loan [2] - 24:6, 26:5
Loan [2] - 25:15, 25:23
loans [1] - 24:8
located [1] - 104:17
look [24] - 22:12, 24:13, 31:10, 31:18, 35:10, 36:13, 39:18, 46:15, 48:15, 51:9, 52:10, 55:2, 55:11, 55:25, 69:2, 72:14, 79:21, 80:16, 80:24, 88:7, 90:19, 119:15, 119:22, 122:2
looked [2] - 41:19, 46:17
looking [4] - 38:15, 72:2, 113:23, 115:13
looks [2] - 48:23, 80:9
lower [2] - 28:16, 103:25

**M**

mail [2] - 36:18, 129:5
Main [1] - 1:23
main [3] - 74:10, 83:2, 83:6
Major [12] - 16:2, 16:4, 16:23, 39:14, 41:8, 42:4, 47:12, 48:4, 48:7, 67:10, 76:17, 109:7
major [2] - 16:3, 16:6
male [1] - 117:6
management [3] - 69:19, 69:25, 119:8
manager [1] - 116:23
manner [1] - 37:16
March [4] - 13:2, 24:17, 25:11, 128:14
Maria [1] - 106:21
Marine [2] - 10:3, 10:7
Marines [2] - 10:22, 10:24
mark [5] - 35:3,

39:18, 43:23, 90:19, 119:16
**marked** [21] - 22:13, 22:21, 24:14, 24:19, 26:21, 27:4, 31:16, 35:7, 36:19, 39:25, 44:6, 51:7, 51:21, 52:7, 55:17, 68:17, 68:22, 80:2, 90:25, 115:20, 119:20
**markings** [4] - 90:24, 91:9, 91:13, 130:15
**marriage** [1] - 131:16
**MARY** [1] - 3:13
**Matejka** [2] - 22:18, 128:10
**materials** [5] - 124:5, 124:6, 124:12, 124:18, 124:19
**maternity** [2] - 42:11, 53:18
**matter** [8] - 39:5, 89:19, 96:13, 98:16, 99:21, 113:13, 116:7, 131:18
**matters** [1] - 113:12
**MAUREEN** [1] - 1:12
**MCB** [1] - 81:13
**McCormack** [20] - 1:12, 36:15, 37:24, 39:4, 53:2, 53:25, 55:12, 57:11, 58:7, 58:14, 60:5, 61:2, 61:12, 62:2, 62:4, 62:18, 66:4, 67:14, 68:2, 77:9
**McCormack's** [3] - 57:6, 59:3, 66:11
**mean** [7] - 41:15, 44:25, 63:4, 88:16, 110:23, 124:24, 125:17
**means** [1] - 39:6
**meant** [1] - 88:22
**medical** [7] - 32:3, 32:13, 33:6, 33:11, 33:25, 34:15
**meet** [7] - 20:13, 21:2, 42:25, 49:2, 49:8, 49:10, 49:24
**meeting** [2] - 53:6, 53:7
**meetings** [1] - 74:23
**memo** [5] - 23:21, 30:24, 37:22, 38:2, 38:6
**memory** [5] - 20:9, 20:10, 37:21, 54:9, 89:25
**mention** [1] - 101:4
**mentioned** [1] -

91:15
**met** [6] - 49:14, 49:22, 50:3, 50:4, 50:8, 61:3
**meted** [3] - 100:22, 101:11, 101:21
**military** [1] - 8:24
**mind** [1] - 98:14
**ming** [1] - 86:16
**minute** [1] - 123:10
**minutes** [1] - 90:16
**miscellaneous** [1] - 81:2
**misinterpreting** [1] - 53:9
**miss** [2] - 62:17, 74:21
**Miss** [141] - 20:19, 21:22, 23:23, 29:13, 30:22, 31:6, 31:12, 32:2, 32:7, 32:8, 32:16, 33:3, 36:9, 37:24, 38:10, 39:4, 39:13, 41:20, 46:12, 47:2, 47:8, 50:8, 50:15, 52:23, 53:2, 53:3, 53:4, 53:8, 53:24, 53:25, 54:7, 54:14, 54:23, 56:14, 57:11, 57:13, 57:18, 57:19, 58:2, 58:10, 59:3, 60:5, 60:6, 60:15, 60:19, 60:24, 61:12, 62:2, 62:3, 62:4, 62:5, 62:11, 62:6, 62:16, 62:18, 62:22, 63:9, 63:19, 66:3, 66:4, 66:5, 66:11, 66:14, 66:16, 66:18, 67:14, 67:20, 67:25, 68:2, 68:8, 70:16, 70:21, 71:4, 71:15, 71:16, 72:22, 73:7, 73:8, 73:25, 74:8, 74:21, 75:4, 75:5, 75:7, 76:8, 76:19, 76:20, 77:9, 78:6, 78:25, 79:6, 79:9, 79:15, 80:22, 80:23, 81:25, 82:20, 83:13, 84:12, 84:17, 87:2, 87:13, 87:17, 87:24, 88:12, 89:17, 92:19, 95:5, 95:8, 96:20, 103:2, 104:6, 104:9, 105:20, 105:24, 106:14, 111:11, 111:13, 113:8, 113:18, 113:19, 113:20, 114:3, 114:14, 115:25, 116:14, 117:8,

118:17, 118:24, 120:7, 121:9, 121:23, 125:5, 125:11, 125:15, 125:22, 126:16, 126:19
**misspeak** [1] - 74:25
**misspoke** [1] - 104:19
**mistrial** [2] - 92:25, 93:14
**misunderstanding** [1] - 111:16
**misunderstood** [1] - 86:4
**money** [1] - 61:4
**month** [1] - 59:5
**months** [4] - 10:11, 58:15, 122:5, 122:8
**Moore** [2] - 123:5, 124:13
**morning** [1] - 81:8
**most** [4] - 28:18, 40:23, 70:11, 116:24
**mostly** [1] - 11:20
**move** [2] - 22:8, 41:13, 41:14, 41:17, 41:19
**movement** [1] - 20:19
**moving** [1] - 37:14
**MR** [30] - 5:7, 22:11, 24:12, 26:20, 31:9, 34:23, 36:12, 38:20, 39:17, 43:19, 50:24, 51:19, 55:10, 64:3, 68:16, 77:24, 78:3, 79:20, 85:5, 85:10, 90:18, 93:25, 111:24, 112:4, 115:14, 119:14, 122:12, 123:17, 126:20, 128:4
**MS** [65] - 22:23, 27:10, 32:20, 32:24, 34:12, 34:16, 38:3, 44:16, 47:18, 49:16, 54:16, 60:9, 61:21, 63:11, 64:2, 64:4, 64:6, 64:17, 65:12, 65:15, 65:17, 65:21, 66:19, 67:3, 73:22, 75:10, 75:21, 79:18, 81:21, 82:9, 82:22, 85:3, 85:8, 85:12, 87:14, 87:21, 88:4, 88:14, 89:10, 93:22, 94:17, 99:5, 100:17, 103:18, 103:20, 104:2, 105:10, 106:10, 108:20, 109:18, 110:20, 111:5, 111:14, 111:22, 112:2, 112:6,

112:9, 112:13, 113:9, 116:18, 120:21, 121:18, 122:15, 123:15, 126:23
**Mt** [1] - 5:12
**murder** [3] - 13:3, 13:16, 13:18
**must** [1] - 33:24

**N**

**name** [17] - 5:8, 18:11, 18:13, 45:21, 45:22, 86:7, 86:18, 86:22, 86:24, 89:14, 94:2, 103:5, 103:8, 105:2, 106:13, 116:25, 117:15
**named** [1] - 5:16
**NANCY** [1] - 1:13
**Nancy** [1] - 70:21
**Narcotics** [3] - 17:18, 17:22, 17:23
**NASSAU** [1] - 131:4
**Nassau** [2] - 95:16, 95:17
**necessary** [1] - 101:19
**need** [6] - 6:9, 6:14, 6:25, 17:24, 42:9, 46:15, 55:22
**needed** [7] - 42:13, 79:16, 108:12, 109:2, 110:5, 110:18, 111:2
**never** [7] - 87:6, 78:21, 82:7, 99:22, 101:23, 114:2, 114:4
**NEW** [3] - 1:3, 127:4, 131:3
**new** [1] - 39:9
**New** [12] - 1:19, 1:24, 2:5, 3:6, 3:12, 5:13, 9:18, 25:11, 122:25, 127:23, 131:7
**Newsday** [2] - 90:22, 130:13
**next** [3] - 51:20, 61:8, 61:11
**none** [1] - 122:11
**normal** [2] - 29:25, 107:16
**normally** [4] - 29:19, 47:23, 87:8, 103:24
**North** [2] - 12:14, 12:23
**Notary** [4] - 2:4, 5:4, 127:23, 131:6
**note** [3] - 33:13, 33:16, 34:15
**noted** [1] - 126:24
**notes** [2] - 33:12,

80:13
**nothing** [1] - 119:13
**Notice** [1] - 2:3
**notify** [1] - 34:6
**November** [6] - 8:20, 14:15, 14:16, 36:18, 37:7, 129:6
**Number** [11] - 24:18, 27:4, 27:13, 39:24, 40:7, 51:6, 60:2, 128:16, 128:22, 129:10, 129:21
**number** [8] - 37:12, 59:10, 74:9, 74:13, 93:3, 109:5, 122:24, 123:21
**Numbers** [5] - 23:2, 55:17, 79:25, 130:7, 130:12
**NYU** [1] - 8:24

**O**

**O-H** [1] - 86:16
**oath** [2] - 4:17, 127:9
**objection** [41] - 32:24, 34:12, 34:16, 38:3, 44:16, 47:18, 49:16, 54:16, 61:21, 63:11, 64:17, 65:12, 66:19, 67:3, 73:22, 75:10, 75:21, 79:18, 82:9, 82:22, 85:3, 87:14, 87:21, 88:4, 88:14, 89:10, 94:17, 99:5, 100:17, 103:18, 104:2, 105:10, 106:10, 108:20, 109:18, 110:20, 111:5, 111:14, 113:9, 120:21, 121:18
**Objection** [1] - 81:21
**objections** [1] - 4:9
**obtain** [1] - 33:11
**obviously** [2] - 30:4, 45:21
**occasion** [2] - 18:22, 22:21
**occasions** [1] - 74:13
**occurred** [2] - 34:10, 76:16
**October** [8] - 27:3, 28:5, 31:4, 38:24, 41:21, 90:25, 128:21, 130:16
**odd** [1] - 85:17
**OF** [6] - 1:3, 1:8, 127:4, 127:5, 131:3, 131:4
**Offense** [2] - 16:4,

16:6
Offenses [1] - 16:23
offers [1] - 7:24
offhand [1] - 86:7
Office [55] - 7:18, 8:5, 12:13, 12:16, 12:18, 13:14, 13:21, 14:21, 17:4, 18:14, 19:4, 19:6, 21:24, 22:19, 24:5, 24:10, 25:7, 25:8, 25:10, 26:4, 26:25, 27:3, 28:3, 33:24, 37:25, 39:22, 44:4, 45:11, 45:14, 52:5, 64:13, 64:15, 64:21, 64:24, 65:3, 65:5, 69:20, 76:5, 95:12, 95:13, 95:16, 95:24, 102:7, 103:9, 118:8, 118:14, 119:5, 125:18, 126:16, 128:12, 128:18, 128:20, 129:8, 129:14, 129:24
OFFICE [1] - 1:8
office [8] - 14:18, 25:8, 36:4, 57:4, 94:22, 96:18, 96:21, 101:24
officer [1] - 4:16
OFFICES [1] - 3:3
official [10] - 1:9, 1:10, 1:10, 1:11, 1:12, 1:13, 1:14, 1:14, 22:24, 27:11
once [3] - 40:10, 66:2, 67:5
one [43] - 15:20, 15:23, 17:7, 19:24, 22:24, 27:11, 27:13, 35:13, 40:12, 41:17, 45:2, 50:21, 64:4, 67:13, 74:17, 74:19, 80:20, 81:8, 82:19, 82:24, 83:6, 83:14, 89:12, 89:20, 93:4, 93:7, 93:8, 93:9, 98:4, 105:6, 107:4, 107:6, 113:7, 114:21, 118:13, 123:7, 123:12, 123:14, 123:19, 123:22, 124:14, 126:19
ongoing [1] - 7:20
oOo [1] - 4:21
open [1] - 37:12
opening [1] - 28:18
opinion [3] - 71:18, 108:22, 108:23
original [2] - 89:21, 89:25
originally [1] - 10:10

otherwise [2] - 7:4, 100:3
outcome [1] - 131:17
outlining [2] - 60:17, 60:18

P

p.m [2] - 1:21, 126:24
pack [2] - 96:17, 96:21
page [28] - 22:16, 22:19, 22:25, 23:21, 31:15, 43:21, 44:2, 46:24, 47:4, 50:17, 51:24, 52:3, 55:16, 59:9, 64:2, 64:4, 80:17, 115:18, 128:7, 128:8, 128:11, 128:23, 129:12, 129:22, 130:6, 130:17
PAGE [1] - 128:3
Page [2] - 52:25, 63:25
pages [3] - 80:6, 80:8, 83:21
papers [1] - 91:10
paragraph [6] - 57:5, 58:20, 58:21, 60:4, 61:11, 80:25
Paragraph [1] - 60:2
Parson [1] - 86:16
part [5] - 7:25, 12:3, 28:18, 40:23, 70:11, 76:4, 81:10, 100:2, 105:18, 116:24
part-time [1] - 7:25
participated [2] - 74:23, 77:18
particular [14] - 21:6, 30:16, 30:18, 30:19, 37:13, 41:2, 49:19, 65:7, 71:17, 77:16, 81:12, 82:6, 82:16, 93:9
particularly [1] - 27:20
parties [2] - 4:4, 131:15
pass [1] - 39:6
pause [1] - 32:21
pay [2] - 108:6, 108:7
paying [2] - 13:24, 114:15
payrolls [2] - 90:24, 130:16
Pearl [4] - 96:24, 100:16, 100:23, 102:20
pearl [1] - 102:4

Penal [1] - 77:4
pencil [3] - 89:22, 91:9, 91:13
pending [5] - 7:7, 98:20, 99:17, 99:24, 99:25
Peninsula [2] - 1:19, 3:5
people [13] - 23:10, 24:7, 28:10, 28:12, 29:5, 33:10, 40:11, 42:9, 42:11, 43:2, 53:17, 77:6, 79:7
People [2] - 91:5, 97:9
performance [1] - 48:20
performed [1] - 19:6
performing [1] - 34:3
perhaps [4] - 33:4, 42:12, 67:17, 124:13
period [2] - 10:9, 12:12, 14:12, 15:9, 16:19, 18:16, 26:3, 37:10, 39:7, 42:2, 44:20, 46:11, 47:24, 48:2, 48:9, 53:13, 53:21, 59:5, 62:20, 67:16, 95:12, 109:6
perplexed [4] - 62:5, 66:6, 66:12, 67:14
person [4] - 29:12, 57:9, 89:12, 117:15
person's [1] - 84:12
personally [2] - 38:6, 56:21
personnel [1] - 45:7
persons [3] - 57:10, 86:9, 86:12
pertaining [1] - 113:12
pertinent [1] - 5:25
peruse [3] - 40:4, 55:21, 55:24
phonetic) [1] - 86:19
phrased [1] - 62:2
physically [1] - 88:22
place [9] - 26:19, 34:21, 35:25, 43:8, 44:14, 50:12, 51:18, 63:24, 121:16
Plaintiff [2] - 1:6, 3:4
Plaintiff's [17] - 22:15, 24:16, 26:24, 31:14, 35:5, 36:17, 39:21, 43:25, 51:3, 52:2, 55:15, 68:4, 68:20, 79:24, 90:21, 115:17, 119:18
PLAINTIFF'S [3] - 128:6, 129:3, 130:3

plan [2] - 69:19, 70:2
player [1] - 54:2
plea [1] - 90:17
pleas [1] - 93:15
point [16] - 6:3, 19:12, 19:16, 26:9, 36:3, 39:15, 44:18, 44:19, 44:24, 44:25, 45:18, 57:2, 64:23, 80:5, 91:12, 102:2
policy [3] - 33:9, 34:5, 34:19
portion [1] - 26:4
pose [1] - 6:4
posed [1] - 6:16
position [7] - 8:10, 8:14, 8:16, 15:13, 34:4, 54:15, 64:13
possible [2] - 7:9, 81:13
practice [11] - 11:4, 11:8, 11:9, 11:19, 11:21, 13:8, 13:10, 13:23, 14:11, 14:14, 116:10
preferred [1] - 98:8
preparation [2] - 77:5, 125:23
prepare [1] - 40:21
prepared [5] - 40:22, 40:24, 79:2
prepares [1] - 31:3
presented [6] - 47:2, 69:7, 89:19, 91:13, 91:14, 91:19
presume [4] - 37:19, 39:6, 49:23, 98:12
pretty [1] - 27:25
prevailing [1] - 93:4
previously [11] - 22:13, 26:22, 35:2, 36:14, 39:19, 50:25, 51:21, 55:11, 68:17, 79:23, 80:11
primarily [1] - 11:21
private [7] - 11:4, 11:7, 11:9, 13:8, 13:23, 14:11, 14:14
probable [1] - 116:7
problems [1] - 111:12
Procedure [1] - 77:3
process [5] - 28:9, 44:14, 49:4, 56:17, 76:5, 76:13
production [1] - 38:10
professional [1] - 33:25
Professional [2] - 100:25, 101:14

Program [2] - 25:15, 25:23
program [9] - 9:23, 24:9, 24:11, 25:17, 25:21, 25:24, 26:8, 26:11, 26:17
programs [1] - 24:6
progression [2] - 107:17, 107:18
progressive [3] - 75:25, 76:7, 76:13
promoted [4] - 20:15, 21:5, 42:12, 43:4
promotion [3] - 19:25, 30:5, 41:12
promotions [1] - 40:20
pronounce [1] - 24:24
prosecuted [1] - 97:15
prosecution [1] - 30:14
prosecutor [10] - 13:25, 16:13, 103:9, 105:5, 107:3, 108:10, 108:11, 108:25, 117:5, 117:19
Prosecutor [5] - 15:6, 16:14, 16:21, 18:5, 18:6
prosecutors [4] - 77:13, 114:11, 114:12, 118:13
Prosecutors [2] - 90:23, 130:14
provide [1] - 33:24
provided [2] - 47:14, 56:19
providing [1] - 47:15
Public [4] - 2:4, 5:4, 127:23, 131:6
pull [1] - 10:4
purpose [2] - 7:3, 47:15
purposes [1] - 107:14
pursuant [1] - 2:3
put [8] - 17:13, 47:21, 68:14, 84:15, 85:4, 89:21, 109:7, 109:22
PUTNEY [1] - 3:9

Q

quarters [1] - 6:7
questions [7] - 5:22, 5:23, 6:16, 22:4, 56:8, 67:2, 126:21

quick [1] - 55:25
quickly [1] - 7:5
quite [2] - 37:12, 45:14
quote [1] - 64:10

**R**

race [6] - 102:20, 102:24, 103:3, 117:8, 117:21, 118:25
races [1] - 106:15
Rackets [2] - 17:6, 17:21
raised [1] - 37:22
ran [1] - 14:18
ranging [1] - 84:8
rank [2] - 10:4, 10:19
Raphael [1] - 96:24
rapidly [1] - 37:14
Rashika [5] - 5:15, 18:11, 39:6, 41:7, 45:22
RASHIKA [1] - 1:5
rather [1] - 56:4
re [1] - 25:14
reach [1] - 101:24
reached [1] - 101:23
read [6] - 6:10, 38:21, 38:22, 44:8, 65:21, 65:24, 81:5, 81:19, 114:25, 127:8
reading [1] - 61:13
real [1] - 11:21
really [4] - 18:25, 47:20, 85:16, 108:23
REALTIME [1] - 1:23
reason [10] - 49:23, 53:17, 53:20, 56:22, 74:7, 74:10, 83:2, 83:6, 113:21, 118:2
reasons [6] - 74:9, 82:20, 82:24, 83:7, 83:14, 113:7
receive [6] - 18:6, 23:9, 23:15, 23:17, 72:7, 81:14
received [4] - 9:11, 23:4, 33:5, 87:24
receiving [2] - 71:4, 120:16
recently [2] - 123:2, 123:3
recollection [35] - 19:23, 23:4, 26:2, 30:18, 31:24, 32:4, 32:5, 32:17, 35:21, 37:2, 37:23, 38:23, 40:25, 42:3, 42:6, 42:15, 42:20, 42:23, 45:8, 45:16, 52:16,

52:17, 68:12, 72:4, 74:24, 78:18, 84:10, 92:17, 93:13, 93:14, 93:23, 95:23, 96:3, 115:23, 121:7
recollections [1] - 20:18
recommendation [1] - 74:4
recommendations [1] - 28:23, 70:12
recommended [3] - 73:14, 73:21, 101:19
Record [2] - 38:22, 65:24
record [14] - 5:9, 6:18, 7:8, 8:11, 11:23, 78:2, 93:18, 93:20, 116:18, 116:19, 122:16, 127:11, 127:12, 131:12
referenced [2] - 80:14, 83:13
references [1] - 59:4
referred [2] - 100:24, 101:13
referring [6] - 15:16, 20:23, 91:9, 93:7, 114:21, 123:16
refers [1] - 124:21
refresh [1] - 115:22
regard [28] - 23:20, 30:15, 35:16, 37:21, 38:9, 48:17, 51:15, 54:9, 59:8, 70:15, 76:8, 91:16, 91:17, 92:7, 98:21, 100:10, 100:16, 104:6, 105:7, 108:16, 110:4, 110:10, 116:20, 119:3, 119:7, 120:14, 122:17, 122:18, 124:4
regular [2] - 44:13, 76:4
reiterating [1] - 60:6
related [2] - 58:9, 131:15
relating [4] - 5:24, 20:19, 22:4, 37:3
relation [2] - 19:5, 121:16
relationship [1] - 21:23
relative [2] - 32:12, 68:7
relayed [3] - 60:25, 66:3, 75:5
remain [3] - 13:20, 14:11, 14:13
remember [5] - 17:12, 35:23, 42:10,

53:15, 91:5
renowned [1] - 103:17
repeat [1] - 38:18
repeating [1] - 60:15
rephrase [1] - 6:5
reply [2] - 56:19, 59:13
report [7] - 111:10, 125:14, 125:17, 125:21, 126:2, 126:5
reported [2] - 58:10, 67:20
reporter [1] - 6:11
REPORTING [1] - 1:23
represent [1] - 80:13
representing [1] - 5:15
request [2] - 34:14, 125:13
requested [2] - 42:4, 105:24
require [1] - 64:16
required [1] - 114:9
requires [1] - 34:6
reserved [1] - 4:11
reserves [1] - 10:11
resign [2] - 94:16, 102:13, 117:23
resignation [3] - 95:20, 96:5, 96:12
resigned [2] - 95:19, 95:22, 118:4
resigning [2] - 95:2, 96:3
resort [1] - 119:9
Resources [1] - 18:7
respect [4] - 53:5, 70:13, 90:13, 112:24
respective [1] - 4:4
respond [4] - 6:15, 6:22, 55:4, 56:10
responded [2] - 54:23, 126:8
Respondent [1] - 116:8
responding [2] - 60:20, 126:12
response [16] - 6:19, 50:15, 50:21, 56:14, 56:19, 58:24, 57:6, 57:10, 58:3, 58:11, 59:14, 59:20, 59:25, 60:5, 61:12, 83:23
Response [2] - 51:4, 129:19
responsibility [1] - 99:25
restrict [4] - 111:22, 112:3, 112:6, 112:14

result [3] - 114:22, 125:13, 126:6
resulted [1] - 114:21
retained [1] - 130:23
retired [1] - 8:4
retirement [1] - 7:22
retraining [4] - 87:18, 100:16, 100:21, 114:9
return [2] - 33:7, 33:23
review [1] - 124:5
reviewing [1] - 124:17
right-hand [2] - 45:25, 59:10
Rights [6] - 115:3, 115:7, 115:24, 125:6, 126:9, 126:14
Road [1] - 5:12
Robert [1] - 11:5
role [1] - 87:18
Ronald [1] - 117:19
Ros [1] - 86:19
roster [2] - 85:17, 86:5
Rozea [1] - 2:4
ROZEA [2] - 131:6, 131:24
RPR [1] - 2:4

**S**

salary [2] - 69:24, 120:17
sat [1] - 87:9
Satterfield [1] - 123:5
satterfield [1] - 124:14
saw [2] - 57:13, 88:2
school [2] - 8:23, 8:24
School [1] - 9:18
sealing [1] - 4:5
seated [1] - 7:2
second [9] - 22:18, 23:20, 43:21, 46:24, 47:4, 77:21, 87:9, 88:23, 128:11
secretarial [1] - 77:12
section [1] - 60:8
see [34] - 14:2, 21:9, 22:7, 29:14, 33:22, 41:10, 45:24, 46:5, 47:4, 48:25, 53:8, 53:14, 53:23, 56:22, 57:10, 58:16, 58:23, 58:24, 59:15, 60:7, 60:14, 60:22, 61:6,

64:8, 77:7, 81:3, 81:16, 83:22, 85:16, 85:23, 86:5, 115:12, 122:13, 126:16
seeing [2] - 35:23, 84:8
semester [1] - 9:22
sending [2] - 42:16, 53:15
senior [1] - 106:8
sense [1] - 48:12
sent [2] - 35:18, 53:20
sentence [2] - 61:8, 63:18
sentences [1] - 81:19
sequence [1] - 22:8
series [2] - 76:15, 112:23
serve [1] - 14:21
served [1] - 18:3
service [5] - 8:24, 10:7, 11:13, 26:3, 118:7
Services [1] - 25:12
session [6] - 114:13, 114:14, 114:16, 114:20, 123:4
set [7] - 24:3, 56:8, 72:18, 84:8, 123:9, 131:10, 131:20
seven [4] - 55:16, 115:18, 130:6, 130:17
seven-page [4] - 55:16, 115:18, 130:6, 130:17
several [1] - 61:3
shall [1] - 4:11
Sharyn [1] - 103:5, 103:7
Sheetal [2] - 86:17, 86:18
Shetty [2] - 86:17, 86:18
short [9] - 9:20, 12:12, 39:7, 42:2, 53:13, 53:17, 62:20, 67:16, 109:5
shortly [1] - 53:18
show [5] - 26:21, 50:23, 51:20, 68:6, 68:17
showed [1] - 45:9
shown [2] - 58:7, 84:11
sick [2] - 42:11, 122:9
side [4] - 35:25, 45:25, 50:13, 68:15
signature [1] -

119:25
  signed [2] - 4:15, 4:18
  Signed [1] - 127:20
  similar [1] - 105:20
  simply [1] - 41:16
  simultaneous [1] - 14:4
  Sinai [1] - 5:12
  single [2] - 113:20, 114:2
  singled [2] - 79:14, 114:9
  six [1] - 10:11
  sixteen [1] - 8:15
  skim [2] - 56:6, 83:21
  SLA [2] - 11:22, 11:23
  sleeping [1] - 114:15
  small [1] - 7:25
  someone [3] - 32:17, 64:14, 64:23
  Sonia [1] - 86:19
  SORA [4] - 81:9, 112:25, 113:7, 113:13
  sorry [22] - 14:9, 16:4, 16:5, 26:12, 29:2, 43:18, 55:7, 58:22, 60:9, 60:11, 64:5, 65:14, 71:16, 74:18, 75:23, 84:4, 86:4, 103:21, 104:19, 107:22, 117:10, 123:16
  space [1] - 17:12
  speaking [9] - 37:23, 42:16, 52:18, 52:21, 59:4, 70:23, 71:3, 75:6, 114:22
  Special [1] - 86:21
  special [1] - 13:24
  specific [9] - 19:23, 20:17, 37:23, 38:23, 42:22, 52:16, 71:13, 73:13, 78:5
  specifically [14] - 25:16, 59:21, 71:9, 71:11, 71:24, 72:3, 72:5, 73:10, 73:12, 74:6, 77:17, 78:19, 79:14, 85:24
  specifics [1] - 75:14
  spoken [4] - 38:5, 42:24, 49:7, 49:14
  sponsored [1] - 123:4
  spota [2] - 27:15, 78:4
  Spota [42] - 5:10, 5:14, 22:14, 22:15, 22:18, 24:15, 24:16,
26:22, 26:24, 31:13, 31:14, 35:4, 35:5, 36:16, 36:17, 39:19, 39:21, 43:23, 43:25, 44:10, 47:11, 50:25, 51:3, 51:22, 52:2, 54:11, 55:13, 55:15, 68:4, 68:19, 68:20, 68:25, 79:22, 79:24, 83:24, 90:20, 90:21, 115:15, 115:17, 119:16, 119:18, 128:11
  SPOTA [10] - 1:9, 1:20, 2:3, 127:7, 127:17, 128:4, 128:6, 129:3, 130:3, 131:9
  squarely [1] - 6:21
  ss [2] - 127:4, 131:4
  st [1] - 9:7
  staff [1] - 77:12
  Stamp [19] - 24:18, 27:4, 27:13, 39:24, 40:7, 44:5, 51:6, 52:6, 55:16, 79:25, 80:17, 128:16, 128:21, 129:10, 129:16, 129:21, 130:4, 130:7, 130:11
  Stamps [3] - 22:20, 23:2, 128:13
  stand [1] - 11:24
  standard [2] - 28:2, 98:24
  standpoint [1] - 64:15
  Stankewicz [3] - 24:18, 24:22, 128:15
  start [2] - 45:13, 45:23
  started [1] - 45:2
  starting [1] - 51:25
  state [5] - 5:8, 67:5
  STATE [2] - 127:4, 131:3
  State [13] - 2:4, 11:25, 24:10, 25:24, 25:25, 26:11, 115:2, 115:6, 115:24, 125:5, 126:13, 127:23, 131:7
  statement [2] - 66:13, 126:9
  States [2] - 10:3, 10:7
  STATES [1] - 1:2
  stating [2] - 54:6, 54:15
  statistics [1] - 37:5
  stay [2] - 34:24, 93:19
  Step [2] - 68:21,
130:10
  step [12] - 69:17, 69:18, 70:4, 70:18, 71:4, 71:7, 71:19, 72:7, 72:11, 120:17, 121:9, 121:17
  steps [1] - 70:4
  Stevens [4] - 89:15, 89:17, 92:19, 103:2
  Stewart [1] - 123:5
  still [8] - 12:5, 13:23, 58:19, 92:20, 94:10, 97:6, 99:24, 102:10
  stint [1] - 10:24
  STIPULATED [3] - 4:2, 4:8, 4:13
  stop [1] - 77:20
  Street [1] - 1:23
  stu [1] - 26:12
  student [1] - 24:8
  students [2] - 24:7, 26:2
  stuff [1] - 69:8
  style [2] - 116:20, 119:8
  Subject [1] - 27:14
  subject [3] - 37:3, 39:3, 106:17
  subjected [1] - 102:4
  submit [1] - 56:19
  subscribed [1] - 127:20
  Suffolk [13] - 7:17, 8:9, 12:11, 12:16, 12:17, 15:14, 27:2, 44:3, 52:4, 116:21, 128:19, 129:13, 129:23
  SUFFOLK [2] - 1:8
  suggestion [2] - 106:18, 114:10
  Suite [1] - 1:23
  Sullivan [2] - 13:12, 14:7
  summation [2] - 98:3, 98:13
  supervising [1] - 70:14
  supervisor [4] - 42:23, 43:10, 43:16, 114:23
  supervisors [6] - 29:8, 61:20, 80:14, 80:21, 108:24, 121:12
  supplied [1] - 56:14
  support [1] - 77:12
  sworn [4] - 4:15, 4:18, 5:3, 131:11
  system [1] - 45:4
T

  talks [2] - 69:17, 92:5
  Tan [1] - 86:17
  team [1] - 54:2
  Tennessee [1] - 123:7
  tenure [2] - 19:3, 44:15
  term [3] - 41:16, 94:13, 124:20
  terminate [3] - 94:20, 120:7, 120:20
  terminated [20] - 73:3, 73:15, 73:21, 74:8, 82:20, 84:18, 85:7, 85:9, 94:13, 94:15, 95:22, 96:2, 96:14, 106:18, 117:24, 118:17, 119:4, 120:12, 121:23, 121:25
  terminating [3] - 72:22, 94:24, 118:3
  termination [10] - 83:15, 84:12, 87:13, 87:20, 95:3, 96:5, 96:13, 113:8, 119:8, 121:13
  terms [2] - 58:5, 64:12, 81:23
  terrific [1] - 86:23
  testified [1] - 5:5
  testify [1] - 93:23
  testimony [2] - 22:6, 127:9, 127:12, 131:13
  THE [4] - 64:5, 65:23, 75:23, 103:21
  they've [1] - 80:11
  third [1] - 80:17
  THOMAS [7] - 1:8, 1:20, 2:2, 127:7, 127:17, 128:4, 131:9
  Thomas [2] - 5:10, 27:15
  three [3] - 11:17, 38:25, 45:7
  three-year [1] - 45:7
  titles [1] - 106:8
  today [2] - 5:22, 84:9
  together [1] - 34:24
  Tom [2] - 22:18, 128:10
  took [1] - 13:5
  top [2] - 58:18, 59:13
  towards [5] - 57:8, 57:21, 58:4, 77:6, 77:11
  Town [2] - 12:13, 12:14
  track [2] - 29:19,
29:25
  trade [1] - 61:5
  trained [1] - 79:7
  training [12] - 9:13, 18:7, 79:16, 81:14, 100:20, 108:19, 111:2, 114:12, 114:14, 122:18, 123:3, 124:4
  transcript [2] - 127:8, 127:10
  transfer [7] - 30:4, 42:2, 104:22, 105:25, 109:11, 109:24, 110:4
  transferred [29] - 19:9, 19:14, 21:16, 28:10, 28:13, 30:22, 36:10, 39:13, 40:12, 41:7, 48:4, 61:5, 66:5, 67:10, 67:15, 103:11, 103:16, 103:23, 104:11, 105:6, 105:12, 105:23, 106:3, 106:6, 107:4, 107:7, 108:9, 108:17, 109:6
  Transfers [1] - 27:14
  transfers [4] - 28:2, 40:20, 104:5, 104:8
  treatment [1] - 34:2
  Trial [8] - 15:5, 16:12, 16:20, 17:2, 18:4, 28:19, 29:5, 29:17, 30:8
  trial [4] - 4:12, 108:12, 109:2, 110:18
  trials [2] - 30:10, 87:9, 110:6
  tried [2] - 14:10, 76:25, 77:14, 109:5
  Troulakis [3] - 106:21, 106:23, 106:24
  TROULKIS [1] - 106:22
  true [3] - 127:11, 127:13, 131:12
  try [8] - 6:5, 6:8, 7:4, 7:7, 13:3, 22:5, 22:8, 30:12
  trying [5] - 9:21, 45:5, 86:20, 87:4, 89:14
  turn [2] - 46:23, 59:9
  two [19] - 13:16, 13:17, 14:10, 22:16, 22:25, 31:15, 46:18, 47:23, 58:15, 59:5, 81:19, 87:25, 98:11, 100:12, 100:13, 118:6, 124:14, 128:7,

128:23
**two-month** [1] - 59:5
**two-page** [5] - 22:16, 22:25, 31:15, 128:7, 128:23
**two-year** [1] - 47:23
**TWOMBLY** [1] - 3:9
**type** [7] - 11:18, 32:2, 35:18, 40:10, 40:19, 64:8, 92:14

## U

**ultimate** [3] - 70:6, 70:10, 73:17
**ultimately** [2] - 73:17, 90:16
**unartfully** [1] - 62:2
**under** [1] - 127:9
**undertaken** [1] - 122:20
**Unit** [5] - 27:15, 104:13, 104:14, 105:17, 106:7
**unit** [5] - 16:9, 104:12, 105:7, 107:5, 107:6
**UNITED** [1] - 1:2
**United** [2] - 10:3, 10:7
**University** [2] - 9:7, 9:18
**unlawful** [1] - 116:9
**unusual** [4] - 23:8, 23:13, 23:14, 23:19
**unwanted** [10] - 61:16, 63:10, 63:20, 64:10, 64:15, 64:21, 65:19, 66:18, 67:8, 67:21
**up** [3] - 6:8, 68:4, 123:9
**upheld** [1] - 90:15
**ups** [1] - 88:2
**Upstate** [1] - 122:25
**utilized** [1] - 76:8

## V

**vague** [2] - 20:10, 42:6
**value** [1] - 114:16
**varied** [1] - 28:14
**variety** [1] - 11:20
**verbal** [1] - 83:23
**verbally** [1] - 6:15
**versus** [2] - 91:6, 97:9
**violation** [4] - 92:13, 97:21, 97:24, 98:17
**violations** [2] -

88:20, 100:12
**Violence** [8] - 104:12, 104:13, 104:14, 105:8, 105:17, 105:19, 106:7
**virtually** [1] - 17:3
**vouched** [1] - 98:12
**vouching** [1] - 98:4

## W

**wage** [1] - 93:4
**waived** [1] - 4:7
**warn** [1] - 94:23
**warning** [2] - 95:3, 95:8
**water** [1] - 77:23
**weeks** [1] - 38:25
**whereby** [1] - 56:18
**WHEREOF** [1] - 131:19
**white** [1] - 84:25
**wish** [1] - 121:20
**WITNESS** [6] - 64:5, 65:23, 75:23, 103:21, 128:3, 131:19
**witness** [5] - 5:3, 54:6, 77:5, 131:9, 131:13
**witnesses** [1] - 98:5
**woefully** [1] - 113:22
**words** [2] - 48:6, 82:17
**worker** [1] - 108:13
**workforce** [1] - 10:25
**worthy** [1] - 30:13
**write** [1] - 88:2
**writing** [3] - 54:24, 55:6, 60:18
**writings** [1] - 83:22
**written** [7] - 25:10, 44:14, 58:2, 59:17, 60:15, 66:14, 82:13
**wrote** [3] - 60:6, 60:19, 89:25
**www.realtimereporting.com** [1] - 1:25

## Y

**year** [9] - 10:16, 13:5, 15:2, 21:11, 21:15, 45:7, 47:23, 120:17, 123:13
**years** [8] - 8:15, 11:11, 11:15, 11:17, 122:24, 123:11, 123:19, 123:21
**YORK** [3] - 1:3, 127:4, 131:3

**York** [12] - 1:19, 1:24, 2:5, 3:6, 3:12, 5:13, 9:18, 25:11, 122:25, 127:23, 131:7
**young** [1] - 75:19
**yourself** [3] - 32:18, 116:22, 122:17

C E R T I F I C A T E

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, DEBORAH ROZEA, a Notary Public within and for the State of New York, do hereby certify:

That THOMAS J. SPOTA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of January, 2018.

_____
                DEBORAH ROZEA

```
 1

 2                    ***  ERRATA SHEET  ***
                     REALTIME REPORTING, INC.
 3                 124 East Main Street, Suite 202
                      Babylon, New York 11702
 4                        516-938-4000

 5      NAME OF CASE: HETTIARACHCHI VS. SUFFOLK COUNTY
        DATE OF DEPOSITION: JANUARY 12, 2018
 6      NAME OF WITNESS: THOMAS J. SPOTA
                     FROM              TO           REASON
 7      ____|____|_____|_____|_____

 8      ____|____|_____|_____|_____

 9      ____|____|_____|_____|_____

10      ____|____|_____|_____|_____

11      ____|____|_____|_____|_____

12      ____|____|_____|_____|_____

13      ____|____|_____|_____|_____

14      ____|____|_____|_____|_____

15      ____|____|_____|_____|_____

16      ____|____|_____|_____|_____

17      ____|____|_____|_____|_____

18

19                          ---------------------------

20                          THOMAS J. SPOTA

                        Subscribed and sworn before me
21      this ____ day of _____, 2018.

22      _____    _____
        (Notary Public)        My Commission Expires:
23

24

25
```