UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
RASHIKA N. HETTIARACHCHI,                              :
                                                      :
                              Plaintiff,              :
                                                      :     **OPINION & ORDER**
         -against-                                    :     14-cv-6731 (DLI) (SLB)
                                                      :
COUNTY OF SUFFOLK, SUFFOLK COUNTY                      :
DISTRICT ATTORNEY'S OFFICE, DISTRICT                   :
ATTORNEY THOMAS J. SPOTA, in his individual and       :
official capacity, CHIEF ASSISTANT DISTRICT           :
ATTORNEY EMILY CONSTANT, in her individual            :
and official capacity, DIVISION CHIEF EDWARD G.       :
HEILIG, in his individual and official capacity,      :
BUREAU CHIEF EDWARD JABLONSKI, in his                 :
individual and official capacity, BUREAU CHIEF        :
MAUREEN MCCORMACK in her individual and               :
official capacity, BUREAU CHIEF KERRIANN              :
KELLY in her individual and official capacity,        :
DEPUTY BUREAU CHIEF NANCY CLIFFORD in                 :
her individual and official capacity, DEPUTY BUREAU   :
CHIEF JAMES CHALIFOUX in his individual and           :
official capacity,                                    :
                                                      :
                              Defendants.             :
                                                      :
------------------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

Rashika N. Hettiarachchi ("Plaintiff") filed this action against the County of Suffolk (the "County"), the Suffolk County District Attorney's Office (the "DA's Office"), Thomas J. Spota, Emily Constant, Edward G. Heilig, Edward Jablonski, Maureen McCormack, Kerriann Kelly, Nancy Clifford, and James Chalifoux (the "Individual Defendants") (all collectively, "Defendants"), claiming that Defendants discriminated against her on the basis of her race, gender, national origin, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); 42 U.S.C. § 1983 ("Section

1983"); the Americans With Disabilities Act, 42 U.S.C. § 12101 ("ADA"); and the New York State Human Rights Law, N.Y. Exec. Law § 296.  Plaintiff has withdrawn some of her claims, and others were dismissed in a January 25, 2016 opinion by the Hon. Joan M. Azrack, United States District Judge, who then presided over this matter.  *See*, Dkt. Entry Nos. 21, 29.

Before the Court is Defendants' motion for summary judgment on Plaintiff's remaining causes of action: (1) a Title VII claim against the DA's Office relating to Plaintiff's termination; (2) Section 1981 and 1983 claims against Suffolk County and the Individual Defendants, in their personal and official capacities, relating to their failure to promote Plaintiff and for her termination; and (3) ADA claims against the DA's Office relating to Plaintiff's termination.  *See*, Defs. SJM, Dkt. Entry Nos. 73–82.  Plaintiff opposed Defendants' motion.  *See*, Opp., Dkt. Entry Nos. 83-86. Defendants replied.  *See*, Reply, Dkt. Entry Nos. 87–92.

For the reasons set forth below, Defendants' motion for summary judgment is denied as to Plaintiff's Title VII race and national origin discrimination claim against the DA's Office, and Section 1983 race and national origin discrimination claim against Suffolk County, Thomas J. Spota, Emily Constant, and Edward G. Heilig in their personal capacities.  Defendants' motion for summary judgment is granted in all other respects.

## **BACKGROUND**

The material facts recounted below are taken from Defendants' Local Rule 56.1 Statement ("Def. 56.1 Stmt.," Dkt. Entry No. 75), Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1 Stmt.," Dkt. Entry No. 84), Plaintiff's Counter Statement of Facts[1] ("Pl. Counter 56.1 Stmt.," Dkt. Entry No. 84), and Defendants' Reply to Plaintiff's Counter Statement ("Def. Reply to Pl. Counter 56.1

---

[1] Plaintiff's Local Rule 56.1 Statement, which responds to each paragraph contained in Defendants' Local Rule 56.1 Statement, and Plaintiff's Counter Statement of Facts, which begins on page 36 of the same filing at Dkt. Entry No. 84, are filed as one document but are referred to as separate documents for the sake of clarity.

Stmt.," Dkt. Entry No. 88).  The facts are undisputed unless otherwise stated.  As it must, the Court has viewed the facts in the light most favorable to the nonmoving Plaintiff, considered only facts recited by Plaintiff and Defendants in their respective Rule 56.1 statements and responses that are established by admissible evidence and disregarded conclusory allegations and legal arguments contained therein.  *See*, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("where there are no[ ] citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion.") (internal citations omitted).

I.    Employment Chronology and Medical Leave

Plaintiff, a South Asian female originally from Sri Lanka, worked as an Assistant District Attorney ("Assistant DA") in the DA's Office from October 11, 2005 until her termination on July 17, 2013.  Compl. ¶ 10; Def. 56.1 Stmt. ¶¶ 1, 4, 29.  During her tenure, Plaintiff worked in four different bureaus, beginning in the District Court Bureau ("DCB") from her date of hire to September 23, 2010, where she was supervised by Bureau Chief Edward Jablonski ("Jablonski").  Def. 56.1 Stmt. ¶ 13.  Plaintiff then was transferred to the Case Advisory Bureau ("CAB"), again supervised by Jablonski, until her promotion on October 2, 2012 to the Economic Crimes Bureau ("ECB").  *Id.* ¶ 14.  There, she was supervised by Bureau Chief Maureen McCormack ("McCormack") until her transfer on February 21, 2013 to the Major Crimes Bureau ("MCB"), where she worked until her termination.  *Id.* ¶ 16–17, 29.  Plaintiff was supervised in the MCB by Bureau Chief Kerriann Kelly ("Kelly") and Deputy Bureau Chiefs Nancy Clifford ("Clifford") and James Chalifoux ("Chalifoux").  *Id.* ¶¶ 26–29.

Shortly after Suffolk County District Attorney Thomas J. Spota ("Spota") transferred Plaintiff to the ECB, Plaintiff suffered a mental breakdown and attempted suicide on November 16, 2012, which resulted in her taking a medical leave of absence from November 19, 2012 until

January 11, 2013.  *See*, Deposition of Rashika Hettiarachchi ("Plaintiff Dep."), Dkt. Entry No. 76-1, at 47:3–8; Def. 56.1 Stmt. ¶ 19, 24–25.  Plaintiff was diagnosed with Bipolar II Disorder during her medical leave.  *See*, Plaintiff Dep. at 78:18–20.

DA's Office policy required that, prior to returning from medical leave, an employee must submit a letter from a doctor stating that s/he is able to perform his/her essential job functions. Def. 56.1 Stmt. ¶ 23; Deposition of Edward G. Heilig[2] ("Heilig Dep."), Dkt. Entry No. 86-7 at 69:20–70:7.  On January 8, 2013, while Plaintiff was on medical leave, Chief Assistant District Attorney Emily Constant ("Constant"), the second highest ranking official in the DA's Office, sent Plaintiff a letter outlining Plaintiff's essential job functions and requesting that she supply the DA's Office with a doctor's note confirming that she was healthy enough to perform them.  Deposition of Emily Constant ("Constant Dep."), Dkt. Entry No. 85-7, at 125:11–21; Def. 56.1 Stmt. ¶¶ 22–23.  Constant could not recall making a similar request of another Assistant DA before January 2013, but did recall doing so after Plaintiff's termination from the DA's Office.  Constant Dep. at 126:6–127:8.  Plaintiff's doctor provided the DA's Office with the requested letter on January 10, 2013 and Plaintiff returned to her position the following day.  Def. 56.1 Stmt. ¶¶ 24–25.  Plaintiff was hospitalized again briefly from February 20–24, 2019 after suffering from suicidal ideations. Plaintiff Dep. at 153:1–154:3.

II.  <u>Plaintiff's Performance</u>

The undisputed record reveals several instances of Plaintiff's unsatisfactory performance during her tenure with the DA's Office.  On one occasion, while working for the CAB, Plaintiff declined to cover cases for a colleague in the DCB, where Plaintiff previously had worked.

---

[2] Edward G. Heilig ("Heilig") served as Division Chief, the third ranking position in the DA's Office, and he was in charge of administrative matters during Plaintiff's employment with the DA's Office.  Heilig Dep. at 9:9–10:16.

Plaintiff stated that she had done her time in the DCB and would not cover for attorneys in that Bureau.  She later apologized for this action.  Def. 56.1 Stmt. ¶ 31; Plaintiff Dep. 163:24–164:7.

During Plaintiff's tenure in the ECB, McCormack requested that Plaintiff handle several cases for an Assistant DA in another bureau who was on leave.   Plaintiff did so, but told McCormack upon returning from court that she did not see why she should have to cover cases from another bureau when Assistant DAs from that bureau were present in court.  Def. 56.1 Stmt. ¶¶ 43–44; Plaintiff Dep. 175:19–176:9.

After her transfer to the MCB in February 2013, Plaintiff had a conflict with a Senior Assistant DA with whom she was working on a case.  Plaintiff claims that the Senior Assistant DA made disparaging comments about the victims in a particular case.  Pl. 56.1 Stmt. ¶ 50. Following a conversation with Chalifoux, in which he told Plaintiff that she should work together with others in the Bureau, Plaintiff was reassigned from the case.  *Id.* ¶ 52.

At one point during her tenure in the MCB, Plaintiff advised Kelly that she had been informed by a Legal Aid attorney that another Assistant DA had coerced a confession from a defendant.  Def. 56.1 Stmt. ¶ 56.  The extent and nature of Plaintiff's inquiry into the accusation is disputed, but Kelly advised Plaintiff that, in the future, she should not discuss unsubstantiated allegations against an Assistant DA with the Assistant's colleagues and immediately should report suspected inappropriate conduct to her supervisor.  *Id.* ¶¶ 59, 63.  In response, Plaintiff maintained that she had acted appropriately and no change in her conduct was needed.  *Id.* ¶ 64.

In or around May 2013, Plaintiff and Kelly discussed a potential legal issue concerning another prosecutor's instructions to a grand jury.  Kelly directed Plaintiff to research whether there was a problem with the prosecutor's statements to the grand jury, but stated that the sufficiency of the prosecutor's instruction was an issue for the court to decide and that Plaintiff need not point

out the issue to the court.  Def. 56.1 Stmt. ¶¶ 80–81; Deposition of Kerriann Kelly ("Kelly Dep."), Dkt. Entry No. 85-20, at 59:8–16.  After Plaintiff submitted the grand jury minutes to the court, Kelly asked her if she had said anything to court personnel regarding the minutes.  Plaintiff told Kelly that she had not spoken to the court regarding the grand jury minutes, when, in fact, she had told the judge's law clerk to review them thoroughly.  Plaintiff Dep. at 217:15–218:17.  Plaintiff also told counsel for the defendant who was the subject of the grand jury presentation that "there might be issues in the case and that maybe we can work out a deal."  *Id.* at 216:21–25.

Plaintiff later met with Kelly and Chalifoux and admitted that she had been dishonest with them regarding her interaction with the judge's law clerk.  Plaintiff Dep. at 218:14–17.  Kelly and Chalifoux informed Plaintiff that her actions created a trust issue between them and Plaintiff.  *Id.* at 218:22–25.  Plaintiff conceded during her deposition that she understood it was up to the court to decide whether the prosecutor's instruction was sufficient, but that she was being "asked to violate ethics where [she] thought there was something wrong."  *Id.* at 220:15–16.  The judge in the case ultimately found that the instructions to the grand jury were insufficient and ordered the matter re-presented to the grand jury.  Kelly Dep. at 44:11–22.

In another instance, on or around June 11, 2013, two detectives complained to Clifford that Plaintiff had not prepared them adequately for a hearing regarding the burglary of a police officer's house.  Def. 56.1 Stmt. ¶ 95; Plaintiff Dep. at 226:25–227:5.  Plaintiff began preparing the officers for their testimony at 11:00 a.m. for a 2:00 p.m. hearing the same day.  Def. 56.1 Stmt. ¶ 97.  The officers told Clifford that they did not want to testify at the hearing because they felt unprepared and the DA's Office consequently requested an adjournment of the hearing to allow for additional time to prepare the officers.  *Id.* ¶¶ 98–99.

III.   <u>Performance Evaluations</u>

In early 2013, Spota requested that evaluations be prepared for all Assistant DAs based on their performance from the beginning of 2012 to the time of evaluation.  *Id.* ¶¶ 115–16.  During this time period, Plaintiff had worked in both the CAB, where Jablonski was her supervisor, and the ECB, where McCormack was her supervisor.  *See*, *Id.* ¶ 118.  The DA's Office had not conducted performance evaluations prior to 2013 and they have not been conducted since 2013.  Heilig Dep. at 21:22–22:5.[3]

On February 26, 2013, Jablonski completed an evaluation of Plaintiff's work at the CAB from January 1, 2012 through October 2, 2012.  *See*, Evaluation of Rashika Hettiarachchi ("Jablonski Eval."), Dkt. Entry No. 85–15.  The evaluation form lists a variety of areas in which to assess work performance on a scale from "1" or "unacceptable" to "5" or "exceptional."  In the areas of "interaction with support staff" and abilities as a "team player," Jablonski rated Plaintiff as a "2" or "need[ing] improvement."  Jablonski gave Plaintiff a rating of "4" or "very good," in 10 of the 22 areas in which she was evaluated, including "ethical obligations," "witness contact/interaction," "ability to assess legal and factual issues," "preparation for court," and "grand jury ability."  Jablonski rated Plaintiff at "3" or "average" in the remaining areas of evaluation and gave her performance at the CAB an "average" grade overall.  Jablonski did not award an overall score of exceptional to any Assistant DA.  Deposition of Edward Jablonski ("Jablonski Dep."), Dkt. Entry No. 86-5, at 37:13–20.

McCormack, who had supervised Plaintiff for approximately three months in the ECB from October to November, 2012 and again following Plaintiff's return from medical leave from January to February, 2013, completed Plaintiff's evaluation on or around May 14, 2013.  Def. 56.1

---

[3] At least as of the depositions in this case.

Stmt. ¶ 123.  McCormack gave Plaintiff a score of "2" in 6 of the 13 areas in which she assigned a score, and a score of "3" in 7 other areas.  *See*, Evaluation of Rashika Hettiarachchi, ("McCormack Eval."), Dkt. Entry No. 85-17.  McCormack left more than half of the metrics listed on the evaluation form blank and gave Plaintiff an overall score of "2" or "needs improvement."

McCormack did not review the evaluation form with Plaintiff, even though she did so with all other Assistant DAs for whom she completed evaluations.  Deposition of Maureen McCormack ("McCormack Dep."), Dkt. Entry No. 86-6 at 104:6–21.  McCormack attributes this to the fact that Plaintiff no longer was working under her at the ECB at the time she completed Plaintiff's evaluation, unlike all the other attorneys for whom she completed evaluations.  *Id.*  Spota later reviewed the evaluations with Constant and Heilig.  Def. 56.1 Stmt. ¶ 125.

On May 20, 2013, Kelly provided Plaintiff with the evaluations prepared by Jablonski and McCormack.  Plaintiff submitted a written response to each evaluation.  *See*, Response to Evaluation by Bureau Chief Edward Jablonski ("Response to Jablonski"), Dkt. Entry No. 85-16; Response to Evaluation by Bureau Chief Maureen McCormack ("Response to McCormack") Dkt. Entry No. 85-18.  Plaintiff's response to the Jablonski evaluation discussed her efforts to assist other Assistant DAs and various workplace achievements, and noted that she never had been spoken to regarding her interactions with support staff, an area in which Jablonski had indicated that Plaintiff "need[ed] improvement."  *See*, Response to Jablonski.  In her response to the McCormack Evaluation, Plaintiff stated that McCormack's Evaluation was "consistent with [McCormack's] hostility" to Plaintiff and that the evaluation was based on Plaintiff's work for McCormack for a period of approximately two months.  *See*, Response to McCormack.  Believing some of Plaintiff's statements in her response to be false, McCormack drafted a rebuttal and provided it to Heilig.  McCormack Dep. at 90:2–92:4.  Spota was not made aware that Plaintiff

8

responded to her evaluations.  Deposition of Thomas J. Spota ("Spota Dep."), Dkt. Entry No. 86-2, at 56:13–16.  Heilig spoke with McCormack regarding Plaintiff's response to her evaluation, but did not speak with Plaintiff.  Heilig Dep. at 92:8–21.

IV.     Plaintiff's Termination

By later dated July 2, 2013, Spota advised Plaintiff that she would not be receiving a pay increase on the basis of her performance and the recommendation of Kelly.  Ex. BB, Letter from Thomas J. Spota, Dkt. Entry No. 86-8.  In his letter, Spota urged Plaintiff "to reflect upon those areas of your performance that need improvement" and stated his hope that Plaintiff would "react constructively to this situation and . . . strive to improve [her] performance moving forward."  *Id.* Following conversations with Constant, Heilig, Clifford, Chalifoux, and Kelly, Spota decided to terminate Plaintiff's employment with the DA's Office.  Spota Dep. at 73:5–74:2.  On July 16, 2013, two weeks after Plaintiff was informed she would not be receiving a pay increase, Constant and Heilig informed Plaintiff that she was being terminated.  Def. 56.1 Stmt. ¶ 135.  Spota identified Plaintiff's "deceptive" and "dishonest" conduct as the "main reason" for her termination, as well as her lack of understanding of criminal law and procedure, and her confrontational attitude towards attorneys and staff within the DA's Office.  Spota Dep. at 74:7–77:13.  Another Assistant DA, a black female, was terminated shortly before Plaintiff on May 29, 2013.  Pl. Counter 56.1 Stmt. ¶ 304.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

"In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations omitted). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532–33 (2d Cir. 1993) (internal citations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

When considering employment discrimination claims, the Second Circuit has cautioned that a "trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue" and that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Desir v. City of New York*, 453 F. App'x 30, 33 (2d Cir. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22

10

F.3d 1219, 1224 (2d Cir. 1994).  Nonetheless, "it is beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## DISCUSSION

I.    The Title VII and Sections 1981 and 1983 Termination Claims

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  A plaintiff may bring Section 1983 claims against state officials in their personal or official capacities, although Section 1983 claims against individuals in their official capacities are, in reality, "a way of pleading an action against an entity of which an officer is an agent." *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).

The Supreme Court has held, and the Second Circuit recently affirmed, that the express cause of action for damages created by Section 1983 constitutes the "exclusive federal remedy" for the violation of rights under Section 1981. As such, Plaintiff's Section 1981 claims are dismissed.  *See*, *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (quoting *Jett v.*

11

*Dallas Indep. School Dist.*, 491 U.S. 701 (1989)); *See also*, *Edwards v. Town of Huntington*, 2007 WL 2027913, at *3 (E.D.N.Y. July 11, 2007).

Employment discrimination claims against employers under Title VII and against individual defendants under 42 U.S.C. § 1983 generally are analyzed under the same framework. *See*, *Bowen-Hooks v. City of New York*, 13 F. Supp.3d 179, 209 (E.D.N.Y. 2014) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)); *See also*, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015) (holding in the Fed. R. Civ. P. 12(b)(6) context that a Section 1983 "equal protection claim parallels [a plaintiff's] Title VII claim").  That framework is the three-step, burden shifting scheme articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  At the first step in the analysis, a plaintiff must establish a *prima facie* case of discrimination by demonstrating: (1) membership in a protected class; (2) qualifications for the position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See*, *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).  Plaintiff's burden in establishing her *prima facie* case is minimal.  *Id.* (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)).

If a plaintiff succeeds in satisfying these elements, the burden shifts to the defendant to produce admissible evidence that the adverse employment action was undertaken for a legitimate, non-discriminatory reason.  *See*, *Hicks*, 509 U.S. at 506–07 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  Upon this showing by the defendant, the presumption of discrimination created by plaintiff's *prima facie* case "drops out of the picture" and plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Reeves v.*

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (internal quotations omitted).  While often referred to as the "pretext" stage of the analysis, a plaintiff "sustains his burden if he proves that an adverse employment decision was motivated by discrimination, regardless of whether he is able to additionally show that the employer's asserted justification for the decision was 'pretextual.'" *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 n.5 (2d Cir. 2010).

A.  <u>Plaintiff's *Prima Facie* Case</u>

1.  <u>Qualifications for the Position</u>

Defendants do not contest that Plaintiff, a South Asian female, is a member of a protected class.  However, they do contend that Plaintiff cannot satisfy the second element of a *prima facie* case of discrimination "because she was not performing her job satisfactorily."  Defendants' Memorandum in Support of Motion for Summary Judgment ("Mem."), Dkt. Entry No. 74, at 18. To support their contention, Defendants rely on reports of Plaintiff's poor job performance from supervisors, fellow prosecutors, witnesses, victims, and a judge.  *Id.*

On this issue, Defendants have applied an incorrect legal standard, erroneously relying on *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) and *Thornley v. Penton Publ'g*, 104 F.3d 26, 29 (2d Cir. 1997) to support their preferred "satisfactory performance" test.  *See*, Mem. at 18. However, the Second Circuit subsequently clarified that a plaintiff bears a "minimal" burden of demonstrating qualifications for a position at the *prima facie* stage, and is required to show only that she "possesses the basic skills necessary for performance of [the] job."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001); *See also*, *Markovich v. City of New York*, 2013 WL 11332465, at *5 (E.D.N.Y. Aug. 21, 2013), *aff'd*, 588 F. App'x 76 (2d Cir. 2015) (stating that courts in the Second Circuit now reject the "satisfactory performance" requirement).  "[A]ll

that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that [s]he satisfies the employer." *Slattery*, 248 F.3d at 92.

Here, Plaintiff meets the minimal burden of showing that she was qualified for the roles she occupied in the DA's Office. Plaintiff was an Assistant DA for nearly eight years before her termination, during which time she received promotions and handled progressively more complex matters. *See*, Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opp'n"), Dkt. Entry No. 83, at 7. Plaintiff's tenure with and promotions within the DA's Office, coupled with a performance review identifying Plaintiff as an "average" performer in most categories of her employment are sufficient to demonstrate Plaintiff's qualification for employment as an Assistant DA for purposes of her *prima facie* case. *See*, *Slattery*, 248 F.3d at 92 ("[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.").

### 2. Inference of Discriminatory Intent

Defendants concede that Plaintiff's termination constitutes an adverse employment action. Thus, the remaining question is whether Plaintiff sufficiently has alleged that her termination was the result of discriminatory intent.

As with the "qualifications" prong of the *prima facie* case, at this stage Plaintiff must meet a "low threshold" to show that the decision to terminate her was made under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008). Courts may consider a variety of circumstantial evidence in evaluating whether a plaintiff has met her burden because employers are "unlikely to leave a 'smoking gun' attesting to a discriminatory intent[.]" *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Discrimination may be inferred from "the more favorable treatment of employees not in the protected group; or the

sequence of events leading to the plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009), *superseded by statute on other grounds*.  Departures from procedural regularity also can raise a question as to the good faith of the process that led to an adverse employment action.  *See*, *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 313 (2d Cir. 1997) (internal citation omitted).

In support of her *prima facie* case, Plaintiff identifies a number of Caucasian Assistant DAs in the DA's Office who she claims received relatively more favorable treatment.  To support a claim of discrimination based on reference to so-called "comparators," Plaintiff must show that she was similarly situated in all material respects to the individuals to whom she compares herself. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  "An employee is similarly situated to her co-employees in all material respects if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham*, 230 F.3d at 40.

With respect to the other Assistant DAs to whom Plaintiff seeks to compare herself, the record shows that, in general, Assistant DAs were subject to the same standards of performance and discipline.  Plaintiff reviewed and signed a document acknowledging that she was subject to the "Operations and Procedures Manual" for the DA's Office, which provided, *inter alia*, that all Assistant DAs served at the sole discretion of the DA and were terminable at will.  *See*, Def. 56.1 Stmt. ¶ 12.  In the sole year that the DA's Office opted to complete written evaluations, evaluations were completed for all Assistant DAs.  Heilig Dep. at 58:21–23.  While Plaintiff and the

comparators she identifies may have had different direct supervisors and worked in different Bureaus, no one but Spota had "any decision-making authority to hire, fire or promote" Assistant DAs.  Mem. at 31.

Plaintiff also must establish that the comparators she identifies "engaged in comparable conduct" and were punished less severely in order for their relatively favorable treatment to support an inference of discrimination.  *Ruiz*, 609 F.3d at 493–94.  Plaintiff identified at least five Assistant DAs with performance issues who, instead of being terminated, were transferred to another bureau or were retrained.  Opp'n at 9.  Plaintiff asserts that several other Assistant DAs identified by her failed to disclose exculpatory or evidentiary material to defendants in criminal cases as required under decisions from the United States Supreme Court and the New York State Court of Appeals.  Opp'n at 11–12.  Only one of these attorneys was terminated as a result.

Plaintiff contends further that the circumstances surrounding her termination raise an inference of discrimination.  Plaintiff points to the fact that two women of color were terminated in the aftermath of the first and only systematic evaluations conducted at the DA's Office.  Opp'n at 13.  However, it is unclear from the record whether these two women were the only attorneys terminated in the wake of the 2013 evaluations.  *See*, Constant Dep. at 235:9–22.  She also claims that McCormack acted contrary to DA policy by not reviewing Plaintiff's evaluation with her.  *Id.*  Plaintiff's written response to the McCormack evaluation alleged hostility and unfair treatment by McCormack, but Spota, the only person with authority to terminate her, never was made aware of Plaintiff's response.  Spota Dep. 56:13–16.  Plaintiff maintains that, contrary to the "progressive discipline policy" in place at the DA's Office, she never received any written discipline, suspension, or any form of notice that her job was in jeopardy prior to her termination.  Opp'n at 8.

Based on the procedural irregularities associated with Plaintiff's termination discussed above, and notwithstanding the problems present in Plaintiff's comparator evidence discussed below in Section I(C)(1), Plaintiff has succeeded in raising an inference of discrimination based on the circumstances of her termination. *See*, *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 97 (2d Cir. 1999) (to satisfy *prima facie* case, "it is enough for a plaintiff to present evidence that an employer departed from its usual employment practices and procedures in dealing with that particular employee."); *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp.2d 300, 317 (E.D.N.Y.2012) ("It is well settled that departures from procedural regularity can create an inference of discriminatory intent, sufficient to establish a *prima facie* case of employment discrimination.") (internal quotations and citation omitted).

To the limited extent Plaintiff alleges discrimination based on her gender, she fails to state a *prima facie* claim. During Plaintiff's employment, more than half of the attorneys working for the DA's Office were women, and more than two thirds of attorneys in the ECB and MCB were women. *See*, Final Investigation Report and Basis of Determination, New York State Division of Human Rights, Dkt. Entry No. 86-11 at 5. Half of Plaintiff's proposed comparators are women, and most of her supervisors were women. Bureau Chiefs McCormack and Kelly both took maternity leaves while employed by the DA's office. While Spota made the final decision to terminate Plaintiff, he resolved to do so in consultation with Constant, a female and the second highest ranking official in the DA's office, further undermining Plaintiff's claim of gender discrimination. *See*, *Moore v. Kingsbrook Jewish Med. Ctr.*, 2013 WL 3968748, at *11 (E.D.N.Y. July 30, 2013) (collecting cases showing that claims of discrimination are weakened when those who took the allegedly discriminatory action are members of the same protected class as the plaintiff). In light of these facts, Plaintiff has failed to raise an inference that she was the subject

of discrimination based on her gender.  Accordingly, Defendant's motion to dismiss Plaintiff's Section 1983 and Title VII gender discrimination claims is granted.

B.  Defendants' Reason for Plaintiff's Termination

Defendants have produced admissible evidence that could support a finding that Plaintiff's termination was not motivated by discrimination.  *See*, *Hicks*, 509 U.S. at 507.  Defendants assert that Spota fired Plaintiff as a result of her "demonstrated inability to perform her job responsibilities" and because she was "deceptive" and "dishonest to her Bureau Chiefs."  Def. 56.1 Stmt. ¶ 131; Spota Dep. at 74:9–13.  The undisputed facts show that Plaintiff engaged in conduct unbefitting an Assistant DA.  Plaintiff failed to cover for another attorney as directed on at least one occasion (Plaintiff Dep. at 163:24–164:7); failed to prepare law enforcement agents for testimony in court (Def. 56.1 Stmt. ¶¶ 98–101); and lied to a supervisor about her conduct with a judge's law clerk concerning a confidential grand jury matter that violated a clear directive from her supervisor.  (*Id.* ¶ 83).

Poor performance is a legitimate, nondiscriminatory reason for failing to promote or terminating an employee.  *See*, *Sengillo v. Valeo Elec. Sys., Inc.*, 538 F. Supp.2d 585, 588 (W.D.N.Y. 2008), *aff'd*, 328 Fed. Appx. 39 (2d Cir. 2009); *Almonord v. Kingsbrook Jewish Med. Ctr.*, 2007 WL 2324961, at *10, n.8 (E.D.N.Y. Aug. 10, 2007).  Lying to a supervisor also has been held to constitute a legitimate, non-discriminatory reason for terminating an employee.  *See*, *Rodriguez v. Long Island Am. Water, Inc.*, 2014 WL 4805021, at *5 (E.D.N.Y. Sept. 26, 2014) (lying to cover up timesheet falsification is a legitimate, non-discriminatory reason for terminating employee); *Opoku-Acheampong v. Depository Tr. Co.*, 2005 WL 1902847, at *4 n.3 (S.D.N.Y. Aug. 9, 2005) (lying in violation of company policy provided a legitimate, non-discriminatory

reason for the plaintiff's termination).  Therefore, Defendants have produced a legitimate, non-discriminatory motivation for terminating Plaintiff.

    C. <u>Plaintiff's Evidence of Pretext</u>

As Defendants have rebutted Plaintiff's *prima facie* showing of discrimination, "the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d 72, 102 (2d Cir. 2013); *See also*, *Curley v. St. John's Univ.*, 19 F. Supp.2d 181, 188 (S.D.N.Y. 1998) (plaintiff's burden in pretext analysis is to "adduce sufficient evidence to allow a rational fact finder to infer that the employer was motivated in whole or in part by age discrimination") (quoting *Norton v. Sam's Club, et al.*, 145 F.3d 114, 118 (2d Cir. 1998)).  At this stage of the analysis, the court may consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *Reeves,* 530 U.S. at 148–49.  "The task . . . is to examine the entire record and, in accordance with *Reeves*, make the case-specific assessment as to whether a finding of discrimination may reasonably be made." *Female Port Auth. Officer 47708 v. Port Auth. of New York & New Jersey*, 2018 WL 3489569, at *6 (E.D.N.Y. July 19, 2018) (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 382 (2d Cir. 2001)).

    1. <u>Comparator Evidence</u>

To carry her burden at the pretext stage of the analysis, Plaintiff relies in significant part on the same claims she used to establish her *prima facie* case of discrimination, including her claim that similarly situated Caucasian Assistant DAs received better treatment.  Plaintiffs may use the same claims to buttress their position at both the first and third stages of the *McDonnell Douglas* burden shifting framework.  *See*, *Graham*, 230 F.3d at 43.

As discussed above in Section I(A)(2), to support a claim of discrimination based on reference to so-called "comparators," Plaintiff must show that she was similarly situated in all material respects to the individuals to whom she is compared. *Shumway*, 118 F.3d at 64. Individuals are similarly situated in all material respects if they are (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham*, 230 F.3d at 40. A comparator's conduct need not be identical to the plaintiff's, but it must bear a reasonably close resemblance to the plaintiff's conduct in order to facilitate a comparison that may shed light on a defendant's discriminatory intent. *Dotson v. City of Syracuse*, 763 F. App'x 39, 43 (2d Cir. 2019) (citing *Graham*, 230 F.3d at 40); *See also*, *Graham*, 230 F.3d at 40 (conduct may be comparable where it is of "comparable seriousness") (quoting *McDonnell Douglas*, 411 U.S. at 804).

Plaintiff's references to more than a dozen comparators are of limited value in supporting her race discrimination claim because none provides an objective basis for comparison with the conduct in which Plaintiff engaged that led to her termination. Four of the attorneys identified by Plaintiff committed violations of federal constitutional and state law in withholding exculpatory and other evidence from defendants. One of these attorneys was terminated as a result. *See*, Opp'n at 11–12; Constant Dep. at 189:11–191:5; Deposition of James G. Chalifoux ("Chalifoux Dep."), Dkt. Entry No. 86-4, at 97:21–99:25.

It is well settled that these prosecutorial failures of the comparators, while serious, do not necessarily entail any bad faith or deception on the part of a prosecutor, and are qualitatively distinct from the conduct for which Defendants claim Plaintiff was terminated. In *Brady v. Maryland*, the Supreme Court held that the suppression of exculpatory evidence by a prosecutor violates a criminal defendant's right to due process "irrespective of the good faith or bad faith of

the prosecution."  373 U.S. 83, 87 (1963); *See also*, *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (holding that a *Brady* violation may occur irrespective of whether the failure to disclose was willful or inadvertent).  In *People v. Rosario*, the New York Court of Appeals held that prosecutors must provide defense counsel with pre-trial statements made by a prosecution witness relating to the witness' testimony in court.  9 N.Y.2d 286, 289 (1961).  This rule was later codified at N.Y. CPL § 240.15.  A showing of bad faith or deception is not required for a *Rosario* violation. *See*, *People v. Joseph*, 86 N.Y.2d 565, 572 (1995).

Assistant DA 1,[4] a Caucasian male, was found by a court to have withheld unlawfully documents and exculpatory evidence from a defendant in a homicide case.  Constant Dep. at 189:11–191:5; Chalifoux Dep. at 97:21–99:25.  Spota testified that he was "about to terminate" this attorney as a result and that he "had his Bureau Chief go down to ask [Assistant DA 1] to come down to my office to tell him, and I told her to warn him in advance that I was terminating him." Spota Dep. at 94:20–24.  Spota said he could not recall if a similar warning was given to Plaintiff. *Id.* at 95:3–6.  Preempting his termination, Assistant DA 1 came to Spota's office and resigned. *Id.* at 94:19–95:2.   Plaintiff claims that a comparison with Assistant DA 1 reveals her discriminatory treatment because she was not given advance warning of her termination and was not allowed to pack up her own office, unlike Assistant DA 1, who was allowed to return to the office at a later date to collect his belongings himself.  Opp'n at 11–12; Pl. Counter. 56.1 Stmt. ¶¶ 355–61.

While termination qualifies as an adverse employment action, "petty slights" and "minor annoyances" such as not being able to collect one's own belongings upon termination are not actionable.  *See*, *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Burlington*

---

[4] The Court uses the numbers assigned to Plaintiff's comparators by Defendants in their Rule 56.1 Statement rather than the names of the attorneys to whom Plaintiff seeks to compare herself.

*N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In any case, Plaintiff does not allege that she requested the opportunity to return to her office to pack her own things and was denied, or that her belongings were not returned to her. As for Plaintiff's allegation regarding the opportunity to resign, at least one other court has found that denial of the opportunity to resign in lieu of termination does not rise to the level of an adverse employment action. *See*, *Tribble v. Memphis City Sch.*, 2005 WL 1214268, at *4 (W.D. Tenn. May 19, 2005), *aff'd*, 193 F. App'x 401 (6th Cir. 2006). Even if it did so qualify, Plaintiff "pretty much knew" she would be fired when she was called to a meeting with Constant and Heilig. *See*, Plaintiff Dep. at 231:5–11. As a result, Defendants' treatment of Assistant DA 1 does not support the conclusion that Defendants were motivated by discriminatory animus in terminating Plaintiff.

Assistant DA 3, a Caucasian male, committed a *Brady* violation, was not terminated, and was transferred from the Homicide Bureau to the Domestic Violence Bureau. Pl. Counter. 56.1 Stmt. ¶ 362; Constant Dep. at 209:8–21. In that case, the *Brady* violation resulted when, in his summation at trial, Assistant DA 3 referred to a homicide detective without mentioning that the detective was the subject of an Internal Affairs inquiry and a civil lawsuit. Spota Dep. at 98:2–20. Plaintiff offers no information to establish that this attorney, who worked in a different bureau, was similarly situated to her, other than the fact that he was also an Assistant DA. Nor does Plaintiff offer any evidence, or even an allegation, that Assistant DA 3's actions involved dishonesty or bad faith of any kind. Therefore, the conduct in which Assistant DA 3 engaged does not sufficiently resemble Plaintiff's conduct so as to render this comparison probative of discrimination.

Assistant DA 2, a Caucasian female, temporarily was stripped of her responsibilities and ordered to undergo retraining after submitting exhibits to a court on which she had made improper

notations.  Pl. Counter 56.1 Stmt. ¶¶ 352–54.  Assistant DA 2's actions were disclosed voluntarily to the judge in the case, who made no finding of bad faith and called a mistrial before jury selection was completed.  Heilig Dep. at 138:10–25; 143:21–144:9.  This conduct is different materially from the conduct that led to Plaintiff's termination.  Moreover, Plaintiff offers no evidence as to the level of experience of this attorney, who worked in a different bureau from Plaintiff.  Therefore, Assistant DA 2 is not an appropriate comparator to Plaintiff.

Assistant DA 12, a Caucasian female, committed a *Brady* violation in a murder case.  Opp'n at 12; Pl. Counter 56.1 Stmt. ¶ 365.  Plaintiff offers no other information about the violation, or about the attorney who was responsible for it, whom Defendants claim was an exemplary prosecutor and promoted to Homicide Bureau Chief in 2007.  Reply Affidavit of Edward Heilig ("Heilig Reply Aff.") at ¶ 9, Dkt. Entry No. 91.  There is insufficient evidence upon which to conclude that this attorney was similarly situated to Plaintiff in all material respects.  As such, comparison to her does not support Plaintiff's claim of discrimination.

Plaintiff identifies a number of other Assistant DAs who suffered from largely unspecified shortcomings in their performance, but were not terminated.  Assistant DA 9, a Caucasian male, was warned by Heilig that his work performance had to improve or he would be terminated, and was allowed to return to the CAB from a felony bureau to improve his work performance, an opportunity that was unavailable to Plaintiff.  Pl. Counter 56.1 Stmt. ¶¶ 307–08; Constant Dep. at 221; Heilig Dep. at 134.  However, Plaintiff offers no evidence as to the nature of this attorney's performance issues. Without citation to admissible evidence, Plaintiff asserts that Assistant DAs 10 and 11, a Caucasian male and female, were returned to non-felony bureaus in lieu of termination.  Pl. Counter 56.1 Stmt. ¶¶ 309, 310.  Plaintiff does not identify the conduct in which these attorneys engaged, provides no information on their background or qualifications, and cites only to her own

deposition testimony in support of her meager factual allegations. Thus, these two attorneys cannot serve as comparators to Plaintiff.

Assistant DA 4, a Caucasian female, was transferred to the Domestic Violence Unit ("DVU") because "she was not living up to [the] expectations of her supervisors in terms of trial statistics." Opp'n at 9. Constant testified that, while Assistant DA 4's supervisor in the Child Abuse and Domestic Violence Bureau ("CADVB") thought she was not handling as many cases as she should, Assistant DA 4 was transferred partly due to her desire to work in a location closer to her children. Constant Dep. at 224:13–226:18. Plaintiff's termination was unrelated to her "trial statistics," rendering Assistant DA 4 inapposite as a comparator.

Plaintiff alleges that Assistant DA 5, a Caucasian male and Senior Assistant DA, was demoted from the CADVB to the DVU because he was "unproductive" and had "clashed" with his supervisor. Opp'n at 10. However, when Plaintiff herself clashed with McCormack, her supervisor in the ECB, Plaintiff was transferred to another felony bureau, unlike Assistant DA 5, who was demoted. Plaintiff received better treatment than Assistant DA 5. As such, comparison of Plaintiff to this Assistant DA cannot support a finding of discrimination. The same is true with respect to Assistant DA 6, a Caucasian female, who was demoted to the DCB after "struggling" in the ECB. Opp'n at 9–10; Spota Dep. at 106:21–109:7. Moreover, there is no allegation, much less admissible evidence, supporting the conclusion that these attorneys engaged in conduct comparable to the acts for which Plaintiff was terminated.

The comparators identified by Plaintiff suffered from unspecified performance issues, failure to manage a sufficient caseload or failure to make required disclosures to defendants in criminal cases. No trust issues in connection with the comparators were identified. By contrast, during his deposition, Spota explained that the "main reason" Plaintiff was terminated was "that

she was deceptive, dishonest to her Bureau Chiefs," and Plaintiff concedes that she lied to her supervisor about an ex parte conversation she had with a judge's law clerk about a grand jury matter.  Spota Dep. at 74:7–13; Plaintiff Dep. at 218:14–17.

District courts in this Circuit have found that comparator evidence is not probative of discriminatory intent where a plaintiff and her proposed comparators engaged in qualitatively different conduct, including where a plaintiff was dishonest with her supervisors and her comparators were not.  *See*, *Spratt v. Verizon Commc'ns Inc.*, 2014 WL 4704705, at *7 (S.D.N.Y. Sept. 17, 2014), *aff'd*, 633 F. App'x 72 (2d Cir. 2016) (comparator evidence precluded where plaintiff misrepresented his absence from work while comparator simply missed work); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp.3d 120, 144 (E.D.N.Y. 2015) (comparator evidence inapt where comparators were forthcoming with company investigators and plaintiff was not); *Rodriguez*, 2014 WL 4805021, at *8 (finding that acts of "affirmative dishonesty" rendered plaintiff's situation materially distinct from that of comparators); *Bengard v. United Parcel Serv.*, 2001 WL 1328551, at *12 (E.D.N.Y. Aug. 22, 2001), *aff'd*, 48 F. App'x 350 (2d Cir. 2002) (finding that comparator differs in "at least one important material respect" where plaintiff was terminated for dishonesty and there was no evidence comparator had been dishonest).

In *Thompson v. Spota*, plaintiff brought discrimination claims against the DA's Office after being terminated "on the basis of her chronic lateness for work."  2018 WL 6163301, at *12 (E.D.N.Y. Aug. 23, 2018), *report and recommendation adopted*, 2018 WL 4771901 (E.D.N.Y. Sept. 30, 2018), *reconsideration denied*, 2019 WL 2602062 (E.D.N.Y. June 25, 2019) (hereinafter, "*Thompson*").  Even though the court found that the plaintiff's *prima facie* claim was weak, the court denied defendants' motion for summary judgment because of evidence that many other Assistant DAs in the DA's Office regularly arrived late.  *Id.* at *23.  The court summarized its

finding at the *prima facie* stage of the analysis by stating that the plaintiff had met her burden by showing that "there were other Assistant DAs in her bureau who were outside her protected class and arrived late, were generally subject to the same workplace standards regarding attendance, and were not terminated." *Id.*

Unlike *Thompson*, Plaintiff has not shown that the other Assistant DAs she identified engaged in similar conduct, and generally has failed to provide specific information as to the background or qualifications of her comparators. *See*, *Conway v. Microsoft Corp.*, 414 F. Supp.2d 450, 464 (S.D.N.Y. 2006) ("Where co-employees are disciplined differently for conduct that is fundamentally different in quality, there is no 'objectively identifiable basis for comparison' to allow a finding that they are similarly situated.") (quoting *Graham*, 230 F.3d at 40); *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 57 (2d Cir. 2016) (affirming grant of summary judgment on gender discrimination claim where "[p]laintiff did not submit any evidence pertaining to her male peers' job duties, assignments, bonuses, or salary increases"). Accordingly, Plaintiff cannot meet her ultimate burden of showing that Defendants intentionally discriminated against her by relying solely on the proffered comparator evidence.

## 2. Other Evidence of Pretext

While Plaintiff's comparator evidence is insufficient to create a triable question as to Defendants' purported discriminatory motivation, it remains to be determined whether Plaintiff's other evidence could allow a reasonable jury to find in her favor on her Title VII and Section 1983 claims. In instances where "the gap in conduct [between a plaintiff and her comparators] is large enough that any number of explanations can explain the difference" in treatment, a plaintiff must offer some additional evidence that makes discrimination a more likely explanation than equally plausible nondiscriminatory explanations. *See*, *Setelius v. Nat'l Grid Elec. Servs. LLC*, 2014 WL

4773975, at *18 (E.D.N.Y. Sept. 24, 2014).  Plaintiff has succeeded in doing so based on the circumstances surrounding her termination.

For reasons that are not entirely clear, Spota inaugurated an Office-wide policy requiring written evaluations of Assistant DAs in early 2013, during or around the time that Plaintiff was on medical leave from the DA's Office.  In the wake of the newly instituted evaluation process, Spota terminated two Assistant DAs, both of whom were female and minorities, in an office where 90% of the attorneys were Caucasian.  *See*, Constant Dep. at 232:24–233:9.  During her deposition, Constant could not recall any other attorneys who were terminated at that time, though she believed there were others.  *Id.* at 235:9–22.  Plaintiff was terminated two weeks after Spota, in a letter denying her a salary increase, suggested that she should "react constructively to this situation and . . . strive to improve [her] performance moving forward."  The letter did not mention her prospective termination and her termination came without any warning whatsoever.  After Plaintiff's termination, the evaluation system devised by Heilig was scrapped and no new evaluation process was adopted thereafter.  Heilig Dep. at 21:22–22:5.

The undisputed record reveals valid reasons for terminating Plaintiff, and further evidence justifying her termination may be introduced at trial.  Additionally, the comparators Plaintiff has identified do not support a finding that Plaintiff was the victim of intentional discrimination.  Nonetheless, in light of the circumstances surrounding Plaintiff's termination, the Court finds that a reasonable jury could conclude by a preponderance of the evidence that the DA's Office was motivated in part by discriminatory intent.  *See*, *Stern*, 131 F.3d at 313 (holding that the institution and rapid dissolution of an evaluation process amounts to a "departure[ ] from procedural regularity" that may raise a question as to the good faith of a process that leads to an employee's termination) (quoting *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984)).  As a result,

Defendants' motion for summary judgment as to Plaintiff's Title VII racial and national origin discrimination claim against the DA's Office is denied.

II.      Plaintiff's Section 1983 Claims Against the Individual Defendants

Defendants argue that Plaintiff's claims under Section 1983 as to all Individual Defendants except for Spota must be dismissed because only Spota had authority to make decisions regarding Plaintiff's promotion or termination.  Mem. at 30–33.  As for Spota, Defendants contend that he cannot be found liable under Section 1983 because his motivations for terminating Plaintiff were not discriminatory.  *Id.* at 33.

"In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a person acting under the color of state law, and (b) that the defendant caused the plaintiff to be deprived of a federal right."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (internal quotations and citation omitted).  "If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant."  *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014).  Generally, an individual defendant must be a "supervisor or have some position of authority or control over the plaintiff" if s/he is to be found liable under Section 1983.  *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp.2d 347, 355 (E.D.N.Y. 1999).  Additionally, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).

Plaintiff has failed to produce sufficient evidence showing personal involvement in her termination or intent to discriminate on the part of Jablonski or McCormack.  There is no evidence that Jablonski was involved in Plaintiff's termination, as Plaintiff apparently concedes.  Opp'n at 19 ("[A]ll named Defendants were involved in the decision to terminate Plaintiff with the

exception of Defendant Jablonski[.]").  While McCormack gave Plaintiff a negative evaluation, there is no evidence that she recommended Plaintiff's termination.  McCormack testified that she had no involvement in Plaintiff's termination and Plaintiff has not identified any evidence to the contrary.  McCormack Dep. at 97:5–16.  Therefore, Plaintiff's Section 1983 claims against Jablonski and McCormack in their personal capacities are dismissed.

The question is closer with respect to Chalifoux, Clifford, and Kelly, Plaintiff's supervisors during her final months in the MCB.  Chalifoux testified that he spoke with Clifford and Kelly about Plaintiff's conduct in the Bureau, but was not consulted regarding Plaintiff's termination.  Chalifoux Dep. at 31:24–36:21; 95:24–96:11.  Clifford testified that, while she had discussed Plaintiff's dishonesty with Kelly, she "never discussed terminating" Plaintiff and never discussed Plaintiff's performance with Heilig or Constant.  Clifford Dep. at 124:14–126:13.  Kelly similarly testified that she was "absolutely not" involved in the decision to terminate Plaintiff.  Kelly Dep. at 124:5–12.  On the other hand, Spota testified that it "[w]ould have been" Chalifoux, Clifford, and Kelly with whom he spoke in July 2013 regarding Plaintiff's termination, though he did not recall a specific conversation with them, nor did he testify that any of the three recommended Plaintiff's termination.  Spota Dep. at 72:20–73:9.  Plaintiff offers only conclusory allegations to counter the sworn testimony from Chalifoux, Clifford, and Kelly.  Spota's testimony does not indicate that any of these Defendants recommended that Plaintiff be terminated, and Plaintiff offered no evidence to the contrary.  Accordingly, Plaintiff's Section 1983 claims against Chalifoux, Clifford, and Kelly in their personal capacities are also dismissed.

Material issues of fact preclude a grant of summary judgment as to the Section 1983 claims against the remaining Individual Defendants.  Spota made the decision to terminate Plaintiff and testified that "it would have been Miss Constant, and more than likely Mr. Heilig" who

recommended that Plaintiff be terminated.  Spota Dep. at 73:20–74:2.  Constant and Heilig personally terminated Plaintiff after discussing taking such action with Spota.  Spota Dep. at 73:20–74:2.  As these individuals were involved personally with the decision to terminate Plaintiff, and the Court has concluded that disputed material issues of fact remain as to whether Plaintiff's termination was motivated in part by discriminatory intent relating to Plaintiff's race or national origin, Defendants' motion for summary judgment as to the Section 1983 claims against Spota, Constant, and Heilig in their personal capacities is denied.

III.   The Section 1983 Claims Against Suffolk County

Plaintiff alleges that, in terminating her and another Assistant DA of color, Defendants have engaged in a pattern and practice of discrimination for which the County may be held liable under Section 1983.  Opp'n at 30.  Plaintiff also argues that the County may be held liable under Section 1983 because Spota, who qualifies as a policymaker for the County, violated Plaintiff's right to equal protection under the Constitution in terminating her employment.  *Id.* at 29–30.

While the doctrine of *respondeat superior* does not apply in cases brought under Section 1983, Suffolk County can be held liable for the actions of its employees, if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell*, 436 U.S. at 694. Specifically, to establish liability for a municipality under Section 1983, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  A plaintiff may establish a municipal policy or custom by showing, inter alia, that "an official with policymaking authority took action or made a specific decision[,] which caused the alleged violation of

constitutional rights." *Jouthe v. City of New York*, 2009 WL 701110, at *7 (E.D.N.Y. Mar. 10, 2009) (citing *Pembraur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986)).

Spota "had the authority to set department-wide personnel policies" in the DA's Office and, therefore, was an official with policymaking authority. *See*, *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *See also*, *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1153 n.14 (2d Cir. 1995) ("[W]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker.") (quoting *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992)).

Disputed material issues of fact remain as to whether Spota, an individual with policymaking authority for the County, took action that caused a deprivation of Plaintiff's constitutional rights. Accordingly, Defendants' motion to dismiss the Section 1983 claim against the County is denied. Insofar as the Section 1983 claims are asserted against the Individual Defendants in their official capacities, these claims are dismissed as duplicative of Plaintiff's Section 1983 claims against the County. *See*, *Tsotesi v. Bd. of Educ.*, 258 F. Supp.2d 336, 338 n.10 (S.D.N.Y. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). As discussed in Section II, Defendants' summary judgment motion regarding the Section 1983 claims against the Individual Defendants in their personal capacities is denied with respect to Spota, Constant, and Heilig and granted with respect to the remaining Individual Defendants.

IV.   The ADA Claims

    A.   Plaintiff's *Prima Facie* Case of Discrimination

The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability . . . in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). Claims of unlawful employment discrimination under the ADA also may be analyzed

under the *McDonnell Douglas* burden-shifting framework.  *See*, *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003); *Stolpner v. New York Univ. Lutheran Med. Ctr.*, 2018 WL 4697279, at *21 (E.D.N.Y. Sept. 29, 2018).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: 1) her employer is subject to the ADA; 2) she is disabled within the meaning of the ADA or perceived to be so by her employer; 3) she otherwise was qualified to perform the essential functions of the job with or without reasonable accommodation; and 4) she suffered an adverse employment action because of her disability.  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).  As to the second factor, the Supreme Court has articulated a three-pronged test that tracks the language of the statute to decide if an individual is disabled within the meaning of the ADA.  *See*, 42 U.S.C. § 12102(1).  First, the plaintiff must show that her condition constitutes a physical or mental impairment.  Second, the life activity the plaintiff claims has been limited by the physical or mental impairment must qualify as a "major life activity" under the ADA.  Finally, the mental or physical impairment must form a substantial limit on the individual's participation in the major life activity.  *See*, *Petrone v. Hampton Bays Union Free Sch. Dist.*, 2013 WL 3491057, at *19 (E.D.N.Y. July 10, 2013), *aff'd*, 568 F. App'x 5 (2d Cir. 2014) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631–639 (1998)).

As to the first element of the *prima facie* case, there is no dispute that the DA's Office is subject to the ADA.  As to the second element of the *prima facie* case, Plaintiff has established that she is disabled under the ADA as amended by the ADA Amendments Act of 2008.  Regulations promulgated by the Equal Employment Opportunity Commission ("EEOC Regulations") are accorded "great deference."  *See*, *Anderson v. Nat'l Grid, PLC*, 93 F. Supp.3d 120, 133 (E.D.N.Y. 2015) (citing *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997)).

These regulations state that it should be "easily concluded" that "bipolar disorder" is an impairment that limits the major life activity of "brain function."  29 C.F.R. § 1630.2(j)(3)(iii).

While Plaintiff does not indicate the specific life activity that has been limited by her bipolar disorder, common sense dictates that a reasonable juror can conclude that "brain function" is a prerequisite for carrying out the responsibilities of an Assistant DA.  The EEOC Regulations provide that the Court may not consider whether the impairment of bipolar disorder substantially limits Plaintiff's brain function and, in turn, her performance as an Assistant DA, when the condition is treated with prescription medication because "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," including the use of medication. 29 C.F.R. § 1630.2(j)(1)(vi), (5)(i).  In accord with the EEOC's admonition that the phrase "substantially limits" in the definition of "disability" be "construed broadly in favor of expansive coverage," and that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis," the Court concludes that Plaintiff is disabled under the ADA.  29 C.F.R. § 1630.2(j)(1).

For the reasons discussed above in Section I(A)(1), Plaintiff was qualified to perform the essential functions of an Assistant DA.  Accordingly, the third element of her *prima facie* case is satisfied.  As to the fourth element of her *prima facie* case, the relatively close temporal proximity between Defendants' learning of Plaintiff's hospitalization and diagnosis with bipolar disorder and Plaintiff's termination is sufficient to raise an inference that she was terminated because of her disability.

The DA's Office was informed on or around November 20, 2012 that Plaintiff had been admitted to a medical center, after suffering a nervous breakdown, and on or around December 14,

2012 was notified that Plaintiff had been diagnosed with Bipolar II Disorder.  Pl. Counter 56.1 Stmt. ¶¶ 99–100.  Constant testified that she knew Plaintiff was receiving treatment for mental health issues when she sent the January 8, 2013 letter to Plaintiff inquiring about her ability to perform her job functions.  Constant Dep. at 129:20–21.  Kelly testified that she learned of Plaintiff's bipolar diagnosis early in Plaintiff's tenure at the MCB and declared in her affidavit that Plaintiff informed Kelly of her illness on May 16, 2013.  Kelly Dep. at 135:8–16; Affidavit of Kerriann Kelly, Dkt. Entry No. 80, at 7.  Most of the problems relating to Plaintiff's performance that are reflected in the undisputed factual record occurred between Plaintiff's return from medical leave on January 11, 2013 and her termination on July 16, 2013.

The Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated" to show a causal connection between revelation of a protected characteristic and an adverse employment action.  *See*, *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001).  However, the approximately six-month period at issue here does not foreclose the inference of such a relationship for purposes of Plaintiff's *prima facie* case.  *See*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]e have previously held that five months is not too long to find [a] causal relationship.") (citing *Gorman-Bakos*, 252 F.3d at 555); *Behringer v. Lavelle Sch. for Blind*, 2010 WL 5158644, at *11 (S.D.N.Y. Dec. 17, 2010) (finding inference of discrimination where plaintiff was terminated eight months after disclosing disability); *But see*, *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (collecting cases).  The timeline of Plaintiff's medical leave for mental health treatment, followed by the unusual

performance evaluation process, increased tensions with her supervisors after her return to work, that concluded shortly thereafter with her termination, is sufficient to carry Plaintiff's minimal burden at the *prima facie* stage.

### B.   Defendants' Legitimate Reason for Plaintiff's Termination

For the same reasons discussed in the context of Plaintiff's Title VII and Section 1983 claims in Section I(B), above, Defendants have articulated a non-discriminatory reason for Plaintiff's termination, to wit, trust issues generated by Plaintiff's dishonesty to one of her supervisors and her deficient performance on a number of occasions.  The burden thus shifts to Plaintiff to produce evidence sufficient to allow a reasonable jury to conclude, by a preponderance of the evidence, that Plaintiff's disability was a motivating factor behind her termination.

### C.   Plaintiff's Evidence of Pretext as to Disability Discrimination

Plaintiff has not adduced evidence sufficient for a reasonable jury to conclude that her termination was motivated, in part, by unlawful disability discrimination.  As evidence of disability discrimination, Plaintiff asserts that, prior to returning from medical leave, she was required to submit a doctor's note confirming she was able to perform her job at the DA's Office, but Defendants did not request a similar note from other attorneys.  Opp'n at 25.  However, Plaintiff concedes that submission of such a note was standard DA's Office policy and cites no evidence in support of her claim that the policy was not enforced as to any other attorneys who had taken medical leave.  Pl. 56.1 Stmt. ¶ 23.  Constant testified that the policy of requiring attorneys returning from medical leave to submit a doctor's note had been applied in all prior instances.  Constant Dep. at 147:4–11.  Constant's deposition testimony suggests that she previously had not sent a letter "of this length and detail" describing the duties of an Assistant DA to someone on medical leave, but there is no indication in the summary judgment record that Constant's

description of the job was overstated or inaccurate. *See*, *Id.* at 147:21–148:4. Even if Constant's letter described Plaintiff's duties in more detail than letters she had written to other Assistant DAs, this fact is an insufficient basis upon which to find intentional discrimination based on Plaintiff's disability.

Attempting to identify comparator based evidence for her disability discrimination claim, Plaintiff alleges that, in contrast to her treatment, a Caucasian female Assistant DA who took leave to participate in an alcohol addiction rehabilitation program was not required to submit a letter indicating that she was healthy enough to work before she could return to the DA's Office. Opp'n at 26. However, Heilig testified that the other Assistant DA was not required to submit a letter prior to returning to work because she had not taken medical leave, but rather used accumulated sick time to undergo drug treatment. Heilig Dep. at 71:5–7. Heilig testified that he had required and received letters from Assistant DAs confirming they were capable of performing their job duties when returning from medical leave on numerous other occasions. *Id.* at 69:23–70:5. Plaintiff offered no evidence rebutting this testimony.

Plaintiff also alleges that she was subject to enhanced scrutiny upon her return from medical leave in support of her claim of disability discrimination. *See*, Opp'n at 25–26. She claims, for example, that Heilig told Plaintiff's MCB supervisors to "keep an eye" on her, and Kelly, Clifford, and Constant accordingly took notes on Plaintiff's performance. However, Plaintiff had just been transferred from the ECB, and it is undisputed that she had some performance issues there. 56.1 Stmt. ¶¶ 31, 43–44. Heilig testified that he wanted Plaintiff's supervisors to "keep an eye on her" to "evaluate her effectiveness as an assistant district attorney similar to the way they would do it for any other Assistant DA transferred to a new bureau." Heilig Dep. at 37:3–15. Kelly testified that she takes notes on all Assistants who work for her, and

Constant testified that she had seen Clifford take notes on the Assistants she supervised.  Kelly Dep. at 76:17–77:3; Constant Dep. at 247:19–248:12.  Supervisors are entitled to monitor their employees and there is no evidence that Plaintiff's supervisors treated her differently than any other similarly situated Assistant DA in doing so.

The only colorable argument posited by Plaintiff in support of her disability discrimination claim is that her "alleged job performance issues mysteriously arose in 2012 and were not put in writing until early 2013 when Defendants Heilig and Spota determined to conduct written evaluations for the first and last time."  Opp'n at 24.  This temporal proximity argument was sufficient to meet Plaintiff's minimal burden at the *prima facie* stage, but, standing alone, it is an insufficient basis for a reasonable jury to conclude that Plaintiff was the victim of intentional disability discrimination.  *See*, *Kennebrew v. New York City Hous. Auth.*, 2002 WL 265120, at *16 (S.D.N.Y. Feb. 26, 2002) ("While timing may be sufficient to establish an inference of discrimination, the close proximity of a termination to the plaintiff's announcement of [a disability] alone is insufficient to demonstrate a pretext."); *Kerman-Mastour v. Fin. Indus. Regul. Auth., Inc.*, 814 F. Supp.2d 355, 371 (S.D.N.Y. 2011) ("[T]emporal closeness gives rise only to a weak inference of discriminatory intent even with respect to an employee's termination."); *Verga v. Emergency Ambulance Serv., Inc.*, 2014 WL 6473515, at *5 (E.D.N.Y. Nov. 18, 2014) ("While temporal proximity of the comments and the adverse action alone may still be sufficient at the *prima facie* stage, it is not sufficient at the pretext stage.") (internal quotation omitted).  More is required for a reasonable jury to conclude that Plaintiff was the subject of discrimination based on her disability.  *See*, *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) (finding that "where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent,

the causal relationship is not established."); *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp.2d 142, 152 (S.D.N.Y.2008) (temporal proximity alone insufficient to establish pretext).

With no valid comparator evidence in the ADA context, only the timing of her termination to raise an inference of discrimination based on her disability, and a legitimate non-discriminatory rationale for the adverse employment action against her, Plaintiff has not alleged evidence sufficient for a reasonable jury to conclude she was the subject of intentional discrimination based on her disability.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's ADA claims is granted.

V.      The Failure to Promote Claims Under Section 1983 and the ADA

To establish a *prima facie* claim based on a failure to promote, Plaintiff must show that the circumstances surrounding the failure to promote give rise to an inference of discrimination.  *See*, *Fletcher v. ABM Bldg. Value*, 2018 WL 1801310, at *8 (S.D.N.Y. Mar. 28, 2018), *aff'd*, 775 F. App'x 8 (2d Cir. 2019) (quoting *Mandell*, 316 F.3d at 378).  When failure to promote claims are founded upon a reference to comparators, Plaintiff and the comparators must "share a sufficient amount of significant employment characteristics," including "similarities in seniority, performance, and specific work duties."  *Fletcher*, 2018 WL 1801310, at *10 (quoting *Bush v. Fordham Univ.*, 452 F. Supp.2d 394, 410 (S.D.N.Y. 2006)).

Plaintiff identifies five Assistant DAs who allegedly were less qualified and spent less time in the CAB than she before being promoted, but offers no support for her claim other than her own testimony.  Pl. Counter 56.1 Stmt. ¶¶ 49, 56, 60, 61.  Plaintiff has produced no evidence as to the qualifications or performance of these attorneys.  Therefore, Plaintiff has failed to allege facts sufficient to establish that she shares a sufficient amount of significant employment characteristics with the other Assistant DAs with whom she seeks to compare herself.

Moreover, courts within the Second Circuit have held that allegations of a failure to promote *quickly* do not establish an adverse employment action and, thus, fail to allege unlawful discrimination. *See, e.g.*, *Jeffrey v. Montefiore Med. Ctr.*, 2013 WL 5434635, at *20 (S.D.N.Y. Sept. 27, 2013) ("[I]t is a *failure* to promote, not a failure to *quickly* promote that makes an employment action materially adverse.") (emphasis in original); *Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *14 (S.D.N.Y. Mar. 31, 2014), *report and recommendation adopted as modified*, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014) ("plaintiff's failure-to-promote claim cannot survive a motion to dismiss because of the simple fact that plaintiff actually received a promotion"); *Davis v. City Univ. of New York*, 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996) ("The eventual grant of tenure and a promotion to [plaintiff], even if after a delay, and even if that delay were due to discrimination or retaliation, contradicts her claim that she suffered a materially adverse change."). In fact, Plaintiff was promoted from the CAB to the ECB, and later went on to another felony bureau, the MCB.

Plaintiff has not produced evidence supporting an inference of discrimination in Defendants' failure to promote her more quickly out of the CAB and thus fails to establish a *prima facie* case. Accordingly, Defendants' summary judgment motion as to Plaintiff's Section 1983 claim for failure to promote is granted.

Plaintiff's ADA claim based on a failure to promote theory also is dismissed. None of the Defendants had any reason to believe Plaintiff was disabled until November 2012, seven years into her tenure at the DA's Office and well after she was promoted out of the CAB. Consequently, Defendants' motion for summary judgment also is granted with respect to Plaintiff's failure to promote claims under the ADA.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is denied as to the Title VII race and national origin discrimination claim against the DA's Office, the Section 1983 race discrimination claim against Suffolk County, and the Section 1983 race and national origin discrimination claims against Spota, Constant, and Heilig in their personal capacities. Defendants' motion for summary judgment is granted in all other respects.

SO ORDERED.

Dated: Brooklyn, New York
        September 30, 2020

                                        _____
                                                /s/
                                        DORA L.  IRIZARRY
                                        United States District Judge